1  WALTER J. LACK, (SBN 57550)
2  STEVEN C. SHUMAN, (SBN 82828)
   **ENGSTROM, LIPSCOMB & LACK**
3  10100 SANTA MONICA BLVD., Ste. 1200
4  LOS ANGELES, CA 90067-4113
   TELEPHONE: (310) 552-3800
5  FACSIMILE: (310) 552-9434
   EMAIL: sshuman@elllaw.com
6
7  Attorney for Plaintiff RICHARD BEHFARIN

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11  RICHARD BEHFARIN, individually          CASE NO.  2:17-cv-05290-MWF-FFM
    and on behalf of a class of similarly
12  situated individuals,                   [Hon. Michael W. Fitzgerald, Judge]

13                                          **DECLARATION OF STEVEN C.**
                 Plaintiffs,                **SHUMAN IN SUPPORT OF**
14                                          **MOTION FOR FINAL**
                                            **CERTIFICATION OF**
15  vs.                                     **SETTLEMENT CLASS AND FINAL**
                                            **APPROVAL OF PROPOSED**
16                                          **NATIONWIDE CLASS**
    PRUCO LIFE INSURANCE                    **SETTLEMENT AGREEMENT,**
17  COMPANY, THE PRUDENTIAL                 **AND APPROVAL OF NOTICE**
    INSURANCE COMPANY OF                    **UNDER FED. R. CIV.P. 23(e) AND**
18  AMERICA, PRUCO LIFE                     **(g) AND IN SUPPORT OF MOTION**
                                            **FOR ATTORNEYS' FEES, COSTS**
19  INSURANCE COMPANY OF NEW                **AND EXPENSES AND INCENTIVE**
    JERSEY, and DOES 1-10, inclusive,       **AWARD FOR CLASS**
20                                          **REPRESENTATIVE**
21               Defendants.
                                            [Filed concurrently with Notice of Motion
22                                          and Motion for Final Certification of
                                            Settlement Class and Final Approval of
23                                          Proposed Nationwide Class Settlement
                                            Agreement and Approval of Notice Under
24                                          Fed. R. Civ. P. 23(e) and (g), and Notice of
                                            Motion and Motion for Attorneys' Fees;
25                                          Declaration of Richard Behfarin, and
                                            [Proposed Order]
26
27                                          **Hearing Date;**      April 20,2020
                                            **Time:**              10:00 a.m.
28                                          **Courtroom:**         5A
                                            **Complaint filed:**   7/18/17

V3:439665                          1

1.     I am an attorney licensed to practice in the State of California and I am admitted to practice in all the United States District Courts in California as well as the United States Court of Appeals for the Ninth Circuit. I have personal knowledge of the facts herein, and if called as a witness I could and would competently testify to them, except as to those stated on information and belief, and as to those facts, I believe them to be true.

2.     This Declaration is offered in support of Plaintiff's Motion for Final Approval of Nationwide Class Action Settlement and Motion for Attorney Fees and Costs and Incentive Award for Class Representative.

3.     I am a member of the law firm of Engstrom, Lipscomb & Lack, APC, one of the attorneys of record for Plaintiff Richard Behfarin ("Plaintiff").

4.     Engstrom, Lipscomb & Lack and Law Offices of Robert B. Mobasseri, PC are the law firms responsible for the prosecution of the Plaintiff's claims on behalf of the putative class against Defendants Pruco Life Insurance Company ("PRUCO"), The Prudential Insurance Company of America and Pruco Life Insurance Company of New Jersey. I refer to these two law firms as "Class Counsel" following this Court's November 26, 2019 Order appointing us to serve in that capacity. [Dkt 87] I collectively refer to the three life insurers listed here as Defendants.

## PRACTICE BACKGROUND

5.     I earned my law degree at University of California, Los Angeles in 1978 and I was admitted to the California State Bar that year. I am licensed to practice law in California and I have been admitted to practice in the following Courts: Ninth Circuit Court of Appeals, Central District of California, Southern District of California, Northern District of California and Eastern District of California.

6.     I have over 40 years of experience as an attorney working at Engstrom, Lipscomb & Lack. I have extensive experience working in the areas of business torts,

V3:439665

2

insurance bad faith, life insurance matters that arose out of failure to pay death benefits and that arose out of contract breaches and torts other than just failure to pay death benefit claims, mass actions, and other complex litigation.

7.    Among the mass and class action cases on which our firm has served as class counsel, lead or co-lead counsel, or steering committee member are the following:

a.  In *Allegro v. State Farm Automobile Insurance Co.*, Los Angeles County Superior Court, Case Number BC126014, we represented more than 100 plaintiffs insured by the defendants for earthquake coverage.

b.  In *Austin v. I B. Stringfellow, Jr., et al.*, Riverside Superior Court, Case No. 312339, we represented 150 plaintiffs claiming personal injuries from exposure to over 34 million gallons of toxic waste dumped by defendants in an area of Riverside County.

c.  *Baldwin v. US. Financial Life Insurance Company*, Los Angeles Superior Court, Case No. BC 274077, was the lead case of five Class actions brought on behalf of California insureds who were charged a premium by their insurance company for a period of time they did not receive corresponding insurance coverage in return.  This case has been settled and received preliminary and final approval from the Court.

d.  *Natural Gas Anti-Trust Cases I, II, III & IV (Pipeline Cases)*, coordinated in San Diego County, J.C.C.P. Nos. 4221, 4224, 4226 and 4228, involved California class actions brought as a result of restraints put on California's electrical and gas market.  We worked with a small group of attorneys to achieve two $1.7 billion settlements with two sets of defendants.

e.  *The Rhulen Company, Inc. v. Canon U.S.A. Inc.,* Los Angeles County Superior Court Case Number BC 172473 involved an initial class action

V3:439665

3

brought as a result of consumers receiving a defective product.

f.  We have also been appointed California lead counsel on the MDL litigation relating to *In Re Air Crash* (C.D. Cal. 2011) 893 F.Supp.2d 1020. That case involved the crash of a McDonnell Douglas jetliner operated by SpanAir, which crashed on a runway in Madrid, killing all aboard.

g.  We serve as co-lead counsel on the California JCCP action *In Re Incretins*, JCCP No. 4574, and in that capacity we were appointed by Judges Highberger and Battaglia to serve as liaison to the Multi-District Proceedings in *In Re: Incretin-Based Therapies Products Liability Litigation*, MDL Docket No. 2452, Case No. 13-MD-2452 in the Southern District Court of California.

h.  In *Hahn v. Hanil Development Inc., et al.*, Los Angeles Superior Court, Case Number BC468669 we represented the Class Representative in a successful class action brought under the California Health Studio Services Act on behalf of athletic facility members.

i.  *Sherman v. Allstate Insurance Co.*, Los Angeles Superior Court Case Number BC187659 was prosecuted by us as a Class action brought against engineers and other "professionals" who were alleged to have conspired with Allstate in making deletions and changes to official engineering and geological reports pursuant to Allstate's directions as part of their scheme to defraud the insureds.  This case settled for approximately $5 million.

j.  *Smiley v. ICANN, et al.*, Los Angeles Superior Court Case No. BC 254659, involved a nationwide Class in which a temporary restraining order was granted enjoining defendants from conducting an illegal world-wide lottery.  This case was certified as a nationwide Class action

V3:439665

4

1   and it has settled.

2   k.  *Soufrine v. The State Life Insurance Company*, Orange County Superior

3       Court Case No. 03CC01218 was a nationwide Class action brought on

4       behalf of insureds who were charged a premium by their insurance

5       company for a period of time they did not receive corresponding

6       insurance coverage in return.  This case settled on a nationwide basis.

7   l.  *Team Design v. Reliant Energy, Inc., et. al. (Price Indexing Cases)*,

8       MDL 1566, CV-S-03-1432-PMP, C.A. No. 2:03-3644.  This was a

9       California antitrust Class action against Reliant Energy and its

10      subsidiaries and others based on the allegation that Defendants illegally

11      manipulated the California energy markets.

12  m.  *State of California v. Caremark*, Los Angeles Superior Court, CCW,

13      Case No.  BC307240, was a *qui tam* case brought on behalf of the State

14      of California against Caremark for its practices in restocking/resale of

15      prescription medications on accounts paid by the State of California.  We

16      achieved a settlement on behalf of the Relator and the State of

17      California.

18

19  n.  In *Powell v. Mattel*, United States District Court - Central District, Case

20      No. 07-ml-01897 DSF (AJWx), we prosecuted a class action against

21      Mattel and others for lead poisoning found in toys.

22  o.  In *Finseth v. Network Solutions*, United States District Court - Central

23      District, Case No. CV08-01537 PSG (VBKx), we prosecuted a class

24      action in connection with Defendants' purchase and/or retention of

25      domain names.

26  p.  In *Southern California Gas Leak JCCP & Related Cases*, Coordinated in

27      Los Angeles County, JCCP No. 4861, we have been appointed to the

28      Plaintiffs' Steering Committee in coordinated proceedings arising from

the 2015-16 Aliso Canyon gas leak in the Porter Ranch neighborhood of Los Angeles. We represent over 1,000 individuals in this matter.

8.      For decades, my colleagues and I at Engstrom, Lipscomb & Lack have represented groups and classes of individuals in mass and class action lawsuits, and have the experience and resources at our disposal to adequately and fairly represent the Class Members in this action against Defendants. We were willing to and we did devote those assets to the prosecution of this action.

9.      Over the past decade, I have handled numerous individual life insurance cases that arose out of contract breaches other than mere failure to pay benefits upon death and out of fraud claims. I have worked with several industry consultants over the years in the course of handling those cases. Through my work with those consultants and on those cases, I have become familiar with the sorts of life insurance products in the marketplace and generally how they are sold and underwritten.

10.      Mr. Behfarin's claim against PRUCO arose out of an alleged breach of contract other than a mere failure to pay benefits upon death. Rather, it arose from PRUCO's and the other Defendants' practices and policies in handling the curing of defaults and reinstatement following lapse in connection with certain types of life insurance policies. This added complexity to the case.

## THE WORK PERFORMED

11.      I recite some of the background information that may now be familiar to the Court to ensure that the information is readily at hand for the Court's consideration.

12.      Defendants historically sold universal and variable universal life insurance policies to policy owners across the United States. These policies differ from traditional term and whole life insurance policies, which have set premium payment requirements. Universal and variable universal life policies offer a flexible premium payment feature, and the policy owner assumes the risk that the premiums

V3:439665

6

paid in plus income credited or earned will cover the cost of insurance and administrative costs over the long term.  The policy owner has a planned premium payment, and premium paid, plus interest the insurer credits to the policy owner or earnings on the accumulated premium, go into a premium account, or an accumulation account.

13.    In these sorts of policies, the cost of insurance is charged monthly against the premium account at a particular rate, as are the policy charges, or "loads", consisting of premium taxes and sales and administrative costs. As long as the premium payments and credits or earnings that have accumulated into the account exceed the cost of insurance and other costs charged, the policy owner can choose to pay less than the planned premium. If a deficiency develops in the account, though, the policy owner is in default. If the policy owner does not cure the default, the policy lapses. If the policy lapses, the policy owner has the right to reinstate for a stated period of time, provided he or she and the insured comply with stated conditions.

14.    In April, 2016, I was contacted by Mr. Behfarin and his advisor, Steven Roth, who is also a life insurance industry consultant and a licensed life and disability analyst.  Together, they laid out the facts that led to the filing of the complaint.  Mr. Behfarin had received a notice from PRUCO that the policy he had acquired on his parents' lives was in default.  His attempts to cure by tendering what he believed was the contracted-for amount (at the current rates PRUCO had been charging his account) had been rebuffed.  PRUCO countered, demanding premium at its "guaranteed rate" – the maximum rate to which the contract allowed PRUCO to increase its charges.   Even when Mr. Behfarin applied for reinstatement after the policy lapsed and that amount was tendered, PRUCO declined the application for reinstatment, claiming that Mr. Behfarin's father was no longer medically qualified for the policy.

15.    Mr. Behfarin consulted Mr. Roth and they consulted me.  They supplied

the policy forms and policy exemplars and detailed history of Mr. Behfarin's efforts to have the policy reinstated. They also surmised, as did I, that this was not the first and only time a policyholder had been unable to reinstate a PRUCO policy at the current rates.

16.    I discovered from research on Mr. Behfarin's case that for Defendants' universal and variable universal life policies, when a policyholder is in default and wants to cure, and the policy does not contain a no-lapse guarantee feature or other secondary guarantee, the policyholder must pay sufficient premium to keep the policy in force for three months, which means the payment must cover the cost of insurance and the loads for three months. If the policyholder wishes to reinstate the policy after a lapse, a payment must be made of enough premium to make up any shortfall in the premium account that has accrued since the default, along with sufficient premium to keep the policy in force for three months, which again means covering the cost of insurance and the loads for three months.

17.    I did research and I caused research to be done at Engstrom, Lipscomb & Lack to determine whether PRUCO had previously litigated the interpretation of its policy language on the subject of premium required to cure or reinstate, and I also researched whether any other prominent life insurer had done so. I became familiar with other litigation in the life insurance field, but I did not find any class or individual actions making the same contentions as are made here.

18.    I also examined the publicly available financial and securities filings by PRUCO's parent to see if the entity had reported any such litigation to its shareholders or regulators. I did not find any such report.

19.    Working closely with Mr. Behfarin and Mr. Roth, and beginning in 2017, with Mr. Mobasseri, who had also been engaged by Mr. Behfarin, I drafted a class action complaint. It went through a number of revisions and by July, 2017 we were prepared to file it.

V3:439665

8

20.    On July 18, 2017, suit was filed in the District Court for the Central District of Los Angeles, alleging five causes of action:  breach of contract, breach of the implied covenant of good faith and fair dealing,  unfair competition under Bus. & Prof. code § 17200, declaratory relief, and injunctive relief.  [Dkt. No. 1]

21.    Thereafter, pursuant to stipulation, Plaintiff sought leave to file a First Amended Class Action Complaint asserting the same causes of action against Defendants The Prudential Insurance Company of America and Pruco Life Insurance Company of New Jersey.  The Court granted leave to file that Amended Class Action Complaint on October 15, 2019.

22.    The original and amended complaints were brought on behalf of a proposed class of universal and variable universal life policyholders who had been charged premiums at the guaranteed rates rather than current rates when attempting to cure a default or reinstate policies after a default notification or lapse.

23.    PRUCO answered [Dkt. No. 15] and over the following months, I engaged in a dialogue with opposing counsel, about all the procedural, factual and legal issues that arose in the day-to-day litigation.  Those discussions, while cordial, were sometimes contentious as well.

24.    Working with Messrs. Roth and Behfarin, I designed a discovery and disclosure plan aimed at identifying the policies and procedures that had led to the dispute.

25.    I engaged in the process of meeting and conferring as was required of the parties to prepare and exchange their respective Rule 26 disclosures and to discuss the parameters and scope of written discovery.

26.    I then prepared and served:

  a.    Plaintiff's First Set of Interrogatories on PRUCO;

  b.    Plaintiffs' First Set of Requests for Production to PRUCO;

  c.    Plaintiffs' Second Set of Requests for Production to PRUCO.

V3:439665

9

      d.    Plaintiff's Second Set of Interrogatories.

      e.    Plaintiff's First Set of Requests for Admission.

27.    I also noticed the deposition of PRUCO's Rule 30(b)(6) witnesses on 32 discrete topics.

28.    We engaged in Rule 26 disclosures and exchanges of information, and I prepared the exchange and the production. I also personally received and reviewed Defendants' counterpart disclosures.

29.    Plaintiffs' discovery to PRUCO was met with objections and the parties met and conferred again. In order to facilitate that discovery, the parties also negotiated the terms of a Protective Order, which was eventually entered by this Court. PRUCO insisted that the Protective Order was needed to protect its policyholder information as well as business information that it claimed was proprietary and trade secret information. We cooperated with the entry of a Protective Order, but it added a layer of complexity to the briefing and the expert work that was to come.

30.    I negotiated with defense counsel on a number of separate issues. Those included PRUCO's desired Protective Order and a method for selecting and sampling policy data from the many tens of thousands of policies sold by PRUCO. Additionally, I assisted Mr. Roth in formulating objections to a subpoena PRUCO had served on him.

31.    I also negotiated a "rolling production" of the data by PRUCO so that we would be able to receive it in a timely manner without overburdening either side.

32.    I worked with Mr. Behfarin to prepare him for his deposition and I defended that deposition alongside co-counsel.

33.    I studied every policy form that was produced by Defendants in discovery. I was able to confirm that the policies issued to Mr. Behfarin conform to others issued by Defendants in several respects. For instance, the PRUCO policies contain tables showing maximum rates that PRUCO may charge for the cost of

insurance, but PRUCO often charged less than the maximum rates. The policies only allow PRUCO to impose maximum cost of insurance rates, and only allow PRUCO to change the cost of insurance rates, for entire risk classifications, defined by age, gender or health factor, such as smokers. Payment status for an individual policyholder is not identified as a risk classification and of course, does not apply to an entire risk classification.

34.    I could find nothing in the policies to justify PRUCO's premium calculation for people seeking to cure a default or to reinstate after lapse at maximum cost of insurance rates.  Nor did I find language in the policies justifying an increase in the loads that may be assessed when calculating the three months of premium for people seeking to cure a default or reinstate after lapse.

35.    The responses to the discovery included voluminous electronic documents, as well as the policy forms, underwriting manuals, electronic data, dozens of interrogatory responses and responses to Requests to Admit, data on the class population and over 60,790 pages of documents.

36.    Messrs. Mobasseri, Roth and I studied those responses and productions with great care.  There was considerable duplication in the production, which actually expanded the job of reviewing, because in many instances it became necessary to locate other versions of the same document produced to compare for possible changes.

37.    After some extensive meet and confer efforts, conducted through both oral discussions and written correspondence, PRUCO agreed to produce a sampling of 120 redacted policyholder files selected by way of a random number generator process that would produce policies with a broad range of death benefits, and we agreed to proceed by examining those policyholder files as a representative sampling.

38.    I interviewed a number of industry experts and studied their qualifications and publications.  We selected insurance and actuarial expert Ted

1  Affleck, who received Defendants productions that were being delivered to me on a
2  rolling basis.

3      39.    Pursuant to an analytical model he devised, Mr. Affleck undertook a
4  step-by-step analysis of what Plaintiff had been charged and contrasted it to what the
5  contract called for.  He repeated the same process for the policy files produced by
6  PRUCO and performed that same step-by-step analysis for a substantial number of
7  other policyholders.  Many, but not all, had been charged at rates higher than the
8  current rates applicable at the time to cure defaults.

9      40.    I worked closely with Mr. Affleck in an elicitation process to develop
10  and supply to the Court opinions that met the requirements for expert opinions.
11  [Declaration of Theodore E. Affleck, Sept. 28. 2018, Dkt. No. 36-2.]

12      41.    We also secured Defendants' policy forms in use, the reinstatement
13  provisions in those policies, the underwriting manuals, and underwriting guidelines,
14  some of which we concluded upon examination had internally codified the practice
15  over which we were suing, namely using maximum rates rather than current rates to
16  calculate premium due to cure defaults or reinstate when the contracts themselves did
17  not provide for or allow for that.

18      42.    I researched, drafted and revised a Motion for Class Certification, along
19  with the supporting declaration and 260 pages of sealed exhibits.  On September 28,
20  2018, that motion was filed, seeking class certification and appointment of a class
21  representative and class counsel.  [Dkt. 36.]  Because of the Protective Order, we had
22  to carefully prepare and file a redacted version of the Motion for Class Certification,
23  along with redacted versions of the Declarations of Theodore E. Affleck and myself.
24  [Dkt. No. 35, 35-1, and 35-2]

25      43.    During the meet and confer process leading up to the class certification
26  motion and the related sealing aspects of that motion, the parties began to discuss the
27  possibility of a mediated resolution of the dispute.

28      44.    Over the course of the following weeks, the parties exchanged thoughts

V3:439665                                12

1    about the goals of a mediation and potential mediators.

2        45.    On the parties' application, this Court modified the schedule for hearing

3    on and briefing opposition to the Class Certification Motion, to permit the parties to

4    explore a mediated resolution before the parties incurred further significant expense

5    litigating.  The Motion filed September 28, 2018 was not heard.

6        46.    The parties continued to confer and eventually agreed to attempt a

7    mediation, and after discussing several candidates, selected a mediator at JAMS with

8    experience mediating multiple class actions, the Hon. William J. Cahill (Ret.).

9    **MEDIATION AND THE RISK, EXPENSE AND COMPLEXITY OF THE**

10    **LITIGATION**

11        47.    The Hon. William J. Cahill (Ret.) presided as a neutral mediator over

12    three long days of face-to-face negotiations, with more dates of telephone conference

13    and one-to-one sessions with the Judge.  Those negotiations were sometimes

14    contentious and often frustrating because of the zealous convictions of each side to its

15    position on the issues and because the issues themselves were complex.

16        48.    In advance of the mediation, I prepared, with the assistance of Messrs.

17    Behfarin, Roth and Mobaserri, a 25-page mediation brief, accompanied by 150 pages

18    of exhibits.

19        49.    Acting in my capacity as putative Class Counsel, I actively and

20    continuously represented the Settlement Class Members throughout the settlement

21    negotiations.  I was accompanied at the entire mediation by my co-counsel, Robert

22    Mobasseri, and by our life insurance consultant, Steven Roth, as well as by Mr.

23    Behfarin, who himself had been a licensed life agent at the time he procured his

24    policy.

25        50.    In addition to the discovery listed above, our investigation in advance of

26    and to prepare for the mediation also encompassed a survey of other class actions

27    involving life insurance policies and reinstatement issues.  We familiarized ourselves

28    with a number of other class action proceedings and the outcome of those

V3:439665

1   proceedings.

2       51.   We consulted with a highly-experienced life insurance underwriting

3   consultant, Mr. Affleck and together interviewed industry professionals who work

4   with these products.  The consultant prepared a model to analyze the rate structures

5   for current rates and the maximum rates charged for reinstatement.

6       52.   We took those steps in order to be fully informed and prepared at the

7   mediation, and so that Plaintiff Richard Behfarin would be well prepared to

8   participate.

9       53.   Plaintiff Richard Behfarin and consultant Steven Roth attended every

10  mediation session and zealously advocated for the class at each session.  Both directly

11  engaged with Judge Cahill throughout the proceedings.

12      54.   Even before the in-person sessions with Judge Cahill, I made or was part

13  of a series of calls and conversations to stage the process so that it would efficiently

14  address the issues.

15      55.   The first full-day mediation session before Judge Cahill took place on

16  January 25, 2019 but no agreement was reached at that time.

17      56.   A second full-day session followed, on February 20, 2019.  I then

18  participated in conference calls with Judge Cahill on March 1, 2019 and April 26,

19  2019.

20      57.   The proceedings were sometimes contentious and the mediation process

21  very nearly derailed at one point; Judge Cahill was able to persuade the parties to

22  resume negotiations after a series of weekend telephone calls, with the help of some

23  creative ideas by Mr. Mobasseri to help resolve the impasse that had developed.

24      58.   In the days and weeks between sessions, I engaged in countless calls and

25  conversations with opposing counsel, Judge Cahill, and, of course, Messrs. Behfarin,

26  Roth and Mobasseri to discuss the options and to assess the risks and benefits of

27  going forward.

28      59.   During the last session at JAMS on April 30, 2019 the parties at last

V3:439665

14

reached an agreement in principle and, working well into the evening, were able to finalize a written term sheet with Judge Cahill's guidance.

60.    The parties then devoted substantial efforts to the negotiation and preparation of the necessary settlement documentation, which included without limitation, the Stipulation of Settlement, the Class Notice (both postcard and website), Claim Forms for the different categories of relief, a non-disclosure agreement and contract with the Settlement Administrator, Guidelines for the Settlement Administrator, and other materials required to administer the settlement.

61.    The result was a settlement that was finally presented to the Court in the Motion for Preliminary Certification of Settlement Class, Appointment of Class Representative and Class Counsel, Preliminary Approval of Class Action Settlement and Direction of Notice.  [Dkt. No. 74]

62.    Before entering into the Stipulation for Settlement, I conducted a thorough investigation and evaluation of the relevant law, the facts, allegations and defenses to assess the merits of the claims, and to ensure the appropriateness of class certification and the legal and factual grounds for doing so.

63.    Mr. Mobasseri and I familiarized ourselves with the risks posed by continued litigation of this matter.  One risk was that posed by the inevitable battle of experts, with the Parties advancing competing insurance practices and actuarial analyses.  Plaintiff's experts were prepared to show that Defendants charged exorbitant reinstatement fees to punish policyholders whose policies had gone into default while the defense experts were likely to contend that Defendants were within their rights by contract and regulatory law to bill the insurance costs that had to be paid to cure defaults and reinstate policies at the maximum rates rather than at current rates as we contend is required.  While we were confident we had the better side of that argument, this posed a litigation risk. That issue posed a risk to the case as a whole, to Mr. Behfarin's claims individually and, of course, it posed a risk to counsel working on a contingent fee basis.

V3:439665

15

64.    We also recognized a risk that the class would not be certified due to differing reasons for policyholders to lapse their policies.  Because the reasons for lapse varied from person to person, we recognized that there was a risk that class certification in a contested proceeding might be denied.

65.    We carefully balanced the strength of the Settlement Class Members' claims and the relevant litigation risks and concluded that the Settlement is an exceptional result because it provides significant benefits to the Class.  Every qualified Settlement Class Member with a living insured will get substantial relief by way of reinstatement without medical or other underwriting, effective with no retroactive premium during the period of lapse, or can elect a minimum cash recovery, and Class Members whose insureds are deceased will receive a settlement payment based on a percentage of the death benefit under the lapsed policy or the minimum cash recovery.

66.    By settling on the particular terms negotiated with respect to these two categories of Class Members, the parties were also able to focus relief on those actually affected negatively by the practice sued upon, thus largely eliminating the causation issue Defendants planned to assert to oppose certification.

67.    Current universal and variable universal policyholders also will benefit from the Defendants' agreement not to engage in the practice over which we have sued, a very substantial item of additional relief achieved through the settlement.  I will discuss the operative terms of the settlement in greater detail below.

68.    Because we did our homework, we were confident that the Settlement Class Members' claims were factually and legally strong and were well-developed through discovery and expert analysis.  We therefore negotiated the settlement from a position of strength. The results achieved by the settlement reflect these strengths. For the Court's convenience, the final Stipulation of Settlement and Release is attached hereto as Exhibit 1.

69.    I believe that the Settlement is fair, reasonable and adequate under the

16

1    circumstances.

2        70.   I prepared the Motion for Preliminary Certification of Settlement Class,

3    Appointment of Class Representative and Class, Counsel, Preliminary Approval of

4    Class Action Settlement and Direction of Notice. [Dkt. No. 74] Defendants filed a

5    Notice of Non-Opposition [Dkt. No. 83] and I attended oral argument before this

6    Court on November 18, 2019.

7        71.   On November 26, 2019, this Court issued its Order granting the Motion,

8    preliminarily approving the Settlement, appointing Class Counsel and a Class

9    Representative and approving the plan of dissemination of notice, among other things.

10    [Dkt. No. 87]

11        72.   Following that Order, the Settlement Plan moved to the implementation

12    phase. I participated in the training sessions with Epiq, the Settlement Administrator

13    that would be implementing the terms of the Settlement, and I am receiving, reading

14    and asking questions about the administration of the Notice Plan and the Settlement

15    itself.

16    **KEY FEATURES OF THE SETTLEMENT**

17        73.   The Court is by now familiar with the terms of the Settlement, and with

18    the benefits that the Settlement provides for the Class. It affords immediate, crucial

19    economic benefits to current and former policyholders of thousands of policies who

20    were subjected to Defendants' challenged reinstatement practices.

21        74.   The three main categories of relief depend on the status of the Settlement

22    Class Member. They are summarized here:

23           a.  "Lapsed/Alive Population" – those persons associated with Class

24               Policies that lapsed for a final time during the Class Period and have not

25               been reinstated where there is at least one living insured. Those

26               qualifying Class Members may reinstate on the same terms as existed at

27               the time of final lapse, at the "Current Rate" as of the date of

28               reinstatement, without medical or other underwriting. This will return

them to the status quo, and for them, it is complete relief.  Within this group are Class Members who may claim an "enhanced" level of relief consisting of premium forgiveness in years 4 and 5 after reinstatement. Claimants for whom Defendants' records show previous attempted, but unsuccessful, efforts to reinstate and whose policies are in force three years after reinstatement pursuant to the Settlement are entitled to this enhanced relief;

b. "Lapsed/Deceased Population" – those persons who owned or had a beneficial interest in policies that lapsed for a final time during the Class Period and were not reinstated where the insured(s) are deceased.  These Class Members will recover an individualized monetary Settlement Payment calculated by a Claim Scoring Process administered by the Claims Administrator.   The values of these Settlement Payments will range from a "basic payment" of $250 to 75% of the policy death benefit, reduced by a corresponding percentage of the premium to date of death, plus interest at 3% from the date of death.

c. Future relief for the benefit of all current universal and variable universal policyholders consisting of an end to the challenged business practices and installation of policies and procedures to ensure that the amount billed to cure a default or to reinstate a policy will be calculated based on current rates, and not by reference to Guaranteed Rates.

75.    The Settlement implementation is now well underway.  I have received periodic communications from the representatives of Epiq Class Action and Mass Tort Solutions ("Epiq"), the Claims Administrator, which has supplied reports on the mailing of Notice to policyholders and beneficiaries, the most recent of which shows a total of 45,489 unique policy numbers representing 46,716 policyowners and beneficiaries.  I attach as Exhibit 2 a true copy of a January 27, 2020 e-mail from Epiq setting forth these figures, and a breakdown of them by category, as part of the

V3:439665

18

1    most recent report on the notice process.  I attach as Exhibit 3 a true copy of a

2    February 5, 2020 e-mail I received from Epiq showing actual claims activity, and

3    specifically that Epiq has received 690 claims under the Settlement already, as well as

4    a true copy of the latest communications report from Epiq concerning "hits" on the

5    Settlement website and downloading of claim forms.  The report does not encompass

6    claim forms mailed to Class members.

7         76.    Because so much of the Settlement's value is in the opportunity to Class

8    Members to reinstate policies that had lapsed, I engaged Actuarial Strategies to assist

9    us in putting a present value on the benefits for purposes of demonstrating to this

10   Court that the Settlement is worthy of final approval and showing the value of the

11   benefit achieved for the Class.  Attached hereto as Exhibit 4 is a true and correct copy

12   of the report of Cary Lakenbach, President of Actuarial Strategies, demonstrating the

13   estimated present value of the settlement based on assumptions that are stated in the

14   report, and broken into component parts for the settlement groups described above.

15   **REASONABLENESS OF THE REQUESTED ATTORNEY'S FEES**

16        77.    I actively participated in the prosecution of the litigation of this action

17   every single step of the way.  I made every effort to do so efficiently and to divide the

18   work, where feasible, with Mr. Mobasseri in such a way that we did not duplicate our

19   efforts.

20        78.    Before agreeing to represent Mr. Behfarin and the proposed class in this

21   action, my partners and I carefully weighed the risks and benefits of this litigation.

22   We fully expected that Defendants, among the biggest insurers in the world, would

23   vigorously defend its conduct and that overcoming its defenses, certifying a class and

24   ultimately prevailing at trial would be time-consuming and difficult.  We recognized

25   that taking on this case represented a significant investment of time and money by my

26   firm.

27        79.    Mr. Behfarin was not in a position to retain counsel for such an

28   undertaking on an hourly basis, so my firm agreed to represent him and the proposed

class on a contingency basis, meaning that we would only be paid for our efforts if successful in recovering damages –either through settlement or judgment – from Defendants.

80.    My partners and I understood that there was a very real possibility that we would never be able to recoup our investment of time and money in this case for the reasons I identified above – risks inherent in this litigation and all the other risks posed by litigation.

81.    I also understood that even if we were able to prevail and to recoup our investment of time and money, there would necessarily be a delay, potentially many years, between the time the expenditures were made by my firm and the time that we were paid.  Because of the real risk of obtaining no payment, the certainty that payment would be delayed and the large investment of time and money required, we would not have agreed to represent plaintiff and the proposed class on a pure hourly basis.  Those same factors incentivized us to be as economical as possible in incurring costs, consistent with aggressive representation of the putative class.

82.    Defendants devoted significant resources to this litigation, including hiring aggressive and skilled attorneys who provided a tenacious defense.  We knew that prevailing and ultimately collecting a recovery was uncertain, particularly in light of the novelty and complexity of the issues and the potential impediments to class certification I discuss above.  We accepted and proceeded with this litigation in the face of this uncertainty, agreeing to undertake this litigation on a wholly contingent basis and thereby initiating complex, expensive and lengthy litigation, with no guarantee of compensation for the significant amount of time, money and effort that we were prepared to and did invest to prosecute the case.

83.    By pursuing this litigation and devoting the significant resources that this litigation demanded, my firm and I necessarily had to forego developing and working on other cases available to us.

84.    Prevailing and ultimately collecting any recovery from Defendants was

never certain, as we would first have to satisfy a number of challenging thresholds, from pleading and proof issues, to causation and certification and establishing liability at trial. Class counsel are requesting fees of $3,500,000, which is a figure Defendants agreed to pay above and beyond the various types of relief described above as part of a negotiation that took place following agreement on the Class Settlement. My firm's and my and Mr. Mobasseri's contingency risk supports the requested fees.

85.    The value of the Settlement, as conservatively calculated by Actuarial Strategies, is in the range of $19,562,792 to $93,249,879. Even at the most conservative low end of that range, a fee of $3.5 million represents only 17.89% of the value of the Settlement, when costs, administration expenses and the uncontested fee value itself is included as part of the total settlement value.

86.    For purposes of a lodestar cross check, I also personally reviewed the time records of all the participating professionals at my office and can attest that they are reasonable as to the time spent, work allocation and totals, as well as being absolutely necessary to achieve the settlement in this case. As of January 3, 2020, my firm's attorneys and professional support staff devoted a total of 685 hours of professional time to the prosecution of this action.

87.    Because those time records contain attorney work product and reflect many privileged communications, I do not make them part of this record, but summarize the work done into segments. I will make the time records themselves available to the Court should it wish to conduct an *in-camera* review.

88.    I have researched the bases used by courts for determining reasonable hourly rates in the community for the type of work involved when courts are called upon to award attorney fees. I found several cases sanctioning, although not requiring, the use of the Laffey Matrix adjusted by means of the federal Locality Pay Map. The Laffey Matrix, so named because of the case in which it originated, is a set of attorney fees based on the years of experience since law school that the particular

attorney has. It was put out by the United States Department of Justice for the Washington, D.C.—Baltimore, Maryland-Arlington, Virginia area.  Since it originated, it has been adjusted for inflation by the Consumer Price Index, and adjusted for locale by the Locality Pay Map put out by the United States General Services Administration's Office of Personnel Management.  The locality adjustment is performed by multiplying the applicable hourly rate shown on the Laffey Matrix by the difference between the pay adjustment percentages of the Washington, D.C./Baltimore/Arlington locale and the locale in which the litigation is pending.

89.     Attached as Exhibit 5 is a true and correct copy of the Laffey Matrix going back to 1995, which I downloaded from http://www.laffeymatrix.com/see.html. For the period of 6/1/16-5/31/17, the chart reflects an hourly rate of $826 for attorneys with more than 20 years experience.  Most of the attorneys working on this matter—myself and Elizabeth Crooke from our office and Robert Mobasseri—fall into this category.  For the period of 6/1/17-5/31/18, the chart reflects an hourly rate of $864 for attorneys with more than 20 years experience.  The following year rate is $894 for attorneys with more than 20 years experience.  For 6/1/19-5/31/20, the rate is $899 for attorneys with that experience.  Mr. Mobasseri also had an associate, Barbara Rohr, a nine-year lawyer, do some work on the file.  The chart reflects an hourly rate for her of $658 for 6/1/18-5/31/19.

90.     Attached as Exhibit 6 is a true and correct copy of the General Schedule Locality Pay Maps for 2017-2019 published by the General Services Administration, which I downloaded from https://www.federalpay.org/gs/locality.   The Locality Pay Maps include Pay Adjustment percentages for Los Angeles-Long Beach, California, as well as Washington, D. C.—Baltimore-Arlington.  For 2019, the Pay Adjustment percentage for Los Angeles-Long Beach is 31.47%.  For Washington, D.C.—Baltimore—Arlington, the Pay Adjustment percentage is 29.32%.  The differential in those two percentages is 2.15%.  Multiplying the $894 hourly rate by 1.0215 to adjust for the Los Angeles locale yields an hourly rate of $913 in the first half of 2019 and

multiplying the $899 hourly rate by 1.0215 results in an hourly rate of $918 for the last 7 months, when the certification work was all accomplished.   For 2018, the Pay Adjustment Percentage for Los Angeles-Long Beach is 30.57% and for Washington, D.C.—Baltimore-Arlington is 28.22%, resulting in a differential of 2.35%, so the hourly rate for the first portion of 2018 is $884 and for the latter part of 2018 is $915. A similar calculation for 2017 yields a differential of 2.55%.  Multiplying the $826 hourly rate for the first part of 2017 by 1.0255 gives an hourly rate of $847 for that year.  Multiplying the $864 hourly rate for the later portion of 2017 by 1.0255 yields an hourly rate of $886.  We apply those rates in the tables below, and make the same adjustments for other professionals depicted there.

91.     Paralegal rates are also reflected in the Laffey Matrix and for the time period described here, range from $196 to $203 per hour, before application of the Locality adjustment, which raises the range to $201 to $207.

92.     I have been awarded fees calculated on this basis for my legal services in other matters.

93.     From April 2016 to January 3, 2020, hours worked by professionals at Engstrom, Lipscomb & Lack generally can be broken down as follows:

   a.  Initial client interview, file review, intake and case assessment (April, 2016 – May, 2017:

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Steven C. Shuman (partner) | 49.5 | $847 | $41,927 |
| *Total:* | | | $41,927 |

   b.  Data collection and research with consultant for preparation of the complaint to meet Rule 23 requirements, preparation and filing of Complaint (June, 2017 – July, 2017):

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Steven C. Shuman (partner) | 37.3 | $886 | $33,048 |
| Eric Greshler (paralegal) | 4.1 | $201 | $824 |
| *Total:* | | | $33,872 |

c. Initiating dialogue with defense counsel, designing and implementing discovery plan and Rule 26 disclosures, depositions and meeting and conferring with Defense counsel; identifying and working with consultants and experts to ensure sufficient information is supplied for reliable opinions (August, 2017 – September 2018):

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Steven C. Shuman (partner) (2017-2018 rate) | 65.8 | $886 | $58,299 |
| Steven C. Shuman (partner) (2018-2019 rate) | 92.0 | $915 | $84,180 |
| Elizabeth Crooke (partner) (2017-2018 rate) | 1.0 | $886 | $886 |
| Elizabeth Crooke (partner) (2018-2019 rate) | 11.1 | $915 | $10,156 |
| Nima Rajamand (paralegal) | 6.0 | $207 | $1,242 |
| *Total:* | | | $154,763 |

d. Drafting Motion to Certify Class, declarations and exhibits, and meeting and conferring before and after; filing motion under seal (September, 2018—December 2018)

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| Steven C. Shuman (partner) | 63.4 | $915 | $58,011 |

V3:439665

24

| Elizabeth Crooke (partner) | 9.7 | $915 | $8,876 |
| Dawn Fuentes (paralegal) | 3 | $207 | $621 |
| *Total:* | | | $67,508 |

e. Preparing for and participating in multi-session mediation, drafting and finalizing Stipulation for Settlement, Class Notices, screening rules, gating rules, and other settlement requirements; Certification and Preliminary Approval motion (December 2018 —January 3, 2020)

| Name | Hours | Rate | Total |
|---|---|---|---|
| Steven C. Shuman (partner) (2018-2019 rate) | 97.9 | $913 | $89,383 |
| Steven C. Shuman (partner) (2019-2020 rate) | 197.7 | $918 | $181,489 |
| Elizabeth Crooke (partner) (2018-2019 rate) | 4.6 | $913 | $4,200 |
| Elizabeth Crooke (partner) (2019-2020 rate) | 41.9 | $918 | $38,464 |
| *Total:* | | | $313,536 |

94.    The time records reflect that my partners and professional staff and I invested 685 hours up to January 3, 2020, with a lodestar value (hours times rates) of $611,302.  These tables were prepared from contemporaneous time records that are regularly inputted by the attorneys and professional staff members of my firm and are maintained in the ordinary course of business by us.  I have reviewed them to confirm their accuracy.

95.    These hours do not reflect the time I will spend after January 31, 2020.  In my experience, I will be devoting substantial additional time to bring this matter to conclusion, preparing the motion for final approval, submitting periodic reports, responding to any objections, attending hearings, working with the Settlement

Administrator, and all the other tasks that follow upon a class settlement of this magnitude. I would anticipate at least another 100 hours in accomplishing all those tasks – a present value of $91,800. The value of total hours worked and to be worked by my office thus is $703,406, or more. The table below sets forth the time spent, adjusted rates, and total value of that time for the Law Office of Robert B. Mobasseri, Co-Class Counsel:

| Name | Hours | Rate | Total |
|---|---|---|---|
| Robert B. Mobasseri (April, 2016- May, 2017) | 3.0 | $847 | $2,541 |
| Robert B. Mobasseri (June, 2017-July, 2017) | 4.2 | $886 | $3,721 |
| Robert B. Mobasseri (August, 2017- September, 2018) | 16.9 20.2 | $886 $915 | $14,973 $18,483 |
| Barbara A. Rohr (August, 2017- September, 2018) | 8.0 | $673 | $5,384 |
| Robert B. Mobasseri (September, 2018- December, 2018) | 5.15 | $915 | $4,712 |
| Barbara A. Rohr (September, 2018- December, 2018) | .75 | $673 | $506 |
| Robert B. Mobasseri | 40.55 | $913 | $37,022 |

| (December, 2018-January 3, 2020) | 5.9 | $918 | $5,416 |
|---|---|---|---|
| *Total:* | | | $92,758 |

The value of total hours worked and to be worked by Mr. Mobasseri's office is $92,758. Adding that to the $703,406 incurred or to be incurred by our office yields a grand total of attorney time at adjusted Laffey rates in the amount of $796,164. A fee request of $3,500,000 for Engstrom, Lipscomb & Lack and Law Offices of Robert B. Mobasseri works out to a multiplier of 4.4, well within parameters that have been allowed based on case law cited in the Motion.

96.    The hourly rates used to calculate totals in the above tables are within the range of rates found reasonable by other Courts. I am familiar with the prevailing rates in the community for attorneys with my experience and reputation.

97.    We are also claiming unreimbursed litigation expenses incurred by us as is reflected in Exhibit 7. These expenses have been documented in the financial records maintained in my firm's accounting department. The records are prepared from expense reports, check requests, receipts and the like, and are maintained in the ordinary course of business. Upon request, we will provide the supporting documents for those expenses.

98.    Our most significant expenses were for the services of consultants (Messrs. Roth, Affleck and Lakenbach) and a professional neutral, Judge Cahill, and those are appropriately included in this accounting, because the services provided by these professionals was essential and indispensable to the outcome.

99.    I discussed Mr. Affleck's important contributions above. Mr. Roth added another dimension of expertise in functioning as a consultant to me. Mr. Roth is a former New York Life agent and is both a licensed life and disability insurance agent and a licensed life and disability analyst (of which there are only 50 or so in California) who for more than a decade has devoted a significant portion of his

V3:439665

27

1  professional efforts on behalf of clients to ferreting out and seeking correction of or

2  compensation for fraud, financial scams, unfair practices and contract breaches

3  involving life insurance and other financial products.  He has been invaluable in

4  advising on technical life insurance issues and assisting with industry research during

5  the course of prosecution of this case.

6      100.   Defendants have also agreed to take no position on the payment of

7  attorneys' fees and costs provided that the award sought by Plaintiff's counsel does

8  not exceed a total of more than $3.5 million in fees, plus up to $500,000 in expenses,

9  which would include payment to Messrs. Affleck and Roth.   Defendants will pay

10 those awards without them coming out of a common fund or reducing Class

11 Members' recovery, and they were negotiated after completion of the negotiation of

12 the settlement at the last session of mediation.

13     101.   Steven E.M. Roth is a non-testifying expert retained by Plaintiff and

14 Plaintiff's counsel to assist in the assessment and prosecution of this case.  Mr. Roth

15 has a current "life and disability analyst license" as well as life insurance license with

16 the California Department of Insurance and actively sold life insurance for twelve

17 years before becoming an independent analyst in the field.  Mr. Roth consults in

18 matters concerning life insurance sales administration practices.  In the course of his

19 work, he has analyzed a very large number of universal life insurance contracts and

20 the operation of the policies for the needs and benefits of policyholders and

21 beneficiaries.  He has assisted policyholders and beneficiaries in resolving disputes

22 with insurers, testifies as an expert in court and at arbitrations without ever being

23 disqualified, and presented at seminars and symposiums.  Attached as Exhibit 8

24 hereto is a true and correct copy of Mr. Roth's current curriculum vitae.

25     102.   Mr. Roth was initially retained in March 2016, by Richard Behfarin on

26 an hourly basis to assist him with an analysis of his Policy with Pruco. The agreement

27 called for Mr. Roth's standard $500.00 per hour rate at the time.  After analyzing the

28 facts and the policy, Mr. Roth concluded that Mr. Behfarin was being charged more

than the policy provided for in order to cure a default, and ultimately to reinstate, and eventually obtained confirmation that the charges were based on guaranteed rates, not current rates.  When informal efforts to resolve the situation failed, Mr. Roth discussed with Mr. Behfarin that he likely was not the only person who had been overcharged, and that a class action may be appropriate.  He referred Mr. Behfarin to our firm and one other well-known class action law firm (one of the class counsel in *Feller v. Transamerica Life Insurance Company*), but the other firm declined the case.  We agreed to undertake the case.

103.   Mr. Behfarin understood that litigation is uncertain and could involve hundreds of hours and take years to come to resolution. Mr. Behfarin was unable to pay for Mr. Roth's continued efforts but recognized the value of his expertise to the class claims, as did our firm.  Mr. Behfarin agreed to a higher rate to defer payment when the case concluded.  Mr. Roth agreed to take on the risk that if there was no recovery, Mr. Behfarin would potentially be unable to pay for his work on the matter.

104.   Mr. Roth worked extensively on the case, including but not limited to:

    a. Reviewing and assisting with discovery demands and responses;

    b. Reviewing Pruco's discovery responses and its disorganized document production of approximately 65,000 pages. These documents consisted of policyholder files, policies and procedures, and other communications. Over a more than one-year timeframe, the documents came in several rolling productions, which contained duplicates and in some cases were missing pages, adding to the time Mr. Roth had to spend.  A great deal of time was spent going back and forth with opposing counsel concerning their production;

    c. Identifying key documents for plaintiff and performing extensive research and computations to support the allegations of the case;

    d. Writing detailed memos regarding his review of the materials and evaluation of how they support of the claims.  Mr. Roth spent

1  approximately 580 hours alone just on this task;

2  e.  Attending several meetings during the pendency of the litigation with

3  plaintiff's counsel (including me and co-counsel) and Mr. Behfarin, as

4  well as opposing counsel concerning discovery, litigation and trial

5  strategy;

6  f.  Attending the plaintiff's deposition preparation as well as his deposition;

7  g.  Attending and actively participating in all three mediation sessions in

8  front of Judge Cahill.  Among other tasks, Mr. Roth researched average

9  policy size and other industry data to assist in various analyses,

10  researched means of defeating potential defenses during the mediation,

11  and contributed with ideas, comments and arguments to improving the

12  terms of the Settlement for the class;

13  h.  Locating and assisting the testifying expert, Theodore Affleck and work

14  with  Mr. Affleck.

15  i.  Locating and assisting the present consulting actuaries, Charles Preti and

16  Cary Lakenbach to help in quantifying the value of the settlement.

17  Spending many hours working with the actuaries;

18  j.  Exchanging over 300 emails with my office and Mr. Behfarin and

19  counsel during the pendency of this case regarding the complexity of the

20  issues in this case;

21  k.  Reviewing the complaint, answer, and all motions and rulings in this

22  case at the request of counsel to assist in factual and technical assertions

23  regarding the policies;

24  l.  Performing damage calculations concerning the loss of Mr. Behfarin's

25  policy.  This included obtaining life expectancy reports on his parents,

26  attempting to determine if they were insurable elsewhere after lapse of

27  the Pruco policy, and calculating net present values of the loss of the

28  coverage;

1    m. Reviewing and providing feedback on expert reports.

2    105.   Mr. Roth maintained and provided to me computer-based,

3 contemporaneously recorded billing records for this matter that I will provide to the

4 Court for an in camera review upon request to support the information set forth above

5 or the total time spent.  As of the date of this motion, Mr. Roth spent 787.45 hours on

6 this matter.  He remains available to assist as needed with respect to responding to

7 objectors or any other tasks required to see the Settlement through to its conclusion,

8 and I anticipate calling on him to do so if there are objectors.  On January 1, 2019,

9 Mr. Roth's hourly rate was increased from $500.00 to $600.00.  Through that date, he

10 spent 586 hours on the matter, which equate to $293,000 in fees.  The additional

11 201.45 hours were spent after January 1, 2019, which equate to $120,870 in fees.

12 Thus, the total of Mr. Roth's fees before applying any factor for deferred payment or

13 risk of non-payment is $413,870.

14    106.   Mr. Roth agreed during the fee negotiations that followed reaching the

15 settlement at the mediation, that he would discount his fees to an amount equal to the

16 difference between the $500,000 Prudential agreed to pay in costs and the out-of-

17 pocket costs paid by my firm as Class Counsel.  Based on the other costs our firm has

18 incurred, including for other experts, that agreement by Mr. Roth will effectively

19 eliminate any compensation for his deferring payment and risking non-payment, and

20 will effect a small reduction in his normal hourly fee, making it a generous concession

21 on his part to help achieve the overall settlement.  Any amounts paid by defendants for

22 his costs will be from separate funds allocated to costs rather than reducing any class

23 relief.

24    107.   In addition to all the foregoing components of the Settlement and the

25 agreements to compensate and pay costs of Class Counsel and the incentive award

26 described below, Defendants agreed as part of the Settlement to pay all costs of

27 administering the Settlement.  Thus, Defendants will be responsible for paying for all

28 time and expenses of Epiq in administering the Settlement and providing notices.

1    Plaintiff is not privy to the amount of those expenses, and Defendants' counsel has in
2    fact advised that those amounts have not been finalized.  We do know, however, that
3    Defendants deposited $500,000 into the escrow set up pursuant to the Stipulation of
4    Settlement to apply to those expenses of administering the Settlement and complying
5    with notice requirements.

6    **THE PROPOSED INCENTIVE AWARD TO CLASS REPRESENTATIVE**

7        108.   In the preceding paragraphs I have described Mr. Behfarin's remarkable
8    initiative and his efforts on behalf of the class and his investment of time from the
9    beginning through the days of mediation and throughout the negotiations for the
10   settlement that will now benefit nearly 45,000 Class Members.

11       109.   Mr. Behfarin assisted us during discovery; represented the class well at
12   his deposition; communicated with us and our consultants regularly by in-person
13   meetings, phone, and e-mail; reviewed some case documents and discovery; attended
14   every minute of every mediation session and participated in some of the calls between
15   sessions; and was an integral and very active part of this case from start to finish,
16   particularly at critical junctures of the mediation process that resulted in the
17   settlement.  He brought some extra expertise beyond that of a typical class member,
18   as he was a licensed life insurance agent at the time of taking out his policy.  He also
19   negotiated very hard and pushed the rest of the team to achieve the best possible
20   result we could.  In doing so, in the interest of maintaining typicality of claims and his
21   representative status, he agreed to forego claims that potentially could have secured a
22   greater personal recovery for him, such as a breach of implied covenant claim that we
23   determined would be difficult to press on a classwide basis.  The incentive award to
24   him that we have requested, $50,000, compensates for the effort and personal
25   sacrifice he made to prosecute this case and serve as a representative of the
26   Settlement Class.  While we recognize that award is higher than typical incentive
27   awards, case law cited in the Motion does provide some precedent for that amount.

28       110.   The Parties never discussed attorneys' fees, expense reimbursement or

V3:439665                                    32

incentive awards during mediation until all the terms for relief to Settlement Class Members had been agreed.  Pursuant to the Stipulation of Settlement, the procedures for approval of a Fee Award and Incentive Award are likewise to be considered separate and apart from this Court's consideration of the fairness, reasonableness and adequacy of the Settlement. [Stip. §IX.B]

111.   Defendants have agreed to take no position on the payment of an incentive award to the Class Representative provided that it is in the amount of no more than $50,000 and subject to the Court's approval.  Defendants will pay that award without it coming out of a common fund or reducing Class Members' recovery.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 11th day of February, 2020.

*Steven C. Shuman*

Steven C. Shuman

1

## **CERTIFICATE OF SERVICE**

2

3          I hereby certify that on February 11, 2020, a true and correct copy of:

4    **DECLARATION OF STEVEN C. SHUMAN IN SUPPORT OF MOTION FOR**

5    **FINAL CERTIFICATION OF SETTLEMENT CLASS AND FINAL**

6    **APPROVAL OF PROPOSED NATIONWIDE CLASS SETTLEMENT**

7    **AGREEMENT, AND APPROVAL OF NOTICE UNDER FED. R. CIV.P. 23(e)**

8    **AND (g) AND IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS**

9    **AND EXPENSES AND INCENTIVE AWARD FOR CLASS**

10   **REPRESENTATIVE** was filed electronically and will be served via Notice of

11   Electronic Filing under the Court's CM/ECF system this 11TH day of February, 2020,

12   to all parties with an email address on record, who have consented to electronic

13   service in this action.

14

15

16                                              /S/ Steven C. Shuman

17                                              STEVEN C. SHUMAN

18

19

20

21

22

23

24

25

26

27

28

V3:439665                                       34

# EXHIBIT 1

FINAL - EXECUTION VERSION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| RICHARD BEHFARIN, individually and on behalf of a class of similarly situated individuals,<br><br>        Plaintiff,<br><br>   v.<br><br>PRUCO LIFE INSURANCE COMPANY, THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, AND PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY,<br><br>        Defendants. | No. 2:17-cv-05290-MWF-FFM |

## STIPULATION OF SETTLEMENT AND RELEASE

# Table of Contents

Page

I.      **RECITALS** ....................................................................................................... 1

II.      **DEFINITIONS** ............................................................................................... 6

III.      **SETTLEMENT RELIEF** ............................................................................ 10

     A.    Reinstatement Relief for the Lapsed/Alive Population .............................. 10

         1.   Reinstatement Relief: General ............................................................... 10

         2.   Reinstatement Relief: Gating Rules and Exceptions.............................. 11

         3.   Reinstatement Relief: Required Claimant Certifications ....................... 12

         4.   Basic Relief Alternative. ........................................................................ 13

         5.   Reinstatement Relief:  Entire Policy Interest Represented.. .................. 13

         6.   Reinstatement Relief:  Process for Implementation. .............................. 14

         7.   Claims Administrator is Sole Determiner of Authorized Claimants....... 14

         8.   Reinstated Class Policies: Tax Treatment.. ............................................ 14

     B.    Enhanced Reinstatement Relief for Lapsed/Alive Claimants Who Qualify............... 14

         1.   Enhanced Relief: General........................................................................ 14

         2.   Enhanced Relief: Criteria and Benefit.................................................... 15

         3.   Enhanced Relief:  Effect of Loans, Policy Changes Requested by the Policyowner and Performance of Variable Contracts. ............................................................... 16

     C.    Individualized Relief for the Lapsed/Deceased Population......................... 16

         1.   Individualized Relief:  General. .............................................................. 16

         2.   Individualized Relief:  Scoring Structure. ............................................... 17

         3.   Individualized Relief:  Scoring Records and Data .................................. 17

         4.   Individualizeed Relief:  Claims Administrator to Apply Final Score. ................... 18

         5.   Individualized Relief:  Potential for Limited Appeal to Special Master. .............. 18

         6.   Individualized Relief:  Settlement Payment Amounts ........................... 19

         7.   Individualized Relief: Settlement Payment Nature ................................ 19

         8.   Individualized Relief: Settlement Payment Calculation and Timing..................... 20

         9.   Individualized Relief:  Establishing a Claim.......................................... 21

         10. Individualized Relief:  Authorized Claimants......................................... 21

11. Claims Administrator is Sole Determiner of Authorized Claimants......................21

D. Change to Business Practice for Current Policyowners and Owners of Reinstated
Class Policies. ..........................................................................................................22

1. Charges at Default and Lapse/Reinstatement..................................................22


IV. RELEASE OF CLAIMS ....................................................................................................22

A. General Matters Regarding Release.........................................................................22

B. Released Claims .......................................................................................................23

C. Settlement Class Release And Waiver.....................................................................24

1. Release.............................................................................................................24

2. Covenant Not to Sue and Release as Bar .......................................................25

3. Contract Rights Remain ..................................................................................25

4. Claims for Fees and Costs Released.................................................................26

5. Unknown Claims Released ..............................................................................26

6. Release and Waiver Upon Participation in Claims Process .............................26


V. PRELIMINARY APPROVAL ........................................................................................27

A. Reasonable Best Efforts to Effectuate Settlement.. ..................................................27

B. Motion for Preliminary Approval and Stay. ............................................................27

C. No Further Action to Litigate ..................................................................................28

D. Stipulation to Certification of a Settlement Class....................................................28

E. Plaintiff is Settlement Participant ...........................................................................28


VI. NOTICE TO THE CLASS AND COMMUNICATIONS WITH SETTLEMENT
CLASS MEMBERS ("Notice Plan")..................................................................................29

A. Notice to Settlement Class. ......................................................................................29

B. Notice List................................................................................................................29

C. Notice List is Not Settlement Class List. .................................................................30

D. Classification of Individuals on Notice List Not Dispositive ...................................30

E. Direct Notice via Email ...........................................................................................30

F. Direct Notice via U.S. Mail .....................................................................................31

1. Indicator for Lapsed/Deceased .......................................................................31

2. Indicator for Lapsed/Alive Enhanced Relief Eligible. .......................................... 31

3. Effect of Incorrect Classification for Notice Purposes ......................................... 32

G. Settlement Website ....................................................................................................... 32

H. CAFA Notice ................................................................................................................. 33

I. Phone Bank and Right of Communication with Claimants ........................................ 33

VII. REQUESTS FOR EXCLUSION AND OBJECTIONS TO SETTLEMENT ........... 35

A. Requests for Exclusion or "Opt-Outs" ....................................................................... 35

B. Action Upon Requests for Exclusion ........................................................................... 36

C. Exclusion Valid Only if Served by Authorized Person And On Behalf of All. ......... 36

D. Objections to Settlement .............................................................................................. 36

E. Objector Required to Disclose Interest ....................................................................... 37

F. No Solicitation of Objection or Request to Opt Out ................................................... 37

G. Settlement Class Members Otherwise Bound. ............................................................ 38

VIII. CLAIMS ADMINISTRATION ................................................................................... 38

A. Claims Administrator Appointment. ........................................................................... 38

B. Claims Administration Recordkeeping (General). ...................................................... 38

C. Notice Obligations Rest with Claims Administrator. .................................................. 38

D. Supervision of Claims Administrator. ......................................................................... 38

E. Claims Administrator's Determination of Authorized Claimants. ............................. 40

F. Claims Administrator's Interface with Prudential. ...................................................... 41

G. No Recourse by Claimant for Determinations Regarding Authorized Claimants. ...... 41

H. Audit Rights. ................................................................................................................. 42

I. Confidentiality of Claims .............................................................................................. 42

J. Investigation, Reporting and Treatment of Potentially Fraudulent Claims. ............... 43

K. Claims Administrator to Establish Escrow Account. .................................................. 43

L. Qualified Settlement Fund ........................................................................................... 44

M. Funding Escrow Account ............................................................................................. 45

G. Reversion from Escrow Account. ................................................................................. 45

IX. ATTORNEYS' FEES, COSTS AND EXPENSES ....................................................... 45

A. Application for Attorneys' Fees and Costs. ................................................................. 45

B. Fee Award and Incentive Award Not Part of Settlement ............................................ 46

C.   Payment of Fee Award ........................................................................ 46

D.   Incentive Award Class Counsel ........................................................ 46

E.   No Liability for Any Other Amount or Expense .............................. 47

X.     **FINAL APPROVAL AND FINAL ORDER AND JUDGMENT** ................................. 47

XI.    **CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL,
CANCELLATION OR TERMINATION, MODIFICATION.** ........................... 49

A.   Effective Date .................................................................................... 49

B.   Termination ........................................................................................ 50

C.   No Termination Due to Fee Award .................................................... 50

D.   Exclusion Limit Triggering Termination ........................................... 50

E.   Effect of Termination ......................................................................... 50

XII.   **REPRESENTATIONS AND WARRANTIES** ............................................... 51

A.   Cooperation ........................................................................................ 51

B.   Final and Complete Resolution; Non-Disparagement ...................... 52

C.   Publicity and Non-Disparagement. .................................................. 52

D.   Representation by Counsel; Agreement Prepared by all Parties ............................... 53

E.   No Admissions ................................................................................... 53

F.   Certification for Settlement Purposes Only ...................................... 55

G.   Settlement and Claims Administration Process Final: No Recourse ...................... 56

H.   Headings. ............................................................................................ 56

I.   Non-Waiver. ....................................................................................... 56

J.   Exhibits Incorporated. ....................................................................... 56

K.   Entire Agreement ............................................................................... 56

L.   Each Party Bears Costs ...................................................................... 57

M.   No Assignment ................................................................................... 57

N.   Authority ............................................................................................ 57

O.   Execution ........................................................................................... 57

P.   Binding Upon Successors ................................................................... 57

Q.   Court Retains Exclusive Jurisdiction ................................................ 58

R.   Applicable Law and Venue ................................................................ 58

S.   Notice to Parties ................................................................................ 58

T.   Return of Discovery Documents ....................................................... 59

U.   Modification of Time Deadlines ........................................................ 59

**FINAL - EXECUTION VERSION**

Case 2:17-cv-05290-MWF-FFM   Document 72-1   Filed 02/11/20   Page 42 of 135   Page
ID #:1895

FINAL - EXECUTION VERSION

This Stipulation of Settlement and Release ("Settlement Agreement" or "Stipulation"),
dated October _____, 2019, is made and entered into by and among Plaintiff Richard Behfarin
("Behfarin"), individually and on behalf of the proposed Settlement Class (defined below), and
Defendants Pruco Life Insurance Company ("Pruco"), The Prudential Insurance Company of
America, and Pruco Life Insurance Company of New Jersey (together and collectively,
"Defendants" or "Prudential") (together the "Parties"), through their counsel of record.  This
Settlement Agreement, inclusive of the Exhibits hereto, is intended to fully, finally and forever
resolve, discharge, settle, release and dismiss with prejudice the above-captioned putative class
action, the Released Claims as defined herein, and all issues and matters related thereto, upon,
subject to, and as further specified by, the terms and conditions hereof.

## I.      RECITALS

A.      **WHEREAS,** Plaintiff Behfarin commenced a putative class action against
Defendant Pruco and other unnamed individuals/entities captioned, *Richard Behfarin et al. v.
Pruco Life Insurance Company and Does 1-10, inclusive*, Case No. 2:17-cv-05290-MWF-FFM
(C.D. California), as amended to include all Defendants (the "Action"), seeking to represent a
nationwide class of persons who owned universal life or variable universal life insurance policies
issued by Defendants which policies defaulted and/or lapsed between July 18, 2013 and the
present;

B.      **WHEREAS**, Plaintiff alleged that Defendants requested payments from
Policyowners applying Guaranteed Charges that were in excess of the amounts allowed under
Defendants' universal and variable universal life insurance contracts when such policies went
into default or lapsed, including by imposing increased, improper, and undisclosed loads and cost
of insurance charges calculated at maximum rates and based on criteria not specified in the

**FINAL - EXECUTION VERSION**

contract to cure default or reinstate a lapsed policy;

      **C.**    **WHEREAS**, Plaintiff alleged that certain of Defendants' universal life and

variable universal life Policyowners experienced policy lapse and were not able to reinstate after

Defendants requested payment of three months of premium calculated at Guaranteed Charges in

order to cure a default or deficiency or to reinstate the policy;

      **D.**    **WHEREAS**, Plaintiff alleged that, during the alleged Class Period, Defendants

sent notices to certain of its universal and variable universal life Policyowners upon policy

default, during grace periods and/or upon policy lapse, which specified amounts owed to cure a

default and prevent lapse or to reinstate policies following lapse, that were allegedly incorrect or

inconsistent with policy requirements or terms;

      **E.**    **WHEREAS,** Plaintiff further alleged that, during the alleged Class Period, certain

Policyowners were unable to reinstate their policies following a policy default and lapse caused

by the above practices, due to other policy provisions and conditions, which caused injury;

      **F.**    **WHEREAS**, Plaintiff alleged that Defendants' conduct described in the Action

constituted breach of contract, breach of the duty of good faith and fair dealing, and violations of

the California Unfair Competition Law, Bus. & Prof. Code §§17200 *et seq*., and similar laws of

other United States jurisdictions;

      **G.**    **WHEREAS**, the proposed class that Plaintiff moved to certify in the Action in his

motion for class certification included persons who owned or had a beneficial interest in: (i)

policies that lapsed for a final time during the Class Period and have not been reinstated to date

where there is at least one living insured (the "Lapsed/Alive Population"); (ii) policies that

lapsed for a final time during the Class Period and were not reinstated where the insured(s) are

deceased (the "Lapsed/Deceased Population"); and (iii) policies that went into default or lapsed

2

**FINAL - EXECUTION VERSION**

for which payment was made during the Class Period to cure the default or to reinstate after lapse where there is at least one living insured and the policy remains in force (the "Current Policyowner Population"), (taken together, the "Settlement Class" and "Class Policies" as more specifically defined below);

       **H.**    **WHEREAS**, Plaintiff sought damages and declaratory and injunctive relief for those Class Policies and Settlement Class Members in the Lapsed/Alive and Lapsed/Deceased Populations, and sought declaratory and injunctive relief for those Class Policies and Settlement Class Members in the Current Policyowner Population in recognition of the fact that only the amount of premium needed to bring the policy current based on Current Charges (as defined below) was applied as payment, and that all amounts in excess of Current Charges were invested in the Class Policy's contract fund;

       **I.**    **WHEREAS**, Defendants deny all alleged and implied wrongful acts and practices, dispute any injury or liability, dispute Plaintiff's ability to certify any litigation class, and have vigorously defended the Action;

       **J.**    **WHEREAS**, during the pendency of the Action, counsel for Plaintiff and the putative class conducted discovery and investigation into the claims and allegations raised by the Complaint and were provided by Defendants with extensive documentation, electronic data, and other information in connection therewith, including over 60,790 pages of documents, dozens of Interrogatory responses and responses to Requests to Admit, extensive data on the class population, and policy records related to numerous randomly selected Policyowners (names and personal identifying information redacted), pursuant to Plaintiff's requests;

       **K.**    **WHEREAS**, the Parties retained insurance and actuarial experts regarding the allegations in the Action and the appropriateness of class certification, which experts reviewed

Case 2:17-cv-05290-MWF-FFM   Document 72-1   Filed 10/21/19   Page 99 of 198   Page
ID #:1008

**FINAL - EXECUTION VERSION**

all documents, electronic data, discovery responses and the randomly selected sample
Policyowner records and considered the widely varying circumstances of Policyowners and the
decisions made regarding policies entering default and/or lapse;

     **L.**     **WHEREAS**, on January 25, 2019, the Parties and counsel participated in an
initial mediation session before the Honorable William J. Cahill (Ret.) of JAMS to evaluate and
commence negotiation of a potential class-wide settlement;

     **M.**     **WHEREAS**, with the assistance of Judge Cahill, the Parties continued settlement
discussions and negotiations through two additional in-person mediation sessions in February,
2019 and April, 2019, as well as numerous communications between these in-person mediation
sessions to continue negotiations;

     **N.**     **WHEREAS**, these efforts culminated on April 30, 2019, when the Parties
reached an agreement in principle, subject to the negotiation of a stipulation of settlement and
release and approval of the class-wide settlement by the Court;

     **O.**     **WHEREAS**, this Settlement Agreement was reached as the result of extensive,
good-faith, and arm's length negotiations between the Parties and their counsel, including with
the assistance of the Honorable William J. Cahill (Ret.) of JAMS;

     **P.**     **WHEREAS,** this Settlement Agreement, together with all Exhibits hereto,
supersedes all prior negotiations, drafts, discussions and term sheets, and reflects the final and
binding agreement between the Parties;

     **Q.**     **WHEREAS**, before entering into this Settlement Agreement, the Parties, by and
through their respective counsel, conducted a thorough investigation and evaluation of the
relevant law, facts, allegations and defenses to assess the merits of the claims and potential
claims in the Action to determine the strengths and weaknesses of the case as well as the

**FINAL - EXECUTION VERSION**

appropriateness of class certification and the legal and factual grounds for opposition thereto;

  **R.**  **WHEREAS**, the Parties and their respective counsel have taken into account the risks, uncertainties, delays, and expenses involved in prosecuting and defending the Action, and other relevant considerations, and have concluded that it is in their respective best interests, including the interests of the proposed Settlement Class, to compromise and to fully and finally resolve and settle the Action in the manner and on the terms and conditions set forth in this Settlement Agreement, and have determined that this Settlement Agreement is fair, adequate, and reasonable and in the best interests of the Settlement Class; and

  **S.**  **WHEREAS**, Defendants continue to deny all allegations of fault, wrongdoing, and liability whatsoever against them and maintain that their practices have at all times been lawful and proper, deny all allegations that Plaintiff, or any member of the proposed Settlement Class, suffered any damages or harm by reason of any alleged conduct, statement, act, or omission of Defendant(s) or that Plaintiff could establish any damages or entitlement to injunctive relief on a class-wide basis, and deny that any putative class could meet the requirements for certification as a litigation class.

  **NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by, between and among Plaintiff (individually and on behalf of the entire Settlement Class) and Defendants, that, in consideration of the benefits flowing to the parties from the Settlement Agreement, the Action and the matters that were or could have been raised in the Action and/or that arise out of or are related to the alleged facts at issue in the Action hereby are settled, compromised and dismissed on the merits and with prejudice, and all Released Claims as against the Releasees shall be released, upon and subject to the terms and conditions set forth below and subject to the approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

## II.    DEFINITIONS

As used in this Settlement Agreement and the annexed Exhibits, which are an integral part of this Settlement Agreement and are incorporated in their entirety herein, the following terms shall have the following meanings (unless a part or subpart of this Settlement Agreement or its Exhibits otherwise provides):

a.      **"Action"** means the matter captioned, *Richard Behfarin et al. v. Pruco et al.*, Case No. 2:17-cv-05290-MWF-FFM (C.D. California), as amended to include all Defendants, brought in the United States District Court for the Central District of California.

b.      "**Agent**" means any agent or other representative of Prudential (including brokers and independent contractors appointed by Prudential) in respect of the solicitation, negotiation, sale, delivery and/or servicing of one or more Class Policies which is/are the subject of a Claim.

c.      **"Authorized Claimant"** means any Claimant whose Claim for recovery has been allowed by the Claims Administrator pursuant to the terms of the Settlement Agreement.

d.      **"Basic Relief"** means the amount of $250.

e.      **"Claim"** means a claim by a Claimant submitted to the Claims Administrator.

f.      **"Claim Form"** means the form submitted by a Claimant to tender a Claim.

g.      **"Claimant"** means: (a) for the Lapsed/Alive Population, all such person(s) or entity(ies) having, individually or together, an ownership interest in a Class Policy which is the subject of a Claim; and (b) for the Lapsed/Deceased Population, all such person(s) or entity(ies) who were, individually or together, a Policyowner of a Class Policy which is the subject of a Claim, or if all Policyowners on a Class Policy are also deceased then a designated beneficiary at the time of final lapse of a Class Policy which is the subject of a Claim.

h.      **"Claims Administration Expenses"** means the expenses incurred by the Claims Administrator in fulfilling the obligations described throughout this Settlement Agreement, including, but not limited to, providing Notice (including CAFA notice), managing the Settlement Website, receiving, processing and determining Claims, responding to inquiries from the Settlement Class, mailing payments (where applicable) for Authorized Claimants, and related services, including serving as Escrow Agent and paying taxes and tax expenses related to the Escrow Account (including all federal, state or local taxes of any kind and interest or penalties thereon, as well as expenses incurred in connection with determining the amount of and paying any taxes owed and expenses related to any tax attorneys and accountants retained by the Claims Administrator).

i.      **"Claims Administrator"** means Epiq Class Action & Claims Solutions, Inc., or such other reputable administration company that has been selected jointly by the Parties and approved by the Court to perform the Claims Administration duties set forth in this Settlement

FINAL - EXECUTION VERSION

Agreement. Class Counsel's assent to this Agreement shall constitute consent on behalf of each and every member of the Settlement Class to disclose all information required by the Claims Administrator to perform the duties and functions ascribed to it herein.

j.    **"Class Counsel"** means the law firm of Engstrom, Lipscomb & Lack, together with Robert B. Mobasseri, P.C.

k.    **"Class Notice"** or **"Notice"** means the notices distributed pursuant to the Notice Plan at Section VI of this Settlement Agreement, and includes, collectively, the Summary Notice mailed to persons and entities associated with Class Policies and related materials and the Notice on the Settlement Website informing the Settlement Class of this proposed Class Action Settlement Agreement and Final Approval Hearing, which is to be provided in the manner set forth herein, consistent with the requirements of Due Process and Rule 23, and is substantially in the form of Exhibits A and B hereto.

l.    **"Class Period"** means July 18, 2013 to and through the date of Preliminary Approval.

m.    **"Class Policy"** or **"Class Policies"** means one or more individual universal life or variable universal life insurance policies issued by a Defendant, as to which Guaranteed Charges were applicable to the calculation of the deficiency and/or restatement amount, and which policy either entered into default or lapsed between July 18, 2013 and the date of Preliminary Approval, or which had default cured or was reinstated on or after July 18, 2013 and remains in force on the date of Preliminary Approval.

n.    **"Class Representative"** or **"Plaintiff"** means the named Plaintiff in the Action, Richard Behfarin.

o.    **"Court"** means the United States District Court for the Central District of California.

p.    **"Current Charge(s)"** means, with respect to a Class Policy, the monthly cost of insurance then applicable to a particular policy, along with applicable charges including, but not limited to, sales loads and administrative fees.

q.    **"Current Rate(s)"** means, with respect to a Class Policy, the monthly cost of insurance rate applicable to the particular policy and insured.

r.    **"Defendant"** or **"Defendants"** means, individually or collectively, Prudential, as defined herein.

s.    **"Defendants' Counsel"** means Dentons US LLP.

t.    **"Effective Date"** means the first date by which all of the events and conditions set forth in Section XI.A. have occurred.

u.    **"Escrow Account"** means the separate, interest-bearing account to be established by the Claims Administrator under terms acceptable to all Parties at a depository institution

**FINAL - EXECUTION VERSION**

insured by the Federal Deposit Insurance Corporation, wherein any funds payable by Prudential prior to distribution to Authorized Claimants, or to be utilized for payment of claims administration, tax expenses, the Fee Award or the Incentive Award, shall be deposited and held in escrow.

v.      "**Escrow Agent**" means the Claims Administrator.

w.      "**Execution Date**" means the date on which this Settlement Agreement is executed by the last party to do so.

x.      "**Fee Award**" means the amount of attorneys' fees, costs and reimbursement of expenses awarded by the Court to Class Counsel, which will be paid from the Escrow Account funded by Prudential.

y.      "**Final Approval Hearing**" means the hearing at or after which the Court will make its decision whether to finally approve the Settlement as fair, reasonable and adequate.

z.      "**Final Order and Judgment**" means the order issued by the Court approving the Proposed Settlement and the judgment entered pursuant to that order after the Final Approval Hearing.

aa.     "**Final Settlement Date**" means the date on which the Settlement (as approved by the Final Order and Judgment) becomes "Final". For purposes of the Settlement: (1) if no appeal has been taken from the Final Order and Judgment, "Final" means that the time to appeal therefrom has expired; or (2) if any appeal has been taken from the Final Order and Judgment, "Final" means that all appeals therefrom, including any petition for rehearing or reargument, petition for rehearing *en banc* and petitions for *certiorari* or any other form of review have been finally disposed of in a manner that affirms the Final Order and Judgment.

bb.     "**Guaranteed Charge(s)**" means, with respect to a Class Policy, the monthly cost of insurance that a Policyowner would be charged with respect to a particular policy and insured if calculated based on Guaranteed Rate(s), along with guaranteed maximum applicable charges including, but not limited to, sales loads and administrative fees.

cc.     "**Guaranteed Rate(s)**" means, with respect to a Class Policy, the monthly cost of insurance rate applicable to the particular policy and insured that is guaranteed by the policy contract as a rate that cannot be exceeded when determining the Current Rate.

dd.     "**Incentive Award**" means any award by the Court to the Class Representative as described in Section IX.D.

ee.     "**Lapsed/Alive Population**" means Settlement Class Members associated with Class Policies that lapsed for a final time during the Class Period and have not been reinstated to date where there is at least one living insured.

ff.     "**Lapsed/Deceased Population**" means Settlement Class Members associated with policies that lapsed for a final time during the Class Period and were not reinstated where the insured(s) are deceased.

gg.    **"Limited Appeal"** means the limited right of an Authorized Claimant for Individualized Relief to pursue an appeal to the Special Master at his or her own expense as described at Section III.C.5.

hh.    **"Notice Date"** means the date when the Class Notice is first mailed or published.

ii.    **"Notice Plan"** means the plan for distribution of notice to the Settlement Class and communications with Settlement Class Members described in Section VI below.

jj.    **"Objection/Exclusion Deadline"** means the date by which a written objection to this Settlement Agreement or a request for exclusion submitted by a person within the Settlement Class must be made.

kk.    **"Plaintiff"** means the named plaintiff in the Action, Richard Behfarin.

ll.    **"Policyowner(s)"** means owners of one or more Class Policy(ies).  Excluded from the definition are persons or entities who signed a release in connection with the settlement of a claim, complaint, action, lawsuit or proceeding, pending or threatened, that released Prudential with respect to such Policy(ies).

mm.    **"Preliminary Approval Order"** means the anticipated order preliminarily approving the Settlement Agreement, certifying the Settlement Class for settlement purposes, and directing that Class Notice be provided.

nn.    **"Proposed Settlement"** means the terms of settlement as set forth in this Settlement Agreement.

oo.    **"Prudential"** means The Prudential Insurance Company of America, Pruco Life Insurance Company, and Pruco Life Insurance Company of New Jersey.

pp.    **"Reinstated Class Policy"** means an insurance policy issued by Prudential which is/was reinstated pursuant to Section III.A. herein.

qq.    **"Reinstatement Amount"** means the amount requested by Prudential to reinstate a Class Policy if such relief is awarded pursuant to this Settlement.

rr.    **"Reinstatement Process Guidelines"** means the document by the same name attached as Exhibit C hereto, and consists of rules and procedures that will govern the process by which a Reinstated Class Policy will be offered and reinstated by Prudential if such relief is awarded under the Settlement.

ss.    **"Releasees"** means Pruco Life Insurance Company, The Prudential Insurance Company of America, and Pruco Life Insurance Company of New Jersey, individually and collectively, and all of their current, former and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, employees, agents, independent contractors, brokers, representatives, attorneys, heirs, administrators, executors, predecessors, successors and assigns, or any of them.

tt.     **"Releasing Parties"** means Plaintiff and Settlement Class Members who do not validly and timely opt out of the Settlement Class, all beneficiaries of Class Policies, and with respect to each Class Policy, all of their respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parent companies, subsidiaries, associates, affiliates, agents, consultants, officers, partners, principals, members, attorneys, accountants, financial and other advisors, shareholders, investment advisors, and legal representatives.

uu.     **"Scoring Factor"** shall have the meaning set forth in the Scoring Guidelines.

vv.     **"Scoring Guidelines"** means the "Claims Administration and Scoring Guidelines for the Lapsed/Deceased Population" attached hereto as Exhibit D, and shall serve (substantially in the form attached) as a manual of procedures governing the Scoring Process.

ww.     **"Scoring Process"** means the procedures for presentation to and evaluation of Claims by the Claims Administrator, as described in the Scoring Guidelines.

xx.     **"Secondary Guarantee"** or **"No Lapse Guarantee"** means a contract provision (or provisions) in a Class Policy that ensures that, for a certain period of time, the subject policy will stay in effect even if there is insufficient value in the contract fund to cover policy charges.

yy.     **"Settlement"** means the Proposed Settlement, with such modifications as are made and approved by the Court, as set forth in the Final Order and Judgment.

zz.     **"Settlement Class Members"** means all Policyowners of Class Policies and, where all Policyowners and insureds of a Class Policy are also deceased, then also any designated beneficiary(ies) of that Class Policy at time of final lapse.

aaa.     **"Special Master"** means the Honorable William J. Cahill, (Ret.) of JAMS, or if he is unable or unwilling to serve in that capacity, an alternative JAMS neutral selected by the parties, located in JAMS' Los Angeles, Century City or San Francisco offices.

bbb.     **"Tax Expenses"** means the expenses and costs incurred by the Claims Administrator in connection with determining the amount of, and paying, any taxes owed with respect to the Escrow Account (including, without limitation, expenses of tax attorneys and accountants).

All other capitalized terms used in this document shall have the meanings ascribed to them by this Stipulation and the Exhibits hereto, including the Scoring Guidelines.

## III.     SETTLEMENT RELIEF

### A.     Reinstatement Relief for the Lapsed/Alive Population.

**1.     Reinstatement Relief: General**.  Prudential will offer Authorized Claimants who

FINAL - EXECUTION VERSION

fall within the Lapsed/Alive Population and who have not timely and validly excluded

themselves from the Settlement, the opportunity to reinstate their Class Policy/ies, upon the same

contract terms and face amount as existed at the time of final lapse, without underwriting, at

Current Rates and Current Charges as of the date of reinstatement, but subject to both (a) the

Gating Rules, exceptions and process set forth at Section III.A.2. below, and (b) Claimants'

timely submission of a completed Claim Form, including qualifying answers to the required

Certifications on the Claim Form such that the Claims Administrator determines Claimant to be

an Authorized Claimant  ("Reinstatement Relief").

      **2.**      **Reinstatement Relief: Gating Rules and Exceptions**.  The Reinstatement Relief

described at Paragraph III.A.1, *supra*, is subject to all of the following:

            **a.**      **Gating Rule 1.**  Reinstatement Relief will not be available, and the
Claimant may receive only Basic Relief (if all other conditions are satisfied) if:
(i) the Class Policy had a face amount of $250,000 or higher at the time of final
default and lapse;
(ii) at the time of final default, no more than three months' premium at Current
Rates, plus applicable loads or fees, was requested by Prudential to cure the
default, either due to the presence of a Secondary Guarantee or otherwise; and
(iii) following final default and lapse, no application to reinstate the subject Class
Policy was timely received by Prudential.

            **b.**      **Gating Rule 2:**  Reinstatement Relief will not be available, and the
Claimant may receive only Basic Relief (if all other conditions are satisfied) if, at
the time of final default and lapse, the amount requested by Prudential to cure the
default or reinstate following lapse would have kept the policy in force for three
and one-half (3.5) months or less, based on Current Charges.

            **c.**      **Gating Process.**  Prudential will provide the Claims Administrator with
data from Prudential's records sufficient to enable the Claims Administrator to
apply Gating Rule 1 and Gating Rule 2 (collectively, the "Gating Rules") to Class
Policies.  Claimants to whom these Gating Rules apply will have any Claim Form
submitted considered as a Claim for Basic Relief.  Claim Forms requesting any
other type of relief will not be accepted as to Class Policies to which the Gating
Rules apply and shall have no force or effect.

**FINAL - EXECUTION VERSION**

3.     **Reinstatement Relief: Required Claimant Certifications.** Any Claimant in the Lapsed/Alive Population who submits a Claim requesting Reinstatement Relief must timely submit a Claim Form, in the form attached hereto as Exhibit E, that includes, among other things, the following Certifications made under penalty of perjury. These Certifications are continuing Certifications that shall serve as attestations up to the date upon which a Reinstated Class Policy is reinstated. Claim Forms submitted by Claimants who do not or cannot certify to the Certifications below will be deemed Claims for Basic Relief. The Certifications include:

    **a.**     **No Prior Decision to Discontinue Policy.** Claimant and/or any Policyowner of the subject Class Policy did not make a deliberate decision to discontinue the Class Policy prior to default, for any reason.

    **b.**     **Amount Requested by Prudential Directly Impacted Policy Lapse.** If Prudential had requested that Claimant and/or any Policyowner of the subject Class Policy pay a lower amount to cure the default or reinstate the policy that was equal to no more than three months of premium based on Current Charges plus required loads/administrative fees, Claimant and/or any Policyowner would have paid that amount and kept the Class Policy in force.

    **c.**     **No Replacement/Purchase of Other Insurance.** Claimant and/or any Policyowner of the subject Class Policy did not replace (formally or informally) the face amount of insurance of the subject Class Policy with any other life insurance prior to notice of final default. Further, Claimant and/or any Policyowner did not replace the face amount of the subject Class Policy with any other life insurance in an amount equal to or more than 50% of the face amount of the subject Class Policy, after default and before lapse. Claimant consents to Prudential checking Medical Information Bureau ("MIB") records to determine if there is evidence of replacement, and to contact identified carriers for follow up as necessary to investigate if this statement is true and correct

    **d.**     **Owner of Record After Final Lapse.** Claimant and/or any insured or Policyowner of the subject Class Policy is not a life settlement company, investor, or other person or entity who acquired the subject Class Policy (or any right to the subject Class Policy under the Settlement) after final lapse without having any familial or employment relationship with the person whose life is insured by the subject Class Policy.

    **e.**     **No Present Intent to Sell/Transfer to Third Party.** Claimant and all Policyowner(s) of the subject Class Policy represent that they have no present intent to sell or transfer the subject Class Policy, if reinstated, or any right with respect to the subject Class Policy, to a life settlement company, investor or

individual or entity with whom the insured has no familial or employment relationship.

f. **Insured is Alive**. At least one insured on the subject Class Policy is alive as of the date of the Claim Form and date of proposed reinstatement.

g. **Claimant Entitled to Act.** Claimant is the Policyowner, has the right to act with respect to the Class Policy, assumes any and all responsibility for the liability that may result from filing a Claim in the event anyone else asserts ownership of the Class Policy or files a claim on the same Class Policy.

4. **Basic Relief Alternative.** Claimants subject to the Gating Rules/Exceptions described above at Section III.A.2, and Claimants who are unable to truthfully sign the requisite Claimant Certifications described above at Section III.A.3, or any other Claimant who elects such relief, shall be eligible for Basic Relief. Basic Relief shall be payable only once per each Class Policy after timely submission of a completed Claim Form. No Claimant and no Class Policy shall be eligible for both an offer of Reinstatement Relief and Basic Relief.

5. **Reinstatement Relief: Entire Policy Interest Represented**. If more than one person or entity has an ownership interest or ownership right in a Class Policy in the Lapsed/Alive Population, all persons having such an interest or right in such Class Policy must either assign their rights by written instrument or act jointly in exercising any right to Reinstatement Relief, Enhanced Relief (as set forth at Section III.B below) or any right to Object to this Settlement or Exclude a Class Policy from this Settlement (as set forth at Section VII below). If, absent such assignment, a Class Policy is reinstated at the request of less than all persons or entities with an ownership interest or ownership right, the entire Settlement Class and all Class Policies (and Releasing Parties) will be subject to the Release herein, and the Policyowner(s) exercising the right to Reinstatement Relief will assume all obligations as well as all potential liability to any individual or entity who asserts an interest in the Class Policy.

FINAL - EXECUTION VERSION

6. **Reinstatement Relief:  Process for Implementation.**  Any Claimant who passes all of the Gating Rules and who submits a timely Claim Form seeking reinstatement, including making all of the required Certifications, if found by the Claims Administrator to be an Authorized Claimant, will be offered reinstatement of the subject Class Policy without underwriting, subject to payment of the required Reinstatement Amount.  Additional processes and procedures governing reinstatement are set forth in the Reinstatement Process Guidelines, Exhibit C hereto including, but not limited to, the provision of information, including the applicable Reinstatement Amount and charges, fees and required premium payments going forward.

7. **Claims Administrator is Sole Determiner of Authorized Claimants.**  All decisions regarding whether or not a Claimant is an Authorized Claimant and eligible for Reinstatement Relief will rest with the Claims Administrator.  There shall be no recourse to any Defendant or Released Party or their counsel, or to the Class Representative or Class Counsel, or to the Claims Administrator or the Court, for any determination made by the Claims Administrator as to whom Reinstatement Relief will be offered.  Policyowners shall retain such reinstatement rights as may exist in the terms of their Prudential contracts without regard to this Settlement Agreement.

8. **Reinstated Class Policies: Tax Treatment**.  Reinstated Class Policies will be administered by Prudential to comply with the definition of life insurance under federal tax law.

B. **Enhanced Reinstatement Relief for Lapsed/Alive Claimants Who Qualify.**

1. **Enhanced Relief: General**.  Class Policies may be entitled to "Enhanced Relief", as described in this Section III.B., if Prudential's existing records confirm that the Policyowner submitted a timely application for reinstatement pursuant to that policy's contract terms, the final

lapse occurred during the Class Period but before February 25, 2019, and an application for reinstatement was submitted and not approved.  Claimants who may be eligible for Enhanced Relief will be identified by Prudential before sending Class Notice, and will be provided an Enhanced Relief Claim Form, subject to an individual access code as set forth at Section VI.F.2.

2. **Enhanced Relief: Criteria and Benefit.**  To receive Enhanced Relief, Claimants must:  (a) be identified by Prudential as qualifying for Enhanced Relief based on existing Prudential records reflecting that a timely application for reinstatement was submitted and not approved; (b) pass all Gating Rules (see above Section III.A.2.); (c) timely submit a completed Claim Form including all required Certifications; (d) complete reinstatement of the subject Class Policy, including payment of the required Reinstatement Amount pursuant to the Reinstatement Process Guidelines; and (e) pay all required premiums necessary to keep the Reinstated Class Policy in force for the first three years following the Reinstatement Date ("Reinstatement Years 1, 2 and 3").  For Claimants who are determined by the Claims Administrator to meet (a)-(c), and determined by Prudential to meet (d)-(e) above, at the beginning of the fourth and fifth year following the Reinstatement Date, Prudential will pay on the Policyowner's behalf and apply to the policy the amount of premium (inclusive of all premium/tax loads) necessary to satisfy the cost of insurance for the policy, based on the then-Current Rates and Current Charges for that year.  All other amounts, if any, that may be necessary to keep the Reinstated Class Policy in force and/or to satisfy policy terms (such as, for example, a rider or secondary guarantee) will remain the responsibility of the Policyowner.  At the beginning of the sixth year following reinstatement, the owner(s) of the Reinstated Class Policy who receive Enhanced Relief will again be required to make premium payments based on then-Current Rates and Current Charges.

3.      **Enhanced Relief:  Effect of Loans, Policy Changes Requested by the
Policyowner and Performance of Variable Contracts.**  An award of Enhanced Relief will
have no impact on a Claimant's/Reinstated Class Policy owner's obligation to pay interest and/or
principal payments as may be due on loans taken against the cash value of subject policy.
Claimants/Reinstated Class Policy owners who receive Enhanced Relief will be responsible for
the payment of loan interest and/or principal during the fourth and fifth years following
reinstatement; and failure to repay such amounts, if due, will put the policy at risk of lapse.
Further, if a Reinstated Class Policy owner makes or requests any change to the Reinstated Class
Policy that effects its performance, such as (without limitation) a loan, withdrawal, surrender, a
change in the policy's face amount, or any other change, this may prevent the Reinstated Class
Policy from remaining in force, and the policy's continuation would not be guaranteed.
Defendants make no representations or warranties regarding the impact of any such change if
made by the Policyowner.  In addition, for Reinstated Class Policy(ies) that are variable
universal life contracts, investment performance will affect the policy's cash value and additional
payment of premium may be required beyond the amounts Prudential will contribute as
described in Section III.B.2 above.

C.      **Individualized Relief for the Lapsed/Deceased Population**

1.      **Individualized Relief:  General.**  Prudential will offer individualized relief to
Authorized Claimants who fall within the Lapsed/Deceased Population, and who have not timely
and validly excluded themselves from the Settlement.  The individualized relief will be in the
form of a monetary Settlement Payment (defined below), the amount of which will be
determined by a Claim Scoring Process.  The Claim Scoring Process is based on an individual
analysis and determination of each Claim according to Scoring Guidelines developed and agreed

to by the Parties, and attached as Exhibit D hereto.  The Scoring Guidelines set forth Scoring

Factors, the process and rules that apply to the Scoring Factors and the remedies available to the

Lapsed/Deceased Population based on the information and data contained in Prudential's

records.  Taken as a whole, the Scoring Process provides for a particularized review of the

Claims that are filed, with a remedy reflective of the evidence available in Prudential's records

related to the Class Policy and the risks and uncertainties of litigation.

2.      **Individualized Relief:  Scoring Structure**:  Claims will be scored based upon a

four-tiered, 3-2-1-0 scale, as described in detail in the Scoring Guidelines.  The Scoring

Guidelines establish rules as to the significance of certain facts/factors that may be present in

Class Policy records.  Mutually agreeable guidelines and training will be provided by the Parties

to the Claims Administrator, who will conduct all of the scoring and determine Final Scores.

3.      **Individualized Relief:  Scoring Records and Data**.  Scoring by the Claims

Administrator will be based on the Prudential records and data specified in the Scoring

Guidelines for all Class Policies in the Lapsed/Deceased Population as to which a Claim has

been made.  The records identified in the Scoring Guidelines as to Class Policies on which a

Claim is made will be provided to the Claims Administrator by Prudential in the manner

maintained by Prudential in its regular course of business.  No information relevant to the

Scoring Factors or the determination of whether a Claimant is an Authorized Claimant will be

redacted before information is provided to the Claims Administrator.  The Claims Administrator

may request that Prudential provide recordings of specific telephone calls identified in

Prudential's written file records which were made within the time period beginning ninety (90)

days prior to the date of the default that led to the final lapse and ending ninety (90) days after

the date of final lapse, but may do so if and only if the Claims Administrator determines that the

written record is not sufficiently clear and that audio telephone call recordings (in addition to the available notes of conversations, which appear in each file where relevant) could provide important additional guidance in applying the Scoring Factors.

4.      **Individualized Relief:  Claims Administrator to Apply Final Score.**  For each Claim where a timely, completed Claim Form is submitted by an Authorized Claimant, the Claims Administrator will have two separate scorers review the Claim, apply the Scoring Factors and assign a Score.  If the two individual scorers agree on the Score, that becomes the Final Score.  If the two scorers do not agree, the Claim will be sent to a third scorer at the Claims Administrator (without the scores of the two prior reviewers) who will review all documentation, data and audio call recordings (if any previously were requested) and will serve as tie-breaker and/or final scorer.  The third scorer's determination will be the Final Score, which will be reported by the Claims Administrator to the Claimant by letter.  Claimants will not receive an analysis or the specific reasons for the scores they received.

5.      **Individualized Relief:  Potential for Limited Appeal to Special Master.**  An Authorized Claimant can pursue a Limited Appeal if the claim was decided by tie-breaker (i.e., third scorer).  Limited Appeals will be referred to the Honorable William J. Cahill (Ret.) of JAMS for review.  If Judge Cahill becomes unavailable for this purpose, an alternative JAMS Los Angeles, Century City or San Francisco neutral selected by the parties will serve as Special Master.  The cost of the Limited Appeal will be $1,000, payable exclusively by the Claimant, to JAMS.  Limited Appeals can be taken within ten (10) days of receipt of the Final Score, and only by an Authorized Claimant in a tie-breaker situation where the Final Score has been determined by a third scorer.  Appeals may not be taken by any other person or entity including, but not limited to, any Defendant or Class Counsel.  Judge Cahill will review the file independently,

without information about the Claims Administrator's evaluation of the case or assigned score. Judge Cahill's determination of a Limited Appeal will be final, and will not be subject to any challenge or further appeal. The Settlement Class and Defendants waive any right of recourse to the Court for purposes of challenging any particular Final Score applied by the Claims Administrator or Judge Cahill.

6. **Individualized Relief: Settlement Payment Amounts.** The Claims Administrator will pay, from the Escrow Account, Settlement Payments to Authorized Claimants whose claims are scored as part of the Scoring Process. The amount of a Settlement Payment will be determined by the Final Score, as follows:

   a. **Final Score 3.** For a Final Score of 3, the Settlement Payment will be equal to 75% of the death benefit amount of the subject Class Policy as of the date of death, reduced by 75% of the amount the Policyowner would have been required to pay to reinstate the Class Policy and keep the policy in force from the date of final lapse to the date of death (calculated using Current Rates and Charges), plus interest at 3% on that payment to be paid from date of death to the date the Settlement Payment is made.

   b. **Final Score 2.** For a Final Score of 2, the Settlement Payment will be equal to 55% of the death benefit amount of the subject Class Policy as of the date of death, reduced by 55% of the amount the Policyowner would have been required to pay to reinstate the Class Policy and keep the policy in force from the date of final lapse to the date of death (calculated using Current Rates and Charges), plus interest at 3% on that payment to be paid from date of death to the date the Settlement Payment is made.

   c. **Final Score 1.** For a Final Score of 1, the Settlement Payment will be equal to 5% of the death benefit amount of the subject Class Policy as of the date of death, reduced by 5% of the amount the Policyowner would have been required to pay to reinstate the Class Policy and keep the policy in force from the date of final lapse to the date of death (calculated using Current Rates and Charges), plus interest at 3% on that payment to be paid from date of death to the date the Settlement Payment is made.

   d. **Final Score 0.** For a Final Score of 0, Basic Relief will be paid.

7. **Individualized Relief: Settlement Payment Nature.** Amounts required to be

paid hereunder will be funded by Prudential and paid out of the Escrow Account.  The parties

agree that all payments will be made exclusively as a compromise and shall be deemed  a

Settlement Payment.  Under no circumstance will a Settlement Payment be considered a death

benefit payment (or any other type of payment) under the terms of a Class Policy.

8.    **Individualized Relief: Settlement Payment Calculation and Timing.**  All

Settlement Payments will be calculated after Final Scores have been applied to all Claimants,

and after all Limited Appeals pursuant to Section III.C.5. above are finally adjudicated, as

follows.

      a.    Within ten (10) days of the date on which all Claims received a Final Score, the Claims Administrator will provide to Prudential the list of Authorized Claimants including the policy number for each Class Policy and the Final Score applied to each Claim.

      b.    For each Claim that receives a Final Score of 3, 2 or 1, Prudential will calculate the death benefit and the minimum premium payment (using Current Rates and Charges) on the Class Policy that would have been required to reinstate the Class Policy and have it stayed in force from time of final lapse to the date of death, and within ten (10) business days, provide the results to the Claims Administrator.

      c.    Based upon the Final Score, and within ten (10) days of receiving the calculations provided by Prudential set forth in the above subparagraph (b), the Claims Administrator will determine the Settlement Payment including interest and inform Prudential of the amount required in the Escrow Account to fund all Settlement Payments.

      d.    Within ten (10) business days following receipt of notice from the Claims Administrator of the amount required in the Escrow Account to fund all Settlement Payments, Prudential shall cause sufficient monies to be paid into that Escrow Account.

      e.    Settlement Payments will not be issued to Authorized Claimants unless and until the Settlement becomes Final.  Once the Settlement becomes Final, the Claims Administrator shall issue checks for the Settlement Payments as promptly as possible, but in no more than sixty (60) days following the Settlement becoming Final.

      f.    The Claims Administrator shall perform an address trace for any undeliverable check following receipt of any undeliverable check, and shall re-

send the check within sixty (60) days if a different address is found.  If a check for a Settlement Payment mailed to an Authorized Claimant and not returned as undeliverable is not cashed within one hundred eighty (180) calendar days, the funds shall revert back to the Escrow Account.

9.      **Individualized Relief:  Establishing a Claim**.  To be eligible for Individualized

Relief, a Claimant must timely complete and submit a Claim Form, in the form attached as

Exhibit F.  In addition to the items on the Claim Form, the Claimant must provide due proof of

death of all insureds on the Class Policy to the extent that the Claims Administrator may require,

and provide all materials and information that are required by the Claims Administrator as

further detailed in the Scoring Guidelines (which requirements are intended to mirror what

generally would be required in the ordinary course of Prudential's business to substantiate a

death).  The Claimant must certify, under penalty of perjury, that the Claimant stands in the

shoes of the Policyowner of the Class Policy and/or otherwise is entitled to collect a Settlement

Payment made with respect to the Class Policy and will distribute such Settlement Payment in

whole or in relevant part to any other individual or entity who has a recognized interest therein.

10.      **Individualized Relief:  Authorized Claimants:**  Notwithstanding any other

provision in this Stipulation, where more than one person or entity has an ownership interest or

right in a Class Policy, all persons claiming such an interest or right in such Policy must (a) act

jointly in exercising any right (including any right to exclude him or herself from the Class or to

object to this Settlement) created under this Stipulation; and (b) assume all responsibilities and

liabilities associated with distribution of the Settlement Payment under law, including making

any payments that may be owed to others.

11.      **Claims Administrator is Sole Determiner of Authorized Claimants.**  All

decisions as to whether a Claimant is an Authorized Claimant will rest with the Claims

Administrator.  With respect to the Settlement Class and all Class Policies, there shall be no

recourse to any Defendant or Releasee or its counsel, or to the Class Representative or Class

Counsel, or the Court, for any determination made by the Claims Administrator as to whom

Settlement Payment will be directed.  Likewise, there shall be no ability to challenge, nor any

recourse or right to recover, from the Claims Administrator for determinations made under this

Settlement Agreement.

**D.      Change to Business Practice for Current Policyowners and Owners of
Reinstated Class Policies.**

1.      **Charges at Default and Lapse/Reinstatement**:  Defendants will maintain

policies and procedures to ensure that, from the date of this Settlement Agreement going

forward, with respect to universal life and variable universal life policies issued by a Defendant

in the United States and that remain in force, in the absence of a contract term providing for a

different or lower amount or a different calculation formula (such as, for example, a Secondary

Guarantee against lapse, or a prior signed settlement and/or release agreement with the

Policyowner), and in the absence of a state statutory or regulatory or administrative directive to

the contrary, the amount requested to cure a default or to reinstate a policy will be calculated by

reference to Current Rates and then-Current Charges and not by reference to Guaranteed Rates.

**IV.    RELEASE OF CLAIMS**

**A.      General Matters Regarding Release.**

1.      The obligations incurred pursuant to this Stipulation are in consideration of: (a)

the full and final disposition of the Action as against Defendants; and (b) the Releases provided

for herein.

2.      Pursuant to the Final Order and Judgment, without further action by anyone, upon

the Effective Date of the Settlement, Plaintiff, the Settlement Class, and the Releasing Parties, as

more specifically set out below at Section IV.C.: (i) have and shall be deemed to have fully,

**FINAL - EXECUTION VERSION**

finally, and forever waived, released, relinquished, discharged, and dismissed each and every one of the Plaintiff's and Settlement Class' claims against each and every one of the Releasees; (ii) have and shall be deemed to have covenanted not to sue, directly or indirectly, any of the Releasees with respect to any or all of the Settlement Class claims; and (iii) shall forever be barred and enjoined from directly or indirectly, filing, commencing, instituting, prosecuting, maintaining, or intervening in any action, suit, cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, or before any administrative body (including any state Department of Insurance or other regulatory entity) whether in the United States or elsewhere, on their own behalf or in a representative capacity, that is based upon or arises out of any or all of the Released Claims as more fully set forth in Section IV.B.. Plaintiff, the Settlement Class and the Releasing Parties, shall be bound whether or not a valid and timely Claim Form is required or submitted, or any other action is taken to obtain recovery as a result of the Settlement Agreement. This Release shall not apply to any Settlement Class Member who or which submits a valid request for exclusion from the Class related to a Class Policy per Section VII below.

3.      Nothing in this Settlement Agreement or the Final Order and Judgment, shall bar any action by any of the Parties or their successors or assigns to enforce or effectuate the terms of this Stipulation or the Final Order and Judgment.

**B.      Released Claims.** The Released Claims under this Settlement Agreement include all claims that have been, could have been, may be, or could be alleged or asserted in this Action regarding or concerning directly or indirectly any Class Policy, by Plaintiff, any Settlement Class Member, or any Releasing Party, against any of the Releasees (individually or together) either in the Action or in any other court action or before any administrative body (including any state Department of Insurance or other regulatory commission), tribunal or arbitration panel, and that

FINAL - EXECUTION VERSION

are made on the basis of, connected with, arise out of, or are related to, in whole or in part,

claims that were raised or that could have been raised in the Action, which include without

limitation those regarding:

> (i)   Any or all of the acts, omissions, facts, matters, transactions or occurrences that were directly or indirectly alleged, asserted, described, set forth or referred to in the Action;

> (ii)   The amount of monies or other requirements that were requested by or on behalf of Prudential in order to keep a Class Policy that has entered default in force or to reinstate a Class Policy after lapse including, but not limited to, premium and all fees, charges and other monies, verifications or documentation requested;

> (iii)   Claims, acts or omissions regarding the method of, and/or administration of, and/or communication regarding, the calculations by or on behalf of Prudential of the amount of monies that were requested, in order to keep a Class Policy that has entered default in force or to reinstate a Class Policy after lapse, and including but not limited to premium, fees, charges and other monies or requirements.  This includes but is not limited to any and all claims regarding:

>> (a) premiums;
>> (b) cost of insurance charges, rates and assumptions;
>> (c) administrative fees or loads;
>> (d) underwriting or other requirements; and/or
>> (e) other policy costs.

> (iv)   Claims regarding Prudential's policies and procedures concerning default, grace periods, lapse or reinstatement, including, but not limited to, claims concerning communications, notices, absence or omission of communications or specific information regarding grace periods, default or lapse, or the timing thereof, and claims relating to notice to identified third parties, including, but not limited to, any claims made under any state's law, regulation or administrative directive; and

> (v)   Claims related to Prudential's declination or refusal of an attempt to cure a default or reinstate a Class Policy, for any reason.

**C.      Settlement Class Release And Waiver**

1.      **Release.**  Plaintiff, the Settlement Class and the Releasing Parties associated with

the Lapsed/Alive and Lapsed/Deceased Populations each hereby individually expressly agrees

FINAL - EXECUTION VERSION

that he/she/they/it shall not now or hereafter institute, maintain or assert against any Releasee(s), either directly or indirectly, on his/her/their/its own behalf or on behalf of the Settlement Class, any Class Policy, or any person, and release and discharge each Releasee from, any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights, of any kind or nature whatsoever, whether based on federal, state or local statute or ordinance, regulation, contract, common law, or any other source, related to, based upon, arising out of, in whole or in part, the Released Claims.  For those Reinstated Class Policies that are reinstated under this Settlement Agreement more than five years following default, and were issued under either the 1980 or 2001 CSO mortality table, this Release does not include claims for monetary loss that result directly from Prudential's administration of those policies under the guideline premium limitation ("GPL") and cash value corridor ("CVC") test of section 7702(c) and (d) of the Internal Revenue Code.

2.     **Covenant Not to Sue and Release as Bar.**  Plaintiff, the Settlement Class and the Releasing Parties each individually covenant not to bring any Released Claim and expressly agree that this Release will be, and may be raised as, a complete defense to and will preclude any action or proceeding encompassed by the release(s) contained herein in respect to Class Policies.

3.     **Contract Rights Remain.**  Except as specifically provided for herein, nothing in this Settlement Agreement shall be deemed to alter contractual rights under a current policy or a Reinstated Class Policy, including to make a claim for benefits that will become payable in the future pursuant to the express written terms of the policy issued by Prudential; provided, however, that this provision shall not entitle a Settlement Class Member to assert claims which relate to the allegations in the Action or to the Released Claims described in Section IV.B. above.

FINAL - EXECUTION VERSION

4.      **Claims for Fees and Costs Released.**  Without in any way limiting the scope of

the Release, this Release covers, without limitation, any and all claims for attorneys' fees, costs

or disbursements incurred by Plaintiff's Counsel, Class Counsel or any other counsel

representing Plaintiff or any Settlement Class Members (including counsel to Claimants), or by

Plaintiffs or the Settlement Class, or any of them, in connection with or related in any manner to

the Action, the Settlement of the Action, the administration of such Settlement and/or the

Released Claims except to the extent otherwise specified herein.

5.      **Unknown Claims Released.**  Except as otherwise provided herein, it is the

intention of Plaintiff and the Settlement Class in executing this Settlement Agreement and

Release to fully, finally and forever settle and release all matters, and all claims relating thereto,

which exist, hereafter may exist, or might have existed pertaining to the Released Claims and

Class Policies as set forth above, including "Unknown Claims."  Unknown Claims mean any

claim as to any Class Policy which was not known or suspected by any member of the

Settlement Class to exist in his, her or its favor at the time of the release of such claims, which, if

known by him, her or it, might have affected his, her or its decision(s) with respect to this

Settlement Agreement.  With respect to any and all Released Claims, the Parties stipulate and

agree that, upon the Effective Date of the Settlement, Plaintiff and the Settlement Class shall

expressly waive, and each of the other Settlement Class Members shall be deemed to have

waived, and by operation of the Final Order and Judgment shall have expressly waived, any and

all provisions, rights, and benefits conferred by any law of any state or territory of the United

States, or principle of common law or foreign law, which is similar, comparable, or equivalent to

California Civil Code §1542, which provides:

> A general release does not extend to claims which the creditor does
> not know or suspect to exist in his or her favor at the time of

> executing the release, which if known by him or her must have
> materially affected his or her settlement with the debtor.

Plaintiff and the Settlement Class acknowledge that they may hereafter discover facts, legal

theories, or authorities in addition to or different from those which he, she or it now knows or

believes to be true with respect to the subject matter of the Released Claims and acknowledge,

and each of the other Settlement Class Members shall be deemed by operation of law to have

acknowledged, that the foregoing waiver was separately bargained for and a key element of the

Settlement Agreement.

6. **Release and Waiver Upon Participation in the Claim Process**.  In addition to

the Release and Waiver by Plaintiff, Settlement Class Members, and Releasing Parties, as

described in Section IV  above and incorporated in the Final Order and Judgment, the Parties

agree that all Claimants submitting Claims shall also individually acknowledge the Release (as

reflected in Part III of the Claim Form) in favor of the Defendants and the other Releasees.


## V.   PRELIMINARY APPROVAL

A. **Reasonable Best Efforts to Effectuate Settlement.**  The Parties agree to

cooperate with one another to the extent reasonably necessary and to use their reasonable best

efforts to effectuate and implement the terms and conditions of this Settlement Agreement.

B. **Motion for Preliminary Approval and Stay.**  Following execution of this

Stipulation, and by no later than October 11, 2019 or such later date as set by the Court in the

Action, Class Counsel will submit this Settlement Agreement to the Court and shall move for

entry of the Preliminary Approval Order in the form attached hereto as Exhibit G.  Class Counsel

agrees to provide Defendants' counsel with draft copies of all pleadings and supporting

documents that Class Counsel intends to file in support of this Agreement and Settlement,

**FINAL - EXECUTION VERSION**

including Plaintiff's Motion for Preliminary Approval no later than seven (7) business days prior to filing.  Defendants agree that the motion shall be unopposed provided that it is consistent with this Settlement Agreement.

  **C.**  **No Further Action to Litigate.** From the date of this Stipulation through the Effective Date of the Settlement, the Parties agree, other than for those matters necessary to implement and effectuate the Settlement itself: (a) not to take any steps to prosecute, or assist any other person or entity to prosecute, any of the Released Claims against any Releasee; and (b) not to initiate or participate in any proceedings arising out of, based upon or concerning any of the Released Claims against any Releasee.  To the extent consistent with their ethical obligations, Class Counsel represent that they do not have any clients on whose behalf they presently plan to (a) prosecute, or assist in prosecuting, any of the Released Claims against any of the Releasees; and (b) initiate or participate in any proceedings arising out of, based upon or concerning any of the Released Claims against any of the Releasees, including by opting out of or objecting to this Settlement Agreement.

  **D.**  **Stipulation to Certification of a Settlement Class.** The Parties hereby stipulate for purposes of the Settlement only that the following Settlement Class should be certified pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(e):

> All Policyowners of Class Policies and, where all Policyowners and insureds of a Class Policy are deceased, then also any designated beneficiary(ies) of that Class Policy at the time of final lapse.

> Class Policies include all individual universal life or variable universal life insurance policies issued by a Defendant as to which Guaranteed Charges were applicable to the calculation of the deficiency and/or reinstatement amount, and which policy either entered into default or lapsed between July 18, 2013 and the date of Preliminary Approval, or which had default cured or was reinstated on or after July 18, 2013 and remains in force on the date of Preliminary Approval.

  **E.**  **Plaintiff is Settlement Participant.** Plaintiff agrees that he will not request

exclusion from the Settlement Class, will not object to the Proposed Settlement, and will not file an appeal from or seek review of the Final Order and Judgment, or any alternative order approving the Proposed Settlement terms.

## VI. NOTICE TO THE CLASS AND COMMUNICATIONS WITH SETTLEMENT CLASS MEMBERS ("Notice Plan")

**A.      Notice to Settlement Class.**  In the event that the Court Preliminarily Approves the Settlement, Notice of the terms of the Settlement and the date of the Settlement Hearing scheduled by the Court to consider the fairness, adequacy and reasonableness of the Settlement shall be provided pursuant to the Notice Plan below, in accordance with Rule 23 of the Federal Rules of Civil Procedure.  The Notice shall explain the general terms of the Settlement, the general terms of the proposed Fee Award and Incentive Award, and a description of Settlement Class Members' rights to object to the Settlement, request exclusion from the Settlement Class, and appear at the Settlement Hearing.

**B.      Notice List**.  For the purposes of identifying and providing notice to the Settlement Class, within twenty-one (21) calendar days of the date of entry of the Preliminary Approval Order, Prudential shall provide to the Claims Administrator, to the extent available in Prudential records at that time, the names and last known U.S. Mail addresses of persons to whom Class Notice should be provided, and to the extent recorded by Prudential in policy records, email addresses, divided into the following categories:

1.      For Current Policyowners, the Policyowner(s) of record.

2.      For Class Policies in the Lapsed/Alive population, all Policyowners of record at the time of final lapse of the Class Policy.

3.      For Class Policies in the Lapsed/Deceased population: (i) all Policyowners of record at the time of final lapse of the Class Policy; (ii) to the extent available in Prudential's

records, the Administrator(trix) or other address for the Estate(s) of the insured(s) on the Class

Policy; and (iii) to the extent available in Prudential's records, the beneficiary or beneficiaries on

the Class Policy.

C. **Notice List is Not Settlement Class List**. The mere mailing of a Class Notice to

a person or entity will not render such person or entity a part of the Settlement Class or otherwise

entitle such person to participate in the Settlement as a Claimant. The Notice List is not and

shall not be interpreted as or deemed to be a list of Settlement Class Members or Authorized

Claimants. The Notice List is designed solely for purposes of ensuring that notice is provided to

anyone who potentially could be a member of the Settlement Class. Rights, if any, to Settlement

benefits under this Settlement Agreement, shall be determined in accordance with the provisions

of this Settlement Agreement, and not by reference to the list prepared for Notice purposes.

D. **Classification of Individuals on Notice List Not Dispositive.** Plaintiff and the

Settlement Class acknowledge and understand that Prudential's records may not, and likely will

not in every case, accurately reflect whether a Class Policy falls within the Lapsed/Alive or

Lapsed/Deceased population. Because lapsed policies are no longer active at Prudential,

Prudential's records may not be complete, and deaths typically would not be reported to

Prudential on lapsed policies. Information will be provided for reference by the Claims

Administrator alone, and will not be deemed conclusive or determinative of the population in

which a Claim may belong. Claimants will have the opportunity to make a Claim for that relief

they believe to be appropriate for the particular circumstances of the Class Policy.

E. **Direct Notice via Email.** No later than twenty-eight (28) days from the date on

which the Claims Administrator receives the complete Notice List from Prudential, the Claims

Administrator shall send Notice via email substantially in the form attached as Exhibit H, along

with an electronic link to the Settlement Website and Claim Form, to all individuals on the

Notice List for whom a valid email address was provided by Prudential.  The Claims

Administrator shall also provide these individuals with Direct Notice via U.S. Mail as provided

in Paragraph F below.

     **F.**     **Direct Notice via U.S. Mail.**  No later than the twenty-eight (28) days from the

date on which the Claims Administrator receives the complete Notice List from Prudential, the

Claims Administrator shall send Summary Notice by U.S. Mail substantially in the form attached

as Exhibit A to all persons on the Notice List.  In order to provide the best notice practicable, the

Claims Administrator will run the Notice List through the United States Postal Service's

National Change of Address database before mailing, and in the event that Notices are returned

as undeliverable, will perform a standard skip trace in an effort to ascertain the current address of

the particular person in question, and if such an address is ascertained, shall re-send the Notice to

the new address within three (3) business days of ascertaining the address.

     1.     **Indicator for Lapsed/Deceased**.  For Class Policies believed to be within

the Lapsed/Deceased population, the Summary Notice will include an indicator directing persons

receiving notice to the Claim Form for Individualized Relief.

     2.     **Indicator for Lapsed/Alive Enhanced Relief Eligible**.  For Class

Policies believed to be within the Lapsed/Alive population who also are believed to be eligible

for Enhanced Relief, the Summary Notice will include a statement so indicating and will direct

persons receiving notice to the Claim Form for Reinstatement with Enhanced Relief.  The notice

will include an individual access code that enables only that individual notice recipient to access

the Claim Form for Reinstatement with Enhanced Relief, which shall not be generally available

on the Settlement Website.

3. **Effect of Incorrect Classification for Notice Purposes.** (a) If a Class Policy is incorrectly identified for Notice purposes as within the Lapsed/Deceased Population but is actually within the Lapsed/Alive Population, a Claimant will have the opportunity on the Settlement Website to locate and complete the appropriate Claim Form for Reinstatement Relief or Basic Relief; (b) If a Class Policy is either: (i) incorrectly identified for Notice purposes as within the Lapsed/Alive population but is actually within the Lapsed/Deceased population, or (ii) all insureds on a Class Policy identified for Notice purposes as within the Lapsed/Alive Population pass away during the Claims Period but before a Claim Form is submitted, the Claimant will have the opportunity on the Settlement Website to find and complete the appropriate Claim Form for Individual Relief or Basic Relief; (c) If a Class Policy is identified as within the Lapsed/Alive population, a Claimant files a Claim Form for Reinstatement Relief, and that Claimant is determined by the Claims Administrator to be an Authorized Claimant, but before the Reinstatement Amount is paid all insureds pass away, the Claim will be treated as one for Individualized Relief and subject to the Scoring Process; however, if the Reinstatement Amount has been paid the Reinstated Class Policy will be treated as reinstated and a death claim processed; (d) In the event that the Class Policy belonged to a Current Policyowner, if that policy lapsed for the final time on or after April 30, 2019, no relief other than the relief described at Section III.D.1. is available.

G. **Settlement Website.** No later than two (2) days prior to the date on which Direct Notice is to be mailed, notice shall be provided on a website at an available settlement URL (such as, for example, www.lapsedpolicysettlement.com) which shall be obtained, administered and maintained by the Claims Administrator and shall include the ability to file Claim Forms on-line. The Settlement Class and all Claimants agree that Claim Forms, if submitted electronically,

will reflect an electronic signature and will be binding for purposes of applicable law and contain a statement to that effect.  A complete copy of the submitted electronic form will be promptly emailed to the Claimant.  The Notice provided on the Settlement Website shall be substantially in the form of Exhibit B hereto.  A paper Claim Form will be provided to Claimants upon request.  In the cases where the paper Claim Form is used, it will conspicuously notify the Claimant to retain a copy of the completed Claim Form.  The Claims Administrator will provide a copy of the submitted Claim Form to Claimants, or anyone acting on their behalf, within ten (10) days of a request for same.

**H.     CAFA Notice**.  Pursuant to 28 U.S.C. § 1715, not later than ten (10) days after this Stipulation is filed with the Court, the Claims Administrator shall cause to be served upon the appropriate State Officials in each U.S. State in which Settlement Class Members reside, and the Attorney General of the United States, notice of the proposed settlement as required by law. The Final Approval Hearing shall be no earlier than ninety (90) days after the Notice described in this Paragraph is provided.

**I.     Telephone Bank and Right of Communication with Claimants**.  Prudential expressly reserves the right to communicate with and respond to inquiries from the Settlement Class Members orally and/or in writing in connection with the Settlement, and it may do so through any appropriate means, including (without limitation) in the following respects:

(a)     The Claims Administrator will establish a telephone bank with a toll-free "800" telephone number for responding to general inquiries from the Settlement Class about the Settlement.  Prudential, with participation of Class Counsel as described below, will be responsible for (i)  educating and training the telephone representatives about the background of the Action, product concepts relevant to the Settlement, and the notice,

**FINAL - EXECUTION VERSION**

terms and chronology of the Settlement, (ii) training the telephone representatives to answer potential Claimants' and Policyowners' inquiries specifically relating to the Settlement, (iii) providing scripts and model questions and answers for the telephone representatives to use in answering potential Claimants' and Policyowners' inquiries, and (iv) taking any other steps to promote accurate and efficient communications with potential Claimants and Policyowners. Class Counsel may monitor the education and training process and review and comment on/edit drafts of telephone scripts before their use and by observing training sessions to ensure proper communication and conformance to the Settlement. It is the intention of the Parties that this process be mutually agreeable for adequacy and fairness.

(b) Prudential may continue to process and respond to insured, beneficiary or Policyowner complaints, including complaints submitted to Prudential by regulators, in the usual course of business notwithstanding that some complaints may be about Class Policies or originate with Settlement Class Members and may concern claims relating to Class Policies that otherwise could be eligible for relief under the Settlement Agreement; provided, however, that after the Class Notice mailing and before the implementation of Settlement Relief for a particular Class Policy, any offer of relief by Prudential in response to any such complaint concerning a Class Policy will be accompanied by a copy of the Settlement Agreement.

(c) With respect to Class Policies in the Lapsed/Alive population, once a Claim Form seeking Reinstatement Relief has been submitted and verified by the Claims Administrator and the Claimant is found to be an Authorized Claimant, the Claims Administrator will provide information to enable the Claimant to obtain the necessary

information and take all necessary steps to effectuate the reinstatement of a Reinstated

Class Policy, as set forth in the Reinstatement Process Guidelines.  Once an Authorized

Claimant pursues Reinstatement Relief, communications can take place directly between

Prudential and Claimant without requiring the participation of Class Counsel, although

the Claimant can choose to involve Class Counsel at his/her/its discretion.  In the event

that the Claimant chooses not to proceed with Reinstatement Relief, the Claimant will be

directed back to the Claims Administrator and the Claim will be treated as a Claim for

Basic Relief.

## VII.   REQUESTS FOR EXCLUSION AND OBJECTIONS TO SETTLEMENT

**A.     Requests for Exclusion or "Opt Outs".**  A Settlement Class Member may

request to be excluded from the Settlement Class by sending a timely written request postmarked

on or before the Objection/Exclusion Deadline approved by the Court and specified in the

Notice.  To exercise the right to be excluded (or "opt out"), a Settlement Class Member must

timely send a written request for exclusion to the Claims Administrator providing (1) his/her

name and address; (2) the Policy Number of the applicable Class Policy(ies), (3) a statement that

the Person seeking exclusion is authorized to act on behalf of the Class Policy, including

compliance with paragraph Section III.C.10.; (4) a signature, (4) the name and civil action

number of the case and (5) a clear statement that he or she, on behalf of the Class Policy

associated with them, wishes to be excluded from the Settlement Class for purposes of this

Settlement.  A request to be excluded that does not include all of this information, or that is sent

to an address other than that designated in the Notice, or that is not postmarked within the time

specified, or is not sent by an authorized person as defined at Section VII.C. (below), shall be

invalid, and the person(s) or entity(ies) serving such a request and the subject Class Policy shall

be a member(s) of the Settlement Class and shall be bound as a Settlement Class Member by this Agreement, if approved.  Any member of the Settlement Class who validly elects to be excluded from this Agreement shall not:  (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief under this Settlement Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement.  The request for exclusion must be personally signed by each person or entity requesting exclusion.  No request for exclusion may be made on behalf of a group of Class Policies owned by different Policyowners.  So-called "mass" opt outs and/or attempts to opt out a "class" shall not be allowed.

**B.      Action Upon Requests for Exclusion.**  Upon receiving any request(s) for exclusion, the Claims Administrator shall stamp on the original the date it was received and shall promptly notify Class Counsel and Defendants' Counsel of such request(s) no later than two (2) calendar days after receiving any request.  The Claims Administrator shall indicate whether such request is timely received, and provide copies of the request(s) for exclusion, the mailing envelope, and any accompanying documentation, by email.

**C.      Exclusion Valid Only if Served by Authorized Person And On Behalf of All.**  Any request for exclusion that is served by a person who is not a Settlement Class Member or an attorney representing a Settlement Class Member shall not be valid, and the person serving the attempted exclusion and the Class Policy shall remain subject to all terms of this Settlement Agreement.  Likewise, any request for exclusion that purport to opt out fewer than all Policyowners and/or all designated beneficiary(ies) at the time of final lapse of a Class Policy shall not be valid.

**D.      Objections to Settlement.**  Any Settlement Class Member who has not filed a written request for exclusion for all of his/her/its Class Policies and who wishes to object to the

FINAL - EXECUTION VERSION

fairness, reasonableness or adequacy of this Stipulation or the Proposed Settlement must present

on a timely basis pursuant to the Court's anticipated Preliminary Approval Order the objection in

writing, which must be personally signed by the objector, and must include:  (1) the objector's

name and address; (2) an explanation of the basis upon which the objector claims to be a

Settlement Class Member, including the Policy Number of the applicable Class Policy(ies), and a

statement that the Person seeking to object is authorized to act on behalf of the Class Policy, per

Section III.C.10. above; (3) all grounds for the objection, including all citations to legal authority

and evidence supporting the objection; (4) the name and contact information of any and all

attorneys, brokers, advisors or others who are representing, advising, or in any way assisting the

objector in connection with the preparation or submission of the objection or who may profit

from the pursuit of the objection (the "Objecting Attorneys and Advisors"); and (5) a statement

indicating whether the objector intends to appear at the Final Approval Hearing (either

personally or through counsel who files an appearance with the Court in accordance with the

Local Rules).  Any attorney who wishes to appear must file an appearance so indicating.

      **E.**    **Objector Required to Disclose Interest.**  If a Settlement Class Member or any of

the Objecting Attorneys and Advisors has objected to any class action settlement in a different

case where the objector or the Objecting Attorneys or Advisors asked for or received any

payment in exchange for dismissal of the objection, or any related appeal, without any

modification to the settlement, then the objection must include a statement identifying each such

case by full case caption and amount of payment received.

      **F.**    **No Solicitation of Objection or Request to Opt Out.**  The Parties and their

counsel agree that the decision to opt out should be left to the individual Settlement Class

Members.  At no time shall any Party or their respective counsel seek to solicit or otherwise

encourage Settlement Class Members or any other persons to opt out of the Settlement, submit written objections to the Settlement or encourage Settlement Class Members to appeal the Court's Final Order and Judgment.

   **G.**  **Settlement Class Members Otherwise Bound.** Any Settlement Class Member who does not, in accordance with the terms and conditions of this Settlement Agreement, seek exclusion from the Settlement Class or timely file a valid Claim Form, and any Class Policy as to which exclusion is not sought or a valid Claim Form submitted, shall not be entitled to receive any payment or benefits pursuant to this Stipulation, but will otherwise be bound by all of the terms of this Stipulation, including the terms of the Final Order and Judgment to be entered in the Action and the Releases provided for in the Stipulation, and will be barred from bringing any action (or having any action brought on his/her/its behalf) against any of the Released Parties concerning the Released Claims.

## VIII. CLAIMS ADMINISTRATION

   **A.**  **Claims Administrator Appointment**. As part of the Preliminary Approval Order, the Parties shall seek appointment of the Claims Administrator.  The Claims Administrator shall administer the Settlement, including, but not limited to, executing the Notice Plan, receiving, reviewing, scoring and approving or denying Claims submitted by the Settlement Class to determine Authorized Claimants, acting as Escrow Agent and overseeing the distribution of all Settlement Payments, Basic Payments, Claims Administration Expenses, Fee Awards and Incentive Awards, and such other duties as the Parties or the Court may assign, consistent with this Stipulation and the Exhibits hereto.  The Claims Administrator shall be subject to the jurisdiction of the Court.

FINAL - EXECUTION VERSION

**B.      Claims Administrator Recordkeeping (General).**  The Claims Administrator shall maintain reasonably detailed records of all of its activities under this Settlement Agreement, including all records required by applicable law in accordance with its normal business practices. Such records, other than records regarding the Scoring Process as applied to individual Claims (which will not be made available to the Parties except as subject to Audit pursuant to Section VIII.H. below), will be made available to Class Counsel and Defendants' Counsel upon reasonable request.  The Claims Administrator shall also provide reports and other information to the Court as the Court may require.

**C.      Notice Obligations Rest with Claims Administrator.**  In accordance with the terms of the Preliminary Approval Order to be entered by the Court, the Parties shall cause the Claims Administrator to create a Settlement Website and provide the Notices and Claim Form to the Settlement Class as set forth in Section VI above, and establish a P.O. Box to be identified in the Notice and a toll-free interactive voice-response telephone system and call center.  To the extent that notice is required pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, Defendants' Counsel shall direct the Claims Administrator to timely provide such notice to the required State and Federal officials, as those terms are defined in the statute.

**D.      Supervision of Claims Administrator.**  Prudential and Class Counsel shall be jointly responsible for generally supervising the administration of the Settlement subject to such supervision and direction of the Court as may be necessary or as circumstances may require, and subject to those provisions of this Settlement Agreement that rest all specific Claim determinations within the sole authority of the Claims Administrator.  The Parties shall jointly have the right, but not the obligation, to instruct the Claims Administrator to waive upon mutual

agreement what they deem to be formal or technical defects in any Claim Forms submitted in the

interests of achieving substantial justice.

        **E.**    **Claims Administrator's Determination of Authorized Claimant.**  For purposes

of determining the extent, if any, to which a Claimant shall be entitled to be treated as an

Authorized Claimant, the following conditions shall apply, in addition to the specific

requirements herein for a Claimant to receive Reinstatement Relief, Enhanced Reinstatement

Relief, Individualized Relief, or Basic Relief:

      a.     Each Claimant shall be required to submit a Claim Form, substantially in the forms attached hereto as Exhibits E and F, including such certification as are contained therein;

      b.     All Claim Forms must be submitted by the date set by the Court in the Preliminary Approval Order and specified in the Notice.  Any Settlement Class Member who fails to submit a Claim Form by such date, or such other date as may be ordered by the Court, shall be forever barred from participating in the relief afforded by this Stipulation (other than the relief at  Section III.D.1.), but shall in all other respects be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Final Order and Judgment, and the Releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim or other proceeding of any kind against any Releasees with respect to any Released Claims.  A Claim Form shall be deemed to be submitted when postmarked, if received with a postmark indicated on the envelope and if mailed by first-class mail and addressed in accordance with the instructions thereon.  In all other cases, the Claim Form shall be deemed to have been submitted on the date when actually received by the Claims Administrator.

      c.     Each Claimant and each Claim Form shall be submitted to and reviewed by the Claims Administrator who shall determine in accordance with this Settlement Agreement whether the Claim is an Authorized Claim and the Claimant an Authorized Claimant.

      d.     Claim Forms that do not meet the submission requirements or are not timely submitted may be rejected.  Prior to rejecting a Claim in whole or in part, for reasons other than timeliness (a non-curable deficiency), the Claims Administrator shall communicate with the Claimant in writing, to give the Claimant the chance to remedy any curable deficiencies in the Claim Form submitted.

Case 2:17-cv-05290-MWF-FFM   Document 921   Filed 02/11/20   Page 82 of 135   Page
ID #:18035
Case 2:17-cv-05290-MWF-FFM   Document 921   Filed 10/21/19   Page 90 of 198   Page
ID #:16037

FINAL - EXECUTION VERSION

  **F.**  **Claims Administrator Interface with Prudential.** The Claims Administrator

shall have the following specific obligations related to the determinations it is to make regarding

whether a Claimant is an Authorized Claimant and determination of the relief to be awarded:

  1. For the Lapsed/Deceased population:

    a.  Provide a list of Claimants to Prudential as to whom data and documents
    are requested for the Scoring Process, including names, Class Policy numbers
    and the verified date of death;

    b.  Request call recordings from Prudential where a scorer has determined
    they are necessary to the Scoring Process;

    c.  Provide Prudential with a list of Final Scores to enable Prudential to
    calculate the premium relevant to the Settlement Payment, pursuant to Section
    III.C.8,; and

    d.  Provide Prudential with amounts to deposit in the Escrow Account, as
    needed, to cover Basic Payments and Settlement Payments.

  2. For the Lapsed/Alive population:

    a.  Provide a list of Claimants to Prudential to obtain data to enable the
    application of Gating Rules;

    b.  Provide a list of Claimants to Prudential who failed to certify as obligated
    by the Claim Form and who qualify for Basic Relief;

    c.  Provide a list of Claimants to Prudential who are Authorized Claimants for
    Basic Relief to enable Prudential to fund the Escrow Account as necessary;

    d.  Provide a list of Claimants to Prudential who are Authorized Claimants for
    Reinstatement Relief to enable communications regarding Reinstated Class
    Policies; and

    e.  Provide a list to Prudential of Claimants who are Authorized Claimants for
    Enhanced Relief to enable Prudential to identify such Reinstated Class Policies
    for later implementation of the relief if the conditions precedent are met.

  **G.**  **No Recourse by Claimant for Determinations Regarding Authorized**

**Claimants.** No Claimant or Policyowner shall have any claim against Plaintiff, Class Counsel,

the Claims Administrator or any other agent designated by Class Counsel, or the Defendants,

Releasees and/or their respective counsel, arising from the relief provided or distributions made

substantially in accordance with the Settlement Agreement or any order of the Court. Plaintiff,
Defendants, their respective counsel, and all other Releasees shall have no liability whatsoever
for the determination, administration, scoring or calculation of any Claim determination made by
the Claims Administrator including, but not limited to, the determination as to whether to accept
any Claimant as an Authorized Claimant or with respect to the amount or nature of relief
awarded.

     **H.**    **Audit Rights.**  In furtherance of the Parties' general obligation to supervise the
Claims Administrator, the Parties and their counsel will be permitted to audit the Scoring Process
as it is applied to up to 30% of all Claims subject thereto. The purpose of the Audit is
exclusively to assess whether the Claims Administrator is appropriately following the Scoring
Guidelines and the terms of this Settlement Agreement. The Audit will commence within thirty
(30) days of the commencement of the Scoring Process, and prior to the scoring of 50% of the
Claims. The Audit will be subject to the Protective Order in this case, and any materials
obtained or reviewed in connection therewith shall be used for purposes of the Audit only, except
that Prudential reserves and retains the right to use materials provided from its own files and
records for its own legitimate business purposes. The Special Master will adjudicate any dispute
between the parties regarding the Claims Administration process, applying the terms of this
Settlement Agreement inclusive of the Exhibits hereto. The Scoring Process will not conclude
prior to the conclusion of the Audit. Each side will bear its own costs concerning any audit
activity and will divide equally any costs attributable to the Special Master's involvement in
resolving Party disputes.

     **I.**    **Confidentiality of Claims.**  Claims documents in this case, and all materials and
data held by the Claims Administrator regarding Prudential Policyowners, Class Policies and/or

the Settlement Class shall be strictly confidential and not subject to publication or disclosure. No

person other than the Parties, the Claims Administrator, the Special Master and the Court shall

be permitted to obtain or review any Claim Form, or any decision of the Claims Administrator

with respect to accepting or rejecting any Claim, except as provided for herein or upon Court

Order for good cause shown.

      **J.**     **Investigation, Reporting and Treatment of Potentially Fraudulent Claims.**

Notwithstanding Paragraph I above (confidentiality) and anything else to the contrary in this

Agreement, if the Claims Administrator or any Party has reason to believe that a false or

fraudulent Claim has been submitted in this Settlement, or that any Claim has been submitted

under false pretenses, or contrary to the required Certifications, that a person or persons have

acquired the rights to a Class Policy as an investor for the purposes of making a claim in this

Settlement, the Claims Administrator may reject the Claim. The Claims Administrator shall

bring any such situation to the attention of the Parties. In addition, either Party may bring any

such Claim(s) and all evidence relating thereto to the attention of the Special Master and/or

Court and request that the Claim be investigated by the Parties and/or directly set aside and not

honored in this Settlement, and/or that the Claimant(s) shall be limited to Basic Relief, and may

further request any other relief that is equitable and proper under the circumstances.

      **K.**     **Claims Administrator to Establish Escrow Account**. The Claims

Administrator will establish the Escrow Account, which shall be used to pay: (a) any Taxes and

Tax Expenses; (b) any Notice and Claims Administration Expenses; (c) any Fee Award awarded

by the Court; (d) any Incentive Award awarded by the Court to the Class Representative; and (e)

all Settlement Payments awarded pursuant to the Scoring Process and all Basic Payments

awarded to Authorized Claimants. Except as provided herein or pursuant to orders of the Court,

**FINAL - EXECUTION VERSION**

all funds held by the Escrow Agent shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed or returned pursuant to the terms of this Settlement Agreement and/or further order of the Court. The Escrow Agent shall invest any funds in the Escrow Account exclusively in United States Treasury Bills or United States Treasury Notes (or a mutual fund invested solely in instruments backed by the full faith and credit of the United States) and shall collect and reinvest all interest accrued thereon, except that any residual cash balances up to the amount that is insured by the FDIC may be deposited in any account that is fully insured by the FDIC.  In the event that the yield on United States Treasury Bills or Treasury Notes is negative, in lieu of purchasing such Treasury Bills or Treasury Notes, all or any portion of the funds held by the Escrow Agent may be deposited in any account that is fully insured by the FDIC or backed by the full faith and credit of the United States.  All income or gains earned, or any loss incurred, shall be credited to (or debited from) the Escrow Account.  Releasees shall have no responsibility for, interest in, or liability whatsoever with respect to investment or other decisions by the Escrow Agent.

      **L.**    **Qualified Settlement Fund**.  The Parties agree that the Escrow Account is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1 and that the Claims Administrator, as administrator of the fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be solely responsible for filing or causing to be filed all informational and other tax returns as may be necessary or appropriate (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)) for the Escrow Account. The Claims Administrator shall also be responsible for causing payment to be made from the Escrow Account of any Taxes and Tax Expenses owed.  The Releasees shall not have any

liability or responsibility for any such Taxes or Tax Expenses, or any required filings regarding same.

      **M.**    **Funding Escrow Account.**  No later than thirty (30) days following Preliminary Approval, Prudential will cause $500,000 to be deposited in the Escrow Account for purposes of initial Claims Administration Expenses, pending the Claims Administrator providing detailed information on the number of Basic Payments to be made and the total amounts of Settlement Payments and Claims Administration Expenses ultimately owing.  Upon receipt of detailed information from the Claims Administrator indicating the additional moneys that are required to be deposited in the Escrow Account for purposes of paying Claims Administration Expenses, a Fee Award or Incentive Award, Basic Payments or Settlement Payments, Prudential shall, no later than ten (10) days thereafter, cause the additional funds to be deposited in the Escrow Account.

      **N.**    **Reversion from Escrow Account to Prudential.**  If after the latter of: (i) one hundred eighty (180) calendar days following the last Settlement Payment check having been sent, and (ii) all Claims Administration expenses, the Fee Award and Incentive Award and any Taxes and Tax Expenses due or owing, have been paid, funds remain in the Escrow Account, all such funds shall be refunded by the Claims Administrator to Defendants based upon written instructions provided by Defendants' Counsel.

**IX.**    **ATTORNEYS' FEES, COSTS AND EXPENSES**

      **A.**    **Application for Attorneys' Fees and Costs**.  Class Counsel may apply to the Court for an award of Attorneys' Fees in the Action not to exceed a total of $3.5 million, plus up to $500,000.00 in costs and expenses (the "Fee Award"), payable by Defendants.  Defendants shall take no position with respect to the Fee Award provided that it is consistent with this

**FINAL - EXECUTION VERSION**

Settlement Agreement.  The amount shall be specified in the Notice, which shall also indicate

that Settlement Class Members will not be required to pay any portion of the Fee Award.

       **B.**     **Fee Award and Incentive Award Not Part of Settlement.**  The procedures for,

and the allowance or disallowance by the Court of, any Fee Award or Incentive Award are to be

considered by the Court separately from the Court's consideration of the fairness, reasonableness

and adequacy of the Settlement set forth in this Stipulation.  Any order or proceeding related to

the application for a Fee Award, or any appeal from any Fee Award or Incentive Award or other

order relating thereto, shall not operate to terminate or cancel this Settlement Agreement, nor

affect or delay the finality of the Judgment.

       **C.**     **Payment of Fee Award.**  Upon the Court's approval of a Fee Award, the Fee

Award amount shall be payable by the Claims Administrator from the Escrow Fund within ten

(10) days after entry of the latter of (i) the Court's Final Order and Judgment approving the

Settlement, and (ii) the Court's Fee Award, subject to Class Counsel providing all payment

routing information and tax I.D. numbers for Class Counsel; and (iii) the Effective Date.

Payment of the Fee Award shall be made from the Escrow Account by wire transfer to

Engstrom, Lipscomb & Lack in accordance with wire instructions to be provided by Steven C.

Shuman of that firm, and completion of necessary forms, including, but not limited to, W-9

forms.  Class Counsel shall be solely responsible for allocating and distributing the Fee Award

among counsel for the Class.

       **D.**     **Incentive Award.**  Class Counsel may apply to the Court for an Incentive Award,

payable by Defendants, to the Class Representative from the Escrow Account, in recognition of

his efforts on behalf of the Settlement Class, in the amount of no more than fifty thousand dollars

($50,000.00).  Defendants shall take no position with respect to the Incentive Award, provided

Case 2:17-cv-05290-MWF-FFM   Document 72-1   Filed 02/11/20   Page 88 of 135   Page
ID #:1631
Case 2:17-cv-05290-MWF-FFM   Document 79-1   Filed 10/21/19   Page 96 of 198   Page
ID #:1603

FINAL - EXECUTION VERSION

that it is consistent with this Settlement Agreement.  Payment should be delivered care of Class

Counsel ten (10) business days after the Effective Date.

       **E.**     **No Liability for Any Other Amount or Expense.**  Neither Prudential nor its

current, former and future parents, subsidiaries, affiliates, partners, predecessors, successors and

assigns, nor any of their respective past, present and future officers, directors, employees, agents,

principals, independent contractors, brokers, representatives, attorneys, heirs, administrators,

executors, predecessors, successors and assigns shall be liable or obligated to pay any fees,

expenses, costs or disbursements to, or incur any expense on behalf of, any person, either

directly or indirectly, in connection with the Action, this Stipulation, or the Proposed Settlement,

other than the amount or amounts expressly provided for in this Settlement Agreement.

## X.    FINAL APPROVAL AND FINAL ORDER AND JUDGMENT

      At or after the Final Approval Hearing, and upon the Court's approval of this Settlement

Agreement, the Parties will request from the Court entry of a Final Order and Judgment.  The

Final Order and Judgment will (among other things):

         (a)     Find that the Court has jurisdiction over the subject matter and the parties

to approve the Stipulation of Settlement and Release and all Exhibits thereto;

         (b)     approve the Proposed Settlement as fair, reasonable and adequate; direct

the Parties and their counsel to comply with and consummate the terms of the Settlement

Agreement; and declare the Settlement Agreement to be binding on all Settlement Class

Members and Class Policies and preclusive in all pending and future lawsuits or other

proceedings;

         (c)     Certify the Class for settlement purposes only as follows pursuant to

Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e):

FINAL - EXECUTION VERSION

All Policyowners of Class Policies and, where all Policyowners and insureds of a
Class Policy are deceased, then also any designated beneficiary(ies) of that Class
Policy at the time of final lapse.

Class Policies include all individual universal life or variable universal life insurance
policies issued by a Defendant as to which Guaranteed Charges were applicable to the
calculation of the deficiency and/or reinstatement amount, and which policy either
entered into default or lapsed between July 18, 2013 and the date of Preliminary
Approval, or which had default cured or was reinstated on or after July 18, 2013 and
remains in force on the date of Preliminary Approval.

      (d)     Find that the Class Notice and the Notice Plan implemented pursuant to

the Settlement Agreement (i) constitute reasonable and the best practicable notice; (ii) constitute

notice that is reasonably calculated, under the circumstances, to apprise Policyowners of the

pendency of the Action, their right to object to or exclude themselves from the Proposed

Settlement and to appear at the Final Approval Hearing; (iii) constitute due, adequate and

sufficient notice to all persons entitled to receive notice; and (iv) meet the requirements of due

process, the Federal Rules of Civil Procedure, and the Rules of the Court;

      (e)     find that Class Counsel and the Plaintiff adequately represented the Class

for purposes of entering into and implementing the Settlement;

      (f)     dismiss the Action on the merits and with prejudice, without fees or costs

to any party except as provided in the Stipulation;

      (g)     incorporate the Release set forth above in Section IV, and forever

discharge the Releasees from any claims or liabilities constituting the Released Claims;

      (h)     permanently bar and enjoin (i) Plaintiff, Settlement Class Members who

do not execute and timely file a valid Request for Exclusion from the Settlement Class, and all

Releasing Parties from filing, commencing, prosecuting, participating or intervening in any

lawsuit in any jurisdiction based on or relating to the facts and circumstances underlying the

claims and causes of action in the Action and/or the Released Claims, and (ii) all Settlement

48

**FINAL - EXECUTION VERSION**

Class Members from organizing Policyowners into a separate class for purposes of pursuing as a

purported class action any lawsuit (including by seeking to amend a pending complaint to

include class allegations, or seeking class certification in a pending action) based on or relating

to the claims and causes of action, or the facts and circumstances relating thereto, in the Action

and/or the Released Claims;

    (i)  protect the confidentiality of Claims documents, all materials and data

held by the Claims Administrator regarding Prudential Policyowners, Class Policies and/or the

Settlement Class; and

    (j)  retain jurisdiction over the administration of the Settlement, to supervise

the Settlement relief, to protect and effectuate the Final Order and Judgment, and for any other

necessary purpose.

## XI. CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION, MODIFICATION.

  **A.**  **Effective Date.** This Settlement Agreement shall not become effective unless and

until each of the following events occurs, and the Effective Date of the Settlement Agreement

shall be the date upon which the last (in time) of the following events occurs:

    1.  The Settlement Agreement has been executed by the Parties and their counsel;

    2.  The Court has entered the Preliminary Approval Order and has certified the class

for Settlement purposes;

    3.  The Court has entered an order finally approving the Settlement Agreement,

following Notice to the Settlement Class and a Final Approval Hearing, as provided in the

Federal Rules of Civil Procedure, and has entered the Final Order and Judgment or an alternative

judgment consistent with this Settlement Agreement in all material respects; and

    4.  The Final Order and Judgment has become Final.

FINAL - EXECUTION VERSION

      **B.**    **Termination.**  The Stipulation may be terminated at the sole option and

discretion of Defendants or Plaintiff if (a) the Court, or any appellate court(s), rejects, modifies

or denies approval of any portion of the Proposed Settlement that the terminating party in its (or

their) sole judgment and discretion reasonably determines is material and adverse to the

terminating party; or (b) the Court, or any appellate court(s), does not enter or completely affirm,

or alters or expands, any portion of the Final Order and Judgment that the terminating party in its

(or their) sole judgment and discretion reasonably determines is material and adverse to the

terminating party; or (c) the opt out limit at Paragraph D below is triggered.  The terminating

party must provide written Notice in accordance with Section XII.S. to the other party of its

election to withdraw from and terminate the Stipulation as provided in this Paragraph B, no later

than twenty (20) days after receiving conclusive written notice of the event prompting the

termination.

      **C.**    **No Termination Due to Fee Award.**  Notwithstanding the preceding subsection,

and consistent with Section IX.B. the Parties may not terminate the Stipulation because of the

amount of the Fee Award authorized by the Court or any appellate court(s), or the rejection or

reduction of the Plaintiff's Incentive Award.

      **D.**    **Exclusion Limit Triggering Termination.**  Defendants may unilaterally

withdraw from and terminate the Settlement Agreement if five percent (5%) or more of Class

Policies and/or the Settlement Class validly elect to exclude themselves from the Settlement.

Such withdrawal and termination by Defendants must be made no later than twenty (20) days

after the expiration of the time period during which such exclusions must be filed and receipt of

notice of this event.

      **E.**    **Effect of Termination.**  If this Settlement Agreement is terminated or fails to

become effective for the reasons set forth in Paragraphs B-D above, the Parties shall be restored to their respective positions in the Action as of the date of the signing of this Settlement Agreement, unless Class Counsel and Defendants' Counsel mutually agree in writing to proceed with the Settlement Agreement or agree to modify the Settlement Agreement to cure the reason for rejection, denial, modification, non-affirmance, alteration or expansion.  If this Settlement Agreement is terminated or fails to become effective, any Final Order and Judgment or other order entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and the Parties shall be returned to the *status quo ante* with respect to the Action as if this Settlement Agreement had never been entered into.  Within five (5) business days after written notification of termination as provided in this Agreement is sent to the other Parties, the Escrow Account (including accrued interest thereon), less any Claims Administration costs actually incurred, paid or payable and less any taxes and Tax Expenses paid, due or owing, shall be refunded by the Claims Administrator to Defendants based upon written instructions provided by Defendants' Counsel.

## XII.  REPRESENTATIONS AND WARRANTIES

**A.    Cooperation.**  The Parties (a) acknowledge, represent and warrant that it is their intent to consummate this Settlement Agreement; and (b) agree, subject to their fiduciary and other legal obligations, to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Settlement Agreement, to exercise their reasonable best efforts to accomplish the foregoing terms and conditions of this Settlement Agreement, to secure final approval, and to defend the Final Judgment through any and all appeals.  Class Counsel and Defendants' Counsel agree to cooperate with one another in seeking Court approval of the Settlement Agreement, entry of the Preliminary Approval Order, and the Final Judgment,

FINAL - EXECUTION VERSION

and promptly to agree upon and execute all such other documentation as may be reasonably required to obtain final approval of the Settlement Agreement.

**B.** **Final and Complete Resolution; Non-Disparagement.** The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them with respect to the Released Claims. Accordingly, the Parties agree not to assert in any forum that the Action was brought by Plaintiffs or defended by Defendants, or each or any of them, in bad faith or without a reasonable basis.

**C.** **Publicity and Non-Disparagement.**

1.  Except in connection with a motion for Preliminary Approval, the dissemination of Notice, the Settlement Website, or as otherwise expressly provided for in this Settlement Agreement, Plaintiff and Plaintiff's Counsel will not make any public statements, including but not limiting to issuing any press releases, giving any interviews, posting on any online media including, but not limited to, websites or social media, or publishing, assisting, or facilitating the publication of any articles or similar content, or otherwise market or promote the settlement of the Action or this Settlement Agreement, without prior written approval of Prudential. This Settlement Agreement does not constitute such approval. Plaintiff's Counsel will not disparage Prudential, its Policies, or the Settlement Agreement in the media, through any public statements, online postings, interviews, or publications, or otherwise. The Parties agree that this non-disparagement obligation is a material term of this Settlement Agreement and that Prudential shall be entitled to pursue all remedies and damages available in a court of competent jurisdiction, including, but not limited to, injunctive relief. The Parties stipulate that such a material breach would cause irreparable harm for which no adequate remedy at law exists.

2.      Notwithstanding any other provision in this Settlement Agreement, (a) the Parties shall have the right to disclose the Settlement to regulators and to comply with their financial, legal, reporting, Court, and securities obligations, (b) the Parties shall have the right to take actions to enforce the Settlement Agreement to the extent necessary, (c) Defendants' Counsel and Class Counsel shall have the right to communicate with their clients regarding the Action and the Settlement, (d) Prudential shall have the right to communicate with its shareholders concerning the Action and the Settlement.  The Parties' rights to communicate with Settlement Class Members and the Claims Administrator regarding the Action and the Settlement are addressed in this Settlement Agreement at Section VI.  Prudential shall have the right to communicate with all of its Policyowners in the ordinary course of its business, including specifically as recognized in Section VI.I. herein.

**D.      Representation by Counsel; Agreement Prepared by All Parties.**  The Parties have relied upon the advice and representation of counsel, selected by them, concerning their respective legal liability for the claims hereby released.  The Parties have read and understand fully the above and foregoing agreement and have been fully advised as to the legal effect thereof by counsel of their own selection and intend to be legally bound by the same.  This Settlement Agreement is deemed to have been prepared by counsel for all Parties, as a result of arm's-length negotiations among them.  Because all Parties have contributed substantially and materially to the preparation of this Settlement Agreement, it shall not be construed more strictly against one Party than another.

**E.      No Admissions.**  Whether or not the Effective Date occurs or the Settlement Agreement is terminated, neither this Settlement Agreement nor the Settlement contained herein or any term, provision or definition therein, nor any act or communication performed or

document executed in the course of negotiating, implementing or seeking approval pursuant to or in furtherance of this Stipulation or the Settlement:

1.      is, may be deemed, or shall be used, offered or received in any civil, criminal or administrative proceeding in any court, administrative agency, arbitral proceeding or other tribunal against the Releasees, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claim, the truth of any fact alleged by the Plaintiff, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the definition or scope of any term or provision, the reasonableness of the Settlement or the Fee Award, or of any alleged wrongdoing, liability, negligence, or fault of the Released Parties, or any of them;

2.      is, may be deemed, or shall be used, offered or received against any Releasee, as an admission, concession or evidence of any fault, misrepresentation or omission with respect to any statement or written document approved or made by the Releasees, or any of them;

3.      is, may be deemed, or shall be used, offered or received against the Releasees, or each or any of them, as an admission or concession with respect to any liability, negligence, fault or wrongdoing as against any Released Party(ies), or supporting the certification of a litigation class, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  However, the Settlement, this Stipulation, and any acts performed and/or documents executed in furtherance of or pursuant to this Stipulation and/or Settlement may be used in any proceedings as may be necessary to effectuate the provisions of this Settlement Agreement.  Further, if this Settlement Agreement is approved by the Court, any Party or any of the Releasees may file this Settlement Agreement and/or the Final Judgment in any action that may be brought against such Party or Parties in order to support a defense or counterclaim based

on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

4.      is, may be deemed, or shall be construed against Plaintiff, the Settlement Class, the Releasing Parties, or each or any of them, or against the Releasees, or each or any of them, as an admission or concession that the consideration to be given hereunder represents an amount equal to, less than or greater than that amount that could have or would have been recovered after trial; and

5.      is, may be deemed, or shall be construed as or received in evidence as an admission or concession against Plaintiff, the Settlement Class, the Releasing Parties, or each and any of them, or against the Releasees, or each or any of them, that any of Plaintiff's claims are with or without merit or that damages recoverable in the Action would have exceeded or would have been less than any particular amount.

**F.      Certification for Settlement Purposes Only.**  The Parties acknowledge that (a) any certification of the Settlement Class as set forth in this Agreement, including certification of the Settlement Class for settlement purposes in the context of Preliminary Approval, shall not be deemed a concession that certification of a litigation class is appropriate, or that the Settlement Class definition would be appropriate for a litigation class, nor would Defendants be precluded from challenging class certification in further proceedings in the Action or in any other action if the Settlement Agreement is not finalized or finally approved; (b) if the Settlement Agreement is not finally approved by the Court for any reason whatsoever, then any certification of the Settlement Class will be void, the Parties and the Action shall be restored to the *status quo ante*, and no doctrine of waiver, estoppel or preclusion will be asserted in any litigated certification

FINAL - EXECUTION VERSION

proceedings in the Action or in any other action; and (c) no agreements made by or entered into by Defendants in connection with the Settlement may be used by Plaintiff, any person in the Settlement Class, or any other person to establish any of the elements of class certification in any litigated certification proceedings, whether in the Action or any other judicial proceeding.

      **G.**     **Settlement and Claims Administration Process Final: No Recourse.**  No person or entity shall have any claim against the Class Representative, Class Counsel, the Claims Administrator or any other agent designated by Class Counsel, or the Releasees and/or their counsel arising from distributions from the Escrow Account made substantially in accordance with this Agreement.  The Parties and their respective counsel, and all other Releasees, shall have no liability whatsoever for the investment or distribution of the Escrow Account or the determination, administration, calculation, or payment of any claim or nonperformance of the Claims Administrator, the payment or withholding of taxes (including interest and penalties) owed by the Escrow Account, or any losses incurred in connection therewith.

      **H.**     **Headings.**  The headings used herein are used for the purpose of convenience only and are not meant to have and shall not be given legal effect.

      **I.**     **Non-Waiver.**  The waiver by one Party of any breach of this Settlement Agreement by any other Party shall not be deemed as a waiver of any other prior or subsequent breaches of this Settlement Agreement.

      **J.**     **Exhibits Incorporated.**  All of the Exhibits to this Settlement Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

      **K.**     **Entire Agreement.**  This Settlement Agreement and its Exhibits set forth the entire agreement and understanding of the Parties with respect to the matters set forth herein, and supersede all prior negotiations, agreements, arrangements and undertakings with respect to the

FINAL - EXECUTION VERSION

matters set forth herein. No representations, warranties or inducements have been made to any

Party concerning this Settlement Agreement or its Exhibits other than the representations,

warranties and covenants contained and memorialized in such documents. This Settlement

Agreement may be amended or modified only by a written instrument signed by or on behalf of

all Parties or their respective successors-in-interest.

**L.      Each Party Bears Costs.**  Except as otherwise provided herein, each Party shall

bear its own costs.

**M.      No Assignment.**  Plaintiff represents and warrants that he has not assigned any

claim or right or interest therein as against the Releasees to any other Person or Party and that he

is fully entitled to release the same.

**N.      Authority.**  Each counsel or other Person executing this Settlement Agreement,

any of its Exhibits, or any related settlement documents on behalf of any Party hereto, hereby

warrants and represents that such Person has the full authority to do so and has the authority to

take appropriate action required or permitted to be taken pursuant to the Agreement to effectuate

its terms.

**O.      Execution.**  This Settlement Agreement may be executed in one or more

counterparts. Signature by digital means, facsimile, or in PDF format will constitute sufficient

execution of this Settlement Agreement. All executed counterparts and each of them shall be

deemed to be one and the same instrument. A complete set of original executed counterparts

shall be filed with the Court if the Court so requests.

**P.      Binding Upon Successors.**  This Settlement Agreement shall be binding upon,

and inure to the benefit of, the successors and assigns of the Parties hereto, the Settlement Class,

the Releasing Parties and the Releasees.

**Q.** **Court Retains Exclusive Jurisdiction.** The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Settlement Agreement. All Parties, the Settlement Class, the Releasing Parties and the Releasees submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this Settlement Agreement.

**R.** **Applicable Law and Venue.** This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California. Any action to enforce this Settlement Agreement, the Preliminary Approval Order or the Final Order and Judgment, shall be commenced and maintained only in the United States District Court for the Central District of California.

**S.** **Notice to Parties**. Where this Settlement Agreement requires notice to the Parties, such notice shall be sent to the Parties as follows, with copies to the undersigned counsel:

> For Prudential:
>
> Lisa Wolmart
> Vice President and Corporate Counsel
> Enterprise Litigation Group
> The Prudential Insurance Company of America
> 751 Broad Street
> Newark, NJ  07102
>
> With a copy to:
>
> Laura Geist
> Dentons US LLP
> 1999 Harrison Street, Suite 1300
> Oakland, CA 94612-4709
>
> For the Class:
>
> Steven C. Shuman
> Engstrom, Lipscomb & Lack

FINAL - EXECUTION VERSION

> 10100 N. Santa Monica Blvd. #1200
> Los Angeles, CA  90067

**T.   Return of Discovery Documents.**  No later than ten (10) days after payment of Attorneys' Fees and Costs and Expenses pursuant to Section IX above (unless the time is extended by agreement of the Parties), Plaintiff, Class Counsel, and all persons with whom they have shared information provided by Prudential in this case pursuant to the Protective Order herein, will return to Prudential all documents (and all copies of such documents in whatever form made or maintained) produced by Prudential in the Action.

**U.   Modification of Time Deadlines.**  The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of the Stipulation.

**IN WITNESS WHEREOF**, the undersigned stipulate and have entered into this Settlement Agreement as of the **11** day of October, 2019.

APPROVED AND AGREED TO BY AND ON BEHALF OF THE NAMED PLAINTIFF, IN HIS INDIVIDUAL AND REPRESENTATIVE CAPACITIES

BY: _____   Date: 10-11-2019

Print Name:  Richard Behfarin

APPROVED AND AGREED TO BY DEFENDANTS PRUCO LIFE INSURANCE COMPANY, THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, AND PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY

BY: _____   Date: 10/9/2019

Print Name:  Kent Sluyter

112711495/US_Active

59

FINAL - EXECUTION VERSION

**APPROVED AS TO FORM:**

ENGSTROM, LIPSCOMB & LACK
LAW OFFICES OF ROBERT B. MOBASERRI, PC

BY: *Steven C. Shuman*        Date: 10/11/19

Print Name: *Steven C. Shuman*

ATTORNEYS FOR PLAINTIFF RICHARD BEHFARIN AND THE PUTATIVE
SETTLEMENT CLASS

DENTONS US LLP

BY: *Laura L. Geist*        Date: 10.9.19

Print Name: *Laura L. Geist*

ATTORNEYS FOR DEFENDANTS PRUCO LIFE INSURANCE COMPANY, THE
PRUDENTIAL INSURANCE COMPANY OF AMERICA, AND PRUCO LIFE INSURANCE
COMPANY OF NEW JERSEY

112711495/US_Active

# EXHIBIT 2

**Steve Shuman**

| | |
|---|---|
| **From:** | Pinkerton, Brian <brian.Pinkerton@epiqglobal.com> |
| **Sent:** | Monday, January 27, 2020 1:44 PM |
| **To:** | Steve Shuman |
| **Cc:** | Wei, Justin; Bailey, Jeremy; Palmer, Adam; 'Robert Mobasseri'; 'Carlson, Sarah'; 'Hauser, Sandra D.'; Elizabeth Crooke; 'Steven Roth (steven.roth@wmi-consultancy.com)' |
| **Subject:** | RE: Behfarin v Pruco - Weekly Stats and Current FAQs |

Sorry. I sent that prematurely. Here's the full response:

A notice was sent to each Policyholder and each beneficiary for which we had a mailing address and/or email address. So, at least one notice was mailed for each Class Policy, and for those Class Policies with multiple Policyowners a notice was sent to each of them. Every Policyowner (and beneficiary) received a Unique ID for each Class Policy in the Notice Data provided by Prudential, so they can file separate claims for each Class Policy.

There were 45,489 Policy Numbers in the Class Notice Data from Prudential ("the Data"). There were a total of 46,716 Policyowners and beneficiaries for those Policy Numbers, so we created 46,716 records and assigned each Unique ID. As you noted, there have been and will continue to be some changes in which population certain Class Policies fall into due to new information about post-lapse deaths, but in the initial Data these were the splits for which population the Policyowners and beneficiaries fell into:

> Lapsed/Deceased = 1,268 Class Members for 331 Policy Numbers
> Lapsed/Alive (excluding Enhanced) = 32,244 Class Members for 32,226 Policy Numbers
> Lapsed/Alive Enhanced = 134 Policyowners for 134 Policy Numbers
> Current Policyowners = 13,070 Policyowners for 12,932 Policies

Before the initial mailing we were notified that five of the Class Policies initially listed as in the Lapsed/Alive population had been determined to belong in the Lapsed/Deceased population. The initial Data did not include addresses for all beneficiaries in the Lapsed/Deceased Population. So, the initial mailing of lapsed postcards (32,645 total) went to approximately 32,241 Policyowners in the Lapsed/Alive Population and to approximately 404 Policyowners/beneficiaries in the Lapsed/Deceased Population. We have subsequently received addresses for another approximately 343 beneficiaries in the Lapsed/Deceased Population and have sent them postcards.

According to our records, Mr. Behfarin was sent one postcard notice and one email notice. Per the Settlement Agreement, a postcard was sent to every Class Member with a mailing address, and an email notice was sent (in addition to the postcard notice) to every email address for every Class Member. The two notices sent to Mr. Behfarin had the same Unique ID on them because the notices pertained to the same Class Policy.

Best regards,

Brian Pinkerton, Esq.
Epiq | Senior Project Manager
Office: +1 206 876 5791
Mobile: +1 206 492 4957
Email: brian.pinkerton@epiqglobal.com

# EXHIBIT 3

| | |
|---|---|
| **From:** | Steve Shuman |
| **Sent:** | Friday, February 7, 2020 2:50 PM |
| **To:** | Merlene Fletcher |
| **Subject:** | FW: Behfarin v Pruco - Daily Communications Stats |

**From:** Pinkerton, Brian <brian.Pinkerton@epiqglobal.com>
**Sent:** Wednesday, February 5, 2020 3:32 PM
**To:** 'Carlson, Sarah' <sarah.carlson@dentons.com>; Steve Shuman <sshuman@elllaw.com>
**Cc:** 'robertm@mobasseripc.com' <robertm@mobasseripc.com>; 'Hauser, Sandra D.' <sandra.hauser@dentons.com>;
Wei, Justin <Justin.Wei@epiqglobal.com>; Bailey, Jeremy <jeremy.Bailey@epiqglobal.com>
**Subject:** RE: Behfarin v Pruco - Daily Communications Stats

Counsel,

In addition to the information I provided a few minutes ago, I wanted to offer a bit of detail about the claims we have received so far. Below is a summary of the web claims we have received as of 2/3/20 by claim type and the relief requested:

Reinstatement claim forms submitted on the website through 2/3/20:
- Total: 663
  - Basic Relief: 354
  - Reinstatement: 309
    - 113 are missing at least one required attestation
    - 196 may be valid claims for Reinstatement Relief*

Enhanced Relief claim forms submitted on the website through 2/3/20:
- Total: 12
  - 5 are missing at least one required attestation
  - 7 may be valid claims for Reinstatement with Enhanced Relief*

Individualized Relief claim forms submitted on the website through 2/3/20:
- Total: 15
  - 5 are missing at least one required attestation
  - 10 may be valid claims for Individualized Relief*

*These claims have not been fully reviewed, and the program designed to evaluate claim submissions has not yet been run on these claims. These numbers are based on a manual review of a report pulled from database tables and could change once the claims review process had begun. All determinations regarding whether any claim is an Authorized Claim will also be subject to gating rules, and additional review required by the Settlement Agreement.

Best regards,

**Brian Pinkerton, Esq.**
Epiq | Senior Project Manager
Office: +1 206 876 5791
Mobile: +1 206 492 4957
Email: brian.pinkerton@epiqglobal.com



**Behfarin v Pruco (4744)**
**Client Activity Report**

| Date | 2/3/2020 | 2/4/2020 | 2/5/2020 | 2/6/2020 | Cumulative through 2/6/2020 |
|---|---|---|---|---|---|
| **Incoming and Outgoing Communications** | | | | | |
| Correspondence (Received) | - | - | - | - | 7 |
| Email Correspondence (Received) | - | 3 | 2 | - | 88 |
| Email Correspondence (Sent) | 3 | - | - | - | 93 |
| **Call Center Support     +1 855 915 0909** | | | **Launch Date 01/09/2020** | | |
| IVR - Total Calls | 18 | 19 | 24 | 18 | 730 |
| IVR - Total Minutes | 203 | 151 | 219 | 111 | 5,360 |
| Live Operator - Total Incoming Calls | 14 | 12 | 17 | 12 | 455 |
| Live Operator - Total Incoming Minutes | 219 | 154 | 245 | 105 | 5,528 |
| Live Operator - Total Outgoing Calls | 1 | 3 | 5 | 6 | 150 |
| Live Operator - Total Outgoing Minutes | 1 | 3 | 9 | 20 | 317 |
| **Website      www.LapsedPolicySettlement.com** | | | | | |
| Page Hits | 321 | 190 | 176 | 219 | 15,823 |
| Sessions | 59 | 38 | 34 | 69 | 3,368 |
| claims-guidelines-for-individualized-relief.pdf | - | - | - | - | 27 |
| complaint.pdf | - | - | - | - | 21 |
| individualized-claim-form.pdf | 4 | 1 | 3 | 2 | 172 |
| motion-for-preliminary-approval.pdf | - | - | - | - | 4 |
| notice.pdf | 8 | 5 | 4 | 4 | 236 |
| preliminary-approval-order.pdf | - | - | - | - | 5 |
| reinstatement-claim-form.pdf | 6 | 2 | 2 | 1 | 142 |
| reinstatement-guidelines.pdf | 2 | - | - | 1 | 37 |
| settlement-agreement.pdf | 10 | 6 | 5 | 8 | 331 |

DISCLAIMER: Epiq Class Action & Mass Tort Solutions ("ECA") maintains this report for its clients to provide a near-real-time view into the Administrator's database. Please be aware that, while ECA makes every effort to ensure that the information provided is timely, accurate and complete, the status of documents and line-item counts may be changing due to work in progress, analyst review, quality assurance audits, processing of additional documentation, and data validation. Before using these statistics for critical analysis or for court filings, you should contact your Project Manager.

# EXHIBIT 4

## I.    INTRODUCTION

I have been asked by Counsel for the Plaintiff to provide an estimate of the costs of settlement in the case of Behfarin vs. Prudential.  Behfarin and the class he represents were damaged by Prudential's use of Guaranteed Charges in determining a billed amount that defaulting class owners must provide to avoid lapsing their policies.   This was contrary to the terms of the policy, and, indeed, contrary to overwhelming industry practice.

## II.    EXECUTIVE SUMMARY

Prudential has agreed to provide certain restitution to policies affected by its practice.  I have calculated the present value of such restitution using assumptions that I believe are reasonable and appropriate for the Class.  The assumptions are a combination of the following:

1. The use of Prudential data when available and forthcoming.
2. The use of industry data that in my opinion is relevant and reasonable.
3. Judgment regarding certain assumptions when Prudential data is not available and industry data is not relevant or needs to be modified to fit the characteristics of the Class.

A decision was made to provide a low estimate of such costs, a middle estimate, and a high estimate.   This decision enables the reader to understand how different, yet reasonable assumptions impact results.

The range of measured costs of settlement is:

| | |
|---|---|
| The low estimate of costs of settlement is: | **$19,562,792** |
| The middle estimate of costs of settlement is: | **$47,388,104** |
| The higher estimate of costs is: | **$93,249,879** |

In my opinion the range of these estimates provides a reasonable approximation of the value of the settlement as agreed to by Prudential and Plaintiff.

### A.    FUTURE POLICIES

The impact of this settlement on active policies covered by the Settlement after the Class Period and on future sales of policies under the plans covered by the Settlement is not addressed in the Settlement.  In the development of this report, it became clear that there is significant benefit inuring to such policies as a result of change in company practice resulting from the Settlement.  Even though the benefit is not included in any calculations in the main body of this report, I have added an Addendum (Addendum 2) that discusses it.)

## III.    DISCUSSION OF METHODOLOGY AND OUTCOMES

The Class of policies included in the Settlement was divided into the following categories:

1. Defaulted; Premium paid to restore active status or policy later reinstated; Active
2. Defaulted; Premium paid to restore active status or policy later reinstated; Surrendered
3. Defaulted; Premium paid to restore active status or policy later reinstated; Terminated due to the payment of proceeds upon the death of the Insured(s)
4. Defaulted; Policy lapsed, and was not later reinstated; Insured(s) has(have) died. Death Benefit proceeds would have been paid had owner reinstated
5. Defaulted; Policy lapsed, and was not later reinstated; would currently be considered Active had owner reinstated

The results by category, and totals, are:

| Group # | Group | Action | # of Policies | Low Estimate | Mid Estimate | High Estimate |
|---------|-------|--------|---------------|--------------|--------------|---------------|
| 1 | Defaulted; Reinstated; Active | Did not measure | 12,932 | ------------ | ------------ | ------------ |
| 2 | Defaulted; Reinstated; Surrendered | No value | ---------- | ------------ | ------------ | ------------ |
| 3 | Defaulted; Reinstated; Terminated due to payment of DB proceeds | Did not measure | ---------- | ------------ | ------------ | ------------ |
| 4 | Defaulted; Lapsed; DB proceeds would have been paid had owner reinstated | Estimated | 331 | $5,986,190 | $10,109,332 | $15,775,952 |
| 5 | Defaulted; Lapsed; Didn't reinstate; Would currently be considered Active had owner reinstated | Estimated | 32,360 | $13,576,602 | $37,278,772 | $77,473,927 |
| TOTALS | | | 45,623 | **$19,562,792** | **$47,388,104** | $93,249,879 |

As the reader will note, the focus of the cost calculations was on categories 4 and 5. The size of their contributions to the cost is substantial in each of the three cases.

### A.    CATEGORY 4 DEFINITION AND DETERMINATION

Prudential has identified all policies that defaulted, actually lapsed, did not later reinstate, and where the insured passed, and under the terms of the agreement will offer a settlement for each policy , which ranges from a low of $250 per policy to 75% of a "net death benefit", where net death benefit in this instance means the gross policy death benefit less the premiums that would need to have been paid between the date of default and the date the death benefit proceeds would have been payable..

The settlement is based on a scoring system, from 3 to 0 (zero), based on evidence in Prudential's policy files related to the owner's likelihood of returning to an Active status had Prudential not required the higher premium. The percentage of the death benefit is shown next to each category.

| Settlement breakdown-scores | |
|---|---|
| (3) If determined to be highly likely to have reinstated: | 75% |
| (2) If determined to be likely to have reinstated: | 55% |
| (1) If determined to be likely to not have reinstated: | 5% |
| (0) If determined to be highly likely to not have reinstated. | $250 |

The settlement also includes interest at an annual effective rate of 3% from the date of death to the date the Settlement Payment is made.

A.    CATEGORY 4 ASSUMPTIONS, WITH RATIONALE

The chart provides a summary of the assumptions used in determinations

| | Default; No reinstatement; Insured Deceased | | |
| --- | --- | --- | --- |
| | Low | Medium | High |
| # policies | 331 | 331 | 331 |
| % accepting Settlement Offer | 100% | 100% | 100% |
| Average DB | $100,000 | $125,000 | $150,000 |
| Average Issue Age | 60 | 60 | 60 |
| Average Age at death | 76 | 76 | 76 |
| Average months between date of default and date of death | 48 | 48 | 48 |
| Average months between date of death and date of payment | 24 | 24 | 24 |
| Premium (as a % of 2015 VBT ALB S&U, and multiplied by the Ave. DB) | 200% | 175% | 150% |
| Distribution breakdown | | | |
| MNS | 45% | 45% | 45% |
| FNS | 35% | 35% | 35% |
| MSM | 15% | 15% | 15% |
| FSM | 5% | 5% | 5% |
| Settlement breakdown | | | |
| (3) If determined to be highly likely to have re-entered => | 10% | 15% | 25% |
| (2) If determined to be likely to have re-entered => | 20% | 25% | 25% |
| (1) If determined to be likely to not have re-entered => | 30% | 30% | 25% |
| (0) If determined to be highly likely to not have re-entered => | 40% | 30% | 25% |
| Value of Settlement | $5,986,190 | $10,109,332 | $15,775,952 |

Here is a discussion of each of these:

1.      NUMBER OF POLICIES.  The number of policies in this category was provided to Actuarial Strategies by the plaintiff's counsel and was provided to them by Prudential.

2.      PERCENTAGE PARTICIPATION.  We assume 100% of in this category accept the offer, as each would get a minimum of $250, and in a significant percentage of cases, much more.

3.      AVERAGE DEATH BENEFIT.   The death benefit assumption is a critical factor in the magnitude of the value of the settlement.

   a)      It is clear from the formulation of the settlement to this category of owners that the larger the death benefit, the larger is the settlement. (This comment applies when the scoring is 3, 2, or 1.)

   b)      Information provided by Prudential indicated a median policy size of $100,000.  (If all the policies are arranged in order from low amount to high, the median is the middle amount, where as many policies are at or below this level as there are policies at or above it.). We therefore used this assumption in our low-end estimate.

   c)      Yet, we find this assumption problematical.  A mean is a much better indicator of death benefit for the purposes of measurement. Consider this example.  Suppose Prudential had 7 policies with a death benefit of $100,000 and two with a death benefit of $500,000 and $600,000.  If one arranges the policies in order from low to high, one can readily see that the median is $100,000 (it is the fifth policy, so to speak.). However, the mean, the average death benefit would be $200,000.  If one were to use the median in such a circumstance one would totally be ignoring the larger policies.

   d)      LIMRA, one of the leading Insurance industry Trade and Research organization, and the Society of Actuaries (SOA) jointly develop and publish a Life Persistency Study.  This study includes average Death Benefits by product.  In the 2009-2013 Study, the average New Issue Face Amounts for Universal Life and Variable Universal Life were respectively $276,000 and $490,000.

   e)      Prudential did not provide mean Death Benefits, but I would be surprised if its Death Benefits deviated by much from these values. Nevertheless, as noted previously, I decided to use the Prudential provided median value of $100,000 for the low range Death Benefit Assumption but use $125,000 and $150,000 for the two other cases. I believe all three are conservative, however.

4.    AVERAGE ISSUE AGE. The average issue age is an assumption made without the benefit of any information from Prudential. Our judgment as to an appropriate average issue age is based on our knowledge of Universal Life as a product designed in significant part to address the insurance needs of older individuals (and in fact couples, as American estate tax law defers estate tax consequences to the second death of a couple.)

    a)    Note that the results are only modestly affected by changing issue age in any event.

5.    AVERAGE AGE AT DEATH.  As a matter of judgment I assumed the policy would terminate by death after being in-force for 16 years.  (This is accomplished by choosing an age at death 16 years higher than the issue age.)

    a)    This does not necessarily mean that there is anti-selection.  People die for a variety of reasons and at different times, and the assumption here is part of a three part assumption, consisting of issue age, date of death, and date of default, that enables one to capture and calculate the sum of the premiums for the period from default to death.

6.    AVERAGE MONTHS BETWEEN DATE OF DEFAULT AND DATE OF DEATH.  It is for this period that under the settlement rules one must calculate the sum of the premiums paid.  This is an arbitrary assumption.

7.    AVERAGE NUMBER OF MONTHS BETWEEN DATE OF DEATH AND DATE OF PAYMENT.  Prudential has agreed to pay 3% interest per year for this period.  The assumption is two years (24 months).

8.    PREMIUM (AS A PERCENTAGE OF THE 2015 VBT ALB S&U, AND MULTIPLIED BY THE AVERAGE DB)

    a)    The 2015 Valuation Basic Tables are mortality tables developed by the Society of Actuaries and the American Academy of Actuaries to reflect mortality for underwritten policies.

    b)    ALB refers to age last birthday.  This term is used to designate the ages of insureds.  For example, even if an individual were one day short of his 60th birthday, he would be considered age 59 on an age last birthday basis.  We used ALB as that appears to be what Prudential uses (based upon a review of a particular policy form.  It would be highly unusual for a company to use Age Last Birthday for some plans and Age Nearest Birthday for others.)

    c)    S&U refer to use of a select and ultimate period, which for this table is 25 years.  Thus, an insured who is issued a policy at age 50, would have unique mortality rates in this table for 25 years.  Although an individual who bought the policy at age 50 would be age 51 after one year, "his" mortality rate would differ from that of a 51 year old who was just underwritten.

d)    We used a multiplier of 150% - 200%, not because our judgment was that mortality for these cases was 50% - 100% higher than that based on the Table, but rather to try to at least indirectly reflect other charges (i.e., expense factors) that the company levies in a policy.

9.    DISTRIBUTION OF POLICIES. The Tables vary depending whether the insured is male or female, or is a non-smoker or smoker. We have made assumptions regarding the percentage of insureds in each category. As a general statement the percentages of males who are insured is much higher than females, and the percentages of insured nonsmokers is vastly larger than that for smokers. We have reflected that in our assumptions.

10.    SETTLEMENT BREAKDOWNS BASED BY SCORE. This assumption reflects the distribution of the Insureds based on the Scoring Process for settling claims. As noted, the higher the scoring code (code is 3, 2, 1, or 0), the higher is the settlement. One has simply no way of determining the distribution without the results from the Claims Administrator. Consequently, the assumed distributions reflect relatively low percentage values for the higher scoring codes, the ones where greater restitution must be paid, for all three estimates. For example, for the low-end, the assumption is that only 10% get a score of 3, 20% a score of 2, 30% a score of 1, and 40% a score of 0. The changes for the mid-range estimate is modest, with percentages of 15%, 25%, 30%, and 30% respectively for these codes. It is also, I believe a modest assumption for the high range assumption, with a percentage of 25% for each of the scoring code.

a)    Even at these low percentages, the impact of the scoring code assumption is significant, as would be expected. The use of the terms, low-range, mid-range, and high-range might suggest that the high-range assumption is "aggressive", and relatively speaking it is. However, it is quite possible that the outcomes from the Claim Administrator's will be far more heavily weighted toward the higher value codes (3 and 2) than what was assumed.

11.    OTHER ASSUMPTIONS.

a)    All calculations are made assuming the underlying policy is a single life Universal Life policy. However, policy counts do include Second to Die policies.

b)    No loan utilization is assumed nor are loans reflected anywhere in the calculations. Universal Life and Variable Universal Life owners can access their cash values via withdrawals.

c)    Future premiums are assumed to be no greater than the premium assumption, keeping the net amount at risk ostensibly equal to the death benefit.

B.   CATEGORY 5 DEFINITION AND DETERMINATION

Category 5 policies are those that defaulted and did not re-enter, thus lapsing, or did not later reinstate, and where at least one insured remains alive.

The agreement stipulates that Prudential will extend an offer to each owner in this category which, if accepted, will reinstate the policy without any underwriting requirements and without any obligation to pay any premiums for the period from the end of the grace period to reinstatement.

A number of policies have been characterized as "enhanced". The owners of these policies attempted reinstatement earlier, but the applications were denied.

For these enhanced policies, if the premiums required to keep the policy in force for the three years following reinstatement are paid, then Prudential will forego the cost of insurance charges (at current assumption levels) during years 4 and 5 following reinstatement.

The value of policies in the category accepting reinstatement is the present value of the net death benefit less the present value of premiums (i.e., monthly deductions).

If the owner does not choose to reinstate, then it is presumed he will receive a benefit of $250.

This offer has been reflected in the determination of the value of the Settlement.

## C.   CATEGORY 5 ASSUMPTIONS, WITH RATIONALE

**Here is the assumption chart:**

| | Low | Medium | High |
|---|---|---|---|
| # policies | 32,360 | 32,360 | 32,360 |
| % accepting Settlement Offer | 100% | 100% | 100% |
| Average DB | $100,000 | $125,000 | $150,000 |
| Average Issue Age | 60 | 60 | 60 |
| Average Age at Default | 72 | 72 | 72 |
| # of months of grace period | 2 | 2 | 2 |
| # of months from default until Reinstatement Relief | 60 | 60 | 60 |
| Premium (as a % of 2015 VBT ALB S&U, and multiplied by the Ave. DB) | 200% | 175% | 150% |
| Enhanced premium discount in years 4 and 5 after reinstating | 1.23% | 1.23% | 1.23% |
| Mortality (as a % of 2015 VBT ALB S&U) | 225% | 250% | 275% |
| Annual discount rate for calculating actuarial present value | 4.00% | 4.00% | 4.00% |
| _Distribution breakdown_ | | | |
| MNS | 45% | 45% | 45% |
| FNS | 35% | 35% | 35% |
| MSM | 15% | 15% | 15% |
| FSM | 5% | 5% | 5% |
| _Of those accepting Settlement Offer..._ | | | |
| % reinstating | 3% | 4% | 5% |
| % taking $250 | 98% | 96% | 94% |
| Value of Settlement | $15,585,079 | $45,906,383 | $96,150,021 |

1.    NUMBER OF POLICIES.  Prudential has identified 32,360 policies as the number of policies in this category

2.    PERCENTAGE ACCEPTING SETTLEMENT OFFER.  Because 100% of owners will receive a benefit of at least $250, we expect virtually all will accept the offer for reinstatement or take the $250. I would observe that if one focuses on the value of the offer as what one should measure, then one should be indifferent to the percentage who actually opt to accept.

3.    AVERAGE DEATH BENEFIT.  The comments made for Category 4 apply to Category 5.

4.    AVERAGE ISSUE AGE.   The same comments that apply to Category 4 apply to Category 5.

5.    AVERAGE AGE AT DEFAULT.  We assume that default occurs twelve years after issue.  We tested different default points, and the impact of each on the calculated values of settlement is very small.

6.    NUMBER OF MONTHS OF GRACE PERIOD.   If a policy defaults, the owner has a two month grace period during which the company will provide coverage, but if the insured dies during that period, the cost of such coverage will be deducted from the death benefit.  In calculating the value of the reinstatement offer, we subtract the present value of future premiums and the cost of such two months' coverage from the present value of the policy's net death benefit.

7.    NUMBER OF MONTHS FROM DEFAULT UNTIL REINSTATEMENT RELIEF.  As the Class Period began in July 2013 and ended in November 2019, the period from default to Reinstatement Relief can vary from less than one year to over six years.  The impact of different periods is extremely modest.

8.    PREMIUM (AS A PERCENTAGE OF THE 2015 VBT ALB S&U, AND MULTIPLIED BY THE AVERAGE DB). The comments made for the Category 4 discussion apply here as well.

9.    ENHANCED PREMIUM DISCOUNT IN YEARS 4 AND 5 AFTER REINSTATING. The 134 enhanced policies identified by Prudential represent .41% of the total 32,645 policies that have defaulted and have not reinstated (and where at least one insured remains alive). As the median for the enhanced policies is three times larger than that of the entire group, we multiply the .41% by 3 to get 1.23% to reflect the impact of the enhanced policies.  (Not collecting premium for years 4 and 5 results in a lower present value of premiums and therefore a higher settlement value.

10.    MORTALITY (AS A % OF 2015 VBT ALB S&U). The offer by Prudential represents real value to an owner considering reinstatement.  The owner does not have to come up with back premiums, as is ordinarily the case with a reinstatement.  Further, no underwriting is required.  The insured simply needs to be alive. However, the offer requires the owner to come up with three months of premium, albeit a premium based on current charges.  Not everyone may elect to reinstate, but some will.  We have made a very conservative assumption that only a small percentage will elect the reinstatement.  (The others will get $250.) The ones most likely to do so will be those whose insureds have impaired mortality. Their premiums are based on a mortality assumption much lower than their expected mortality. That makes for a really good deal for those insured who are impaired.  To reflect the impaired mortality we assume mortality rates of 225% of the standard rate for the low-range, 250% for the mid-range, and 275% for the higher range.  It is quite conceivable that the rates could be far higher.

11.    ANNUAL DISCOUNT RATE FOR CALCULATING ACTUARIAL PRESENT VALUE. I have used a rate of 4% throughout.  That rate is similar to the FRED (Federal Reserve Bank of St. Louis) Moody's seasoned Baa corporate bond yield during the last six months of 2019, which was 3.88% in December.

12.    DISTRIBUTION BREAKDOWN.  The Category 4 Distribution Breakdown comments apply equally here.

13.    REINSTATEMENT SETTLEMENT OFFER BREAKDOWN.  As was discussed in the mortality section (#10), policies with impaired insureds are more likely to be reinstated.  Item 10 is an assumption of the mortality attributable to such insureds.  Item 13 breaks down the eligible population into those opting to take the $250 and those opting to reinstate.  Because of the costs (premiums) needed to be paid for reinstating, even though the "cost-benefit analysis" may be compelling for many owners, very conservative assumptions for the percentage electing reinstatement have been used.  There is a small 1% increase in the mid-range election percentage, and a second 1% increase in the high-range election percentage.  The impact of higher assumptions is significant, even those the absolute election percentages are small for all categories.

14.    OTHER ASSUMPTIONS.  (a) through (c) are the same as for Category 4

   a)    All calculations are made assuming the underlying policy is a single life Universal Life policy.  However, policy counts do include Second to Die policies.

   b)    No loan utilization is assumed nor are loans reflected anywhere in the calculations.  Universal Life and Variable Universal Life owners can access their cash values via withdrawals.

   c)    Future premiums are assumed to be no greater than the premium assumption, keeping the net amount at risk ostensibly equal to the death benefit.

d)      I assume a policy lapse rate of 4% in the calculation of present values.  The assumption is based on Figure 71 of the LIMRA-SOA 2009-2013 Persistency Study.  I used 4% by examining the lapse rates for the $100,000 to $299,999 policy segment.

**ADDENDUM 1**

The CV for Cary Lakenbach is provided as a separate attachment.

I have not participated in any depositions or trials in the last four years.

A copy of the list of publications is available upon request.

I have received assistance from my business colleague Charles (Chuck) Preti, FSA, MAAA. Any materials and documents he has developed under my direction have been reviewed by me for accuracy and relevance.

I have used reasonable actuarial assumptions and appropriate actuarial methods, and I have otherwise complied with the requirements of Actuarial Standard of Practice No. 17, titled "Expert Testimony by Actuaries".

I am responsible for the development of the assumptions used in the calculations described in the main body of this Addendum.

I have received materials from Prudential and the Claims Administrator relating to the policies described in the Settlement Document. These have been provided to me by Plaintiff counsel. I have relied on the information in these materials (largely emails) but am unable to verify their accuracy.

I have utilized the following reports and information from external resources:

1. LIMRA-SOA 2009-2013 Persistency Study. (Used to reflect lapse assumption in a calculation spreadsheet and as a source for industry average face amount at issue for Universal Life and Variable Universal Life.)
2. Federal Reserve Bank of St. Louis Moody's Corporate Bond Rate information for 2019.

Cary Lakenbach, FSA, MAAA

2/10/20

Date

Actuarial Strategies, Inc. (CL)
February 7, 2020

1

**ADDENDUM 2**

Policies belonging to the Class associated with this Settlement have been divided into five Groups or Categories. An in-depth analysis for two of the five Groups has been conducted and reported herein.

Using current, rather than guaranteed, charges as the basis for calculating the future three months of premium necessary for defaulted policies to return to an Active status will <u>also</u> benefit policies who default in months and years <u>after the Class Period</u>. This is not part of the Class associated with this Settlement but such a change in practice will have measurable benefit for cohorts in the future.

Cohorts are:

1. #1: Owners of currently active policies where such policies are part of a policy form which has benefited from Prudential's corrective action.
2. #2: Owners of currently inactive policies who may return to an Active status. Like Cohort #1, such policies would need to be part of a policy form which has benefited from Prudential's corrective action.
3. #3: Owners of policies yet to be issued where, once again, such policies are part of a policy form which has benefited from Prudential's corrective action.

An owner within each of these three cohorts would benefit from Prudential's corrective action if the policy defaults and the owner chooses to return to an Active status because of, or at least in part due to, the now reasonable premiums being sought by Prudential.

Valuing the benefit to the owner upon returning to an Active status is not unlike the exercise performed for Category 5 of the Class. Assigning a value today involves defining additional assumptions, and there does not readily exist reliable empirical information for many of these assumptions.

Keeping these assumption limitations in mind, the demonstration below attempts to assign a benefit to an Active owner today, who may never have defaulted, but might do so in the future.

<u>Key Assumptions</u>

- 2% of policies default at the end of each policy year for 30 years. Of these, 10% quickly elect to return to an Active status.
- 30% of those returning to an Active status due so, at least in part, because of Prudential's corrective action.
- Prior to a policy defaulting, 4% are terminating each year.

- After a policy defaults and quickly returns to an Active status, middle estimate assumptions, as defined for Class Category 5, are utilized.

For a 55-year-old insured, the present value today would be 0.0784% of the Face Amount. That amounts to $98.00 if the policy's Face Amount is $125,000. If this is representative of a cohort of 100,000 owners, then **the value today would be $9.8 million**.

For a 65-year-old insured, the present value today would be 0.1186% of the Face Amount. That amounts to $148.30 if the policy's Face Amount is $125,000. If this is representative of a cohort of 100,000 owners, then **the value today would be $14.8 million**.

We do not know the number of active policies in force under the plans addressed in the Settlement, but we would expect that the assumption of 100,000 is not at all unreasonable. In any case, using the information provided above, the value can be measured once one knows the exact policy count.



**Cary O. Lakenbach, FSA, MAAA, CLU**
President

Guided by Cary Lakenbach since its founding in 1991, Actuarial Strategies has gained recognition for its creative product development capabilities as well as its solid core actuarial, financial, and marketing and distribution expertise.

Cary's work at Actuarial Strategies centers on (1) Life Insurance Contracts of all kinds (whole life, UL, term, income), (2) Integrated Life & Long Term Care Contracts, all platforms, (3) Chronic Illness Riders (both QLTC and accelerated death benefit), and (4) products for Special Needs families. The services provided are broad, including (a) Creation of Business Opportunities, (b) Feasibility Studies, (c) Product Designs, (d) Comprehensive Pricing / Financial Analysis, (e) Development of Underwriting and Claims Operations (Directly or with Vendor), (f) Tax Analysis, (g) Contract development and Filing Guidance, and (h) Systems and Testing Support.

Other areas of specialization include (1) Expert Witness Work and Litigation Support, (2) Variable Universal, Universal Life (Current Assumption and w/ secondary guarantees), and Term product development for targeted market applications and distribution channels, and (3) Development of Simplified Issue Underwriting, Issue, and Post-Issue Processes for Products for targeted markets and distribution channels.

A sampling of Expert Witness engagements includes:

1. Transfer Value upon transfer from a Welfare Benefit Plan.
2. Compensation Dispute in a COLI business case.
3. Disagreement relating to right of company to raise COI charges for life contracts.
4. Suit relating to company's alleged non-adherence to terms of contract.
5. Dispute regarding misleading illustrations in a life insurance contract.

Cary worked for Connecticut Mutual from 1976 to 1988, during which time he led the Product Development and Management Division and Policy Contract Development Center of the Company. He was significantly responsible for both maintaining the company's strengths in its traditional participating lines as well as leading the development, implementation, and execution of non-traditional product strategies.

Cary is a member of the Hartford Actuaries Club, a charter member of the Society of Actuaries Foundation, has served on a number of industry group task forces, and serves as a board member of two charitable foundations. His education includes a BS degree from the City College of New York and an MA degree in Mathematics from Syracuse University.  Cary writes extensively for insurance publications and presents often at LIMRA, ILTCI, and SOA conferences.

# EXHIBIT 5

# LAFFEY MATRIX

History

Case Law

Expert Opinions

**See the Matrix**

Contact us

Home

Links

<tr>

|  | | | Years Out of Law School * | | | | |
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
|---|---|---|---|---|---|---|---|
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |

| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

# EXHIBIT 6

# General Schedule (GS) Locality Pay Map

There are a total of 53 **General Schedule Locality Areas**, which were established by the GSA's Office of Personnel Management to allow the General Schedule Payscale (and the LEO Payscale, which also uses these localities) to be adjusted for the varying cost-of-living across different parts of the United States.

Each Locality Area has a Locality Pay Adjustment percentage, updated yearly, which specifies how much over the GS Base Pay government employees working within that locality will earn.

Therefore, localities with a higher cost of living have a higher adjustment percentage then cheaper localities. To automatically calculate location-adjusted pay, use our GS Pay Calculator.

| GS Locality Name | Main Area | Code | Pay Adjustment | Year |
|---|---|---|---|---|
| ALBANY-SCHENECTADY, NY-MA | Albany, New York | ALB | 15.85% | 2017 |
| ALBUQUERQUE-SANTA FE-LAS VEGAS, NM | Albuquerque, New Mexico | ALQ | 15.36% | 2017 |
| ATLANTA--ATHENS-CLARKE COUNTY--SANDY SPRINGS, GA-AL | Atlanta, Georgia | ATL | 20.7% | 2017 |
| AUSTIN-ROUND ROCK, TX | Austin, Texas | AUS | 15.97% | 2017 |
| BOSTON-WORCESTER-PROVIDENCE, MA-RI-NH-ME | Boston, Massachusetts | BOS | 26.73% | 2017 |
| BUFFALO-CHEEKTOWAGA, NY | Buffalo, New York | BU | 18.66% | 2017 |
| CHARLOTTE-CONCORD, NC-SC | Charlotte, North Carolina | CHA | 15.65% | 2017 |
| CHICAGO-NAPERVILLE, IL-IN-WI | Chicago, Illinois | CHI | 26.85% | 2017 |
| CINCINNATI-WILMINGTON-MAYSVILLE, OH-KY-IN | Cincinnati, Ohio | CIN | 19.52% | 2017 |
| CLEVELAND-AKRON-CANTON, OH | Cleveland, Ohio | CLE | 19.71% | 2017 |
| COLORADO SPRINGS, CO | Colorado Springs, Colorado | COS | 15.99% | 2017 |
| COLUMBUS-MARION-ZANESVILLE, OH | Columbus, Ohio | COL | 18.49% | 2017 |
| DALLAS-FORT WORTH, TX-OK | Dallas, Texas | DFW | 22.61% | 2017 |
| DAVENPORT-MOLINE, IA-IL | Davenport, Iowa | DAV | 15.56% | 2017 |
| DAYTON-SPRINGFIELD-SIDNEY, OH | Dayton, Ohio | DAY | 17.59% | 2017 |
| DENVER-AURORA, CO | Denver, Colorado | DEN | 24.65% | 2017 |
| DETROIT-WARREN-ANN ARBOR, MI | Detroit, Michigan | DET | 25.68% | 2017 |
| HARRISBURG-LEBANON, PA | Harrisburg, Pennsylvania | HAB | 15.63% | 2017 |
| HARTFORD-WEST HARTFORD, CT-MA | Hartford, Connecticut | HAR | 27.57% | 2017 |
| HOUSTON-THE WOODLANDS, TX | Houston, Texas | HOU | 30.97% | 2017 |
| HUNTSVILLE-DECATUR-ALBERTVILLE, AL | Huntsville, Alabama | HNT | 17.82% | 2017 |
| INDIANAPOLIS-CARMEL-MUNCIE, IN | Indianapolis, Indiana | IND | 15.85% | 2017 |
| KANSAS CITY-OVERLAND PARK-KANSAS CITY, MO-KS | Kansas City, Missouri | KC | 15.59% | 2017 |
| LAREDO, TX | Laredo, Texas | LAR | 16.68% | 2017 |
| LAS VEGAS-HENDERSON, NV-AZ | Las Vegas, Nevada | LAS | 15.93% | 2017 |
| LOS ANGELES-LONG BEACH, CA | Los Angeles, California | LA | 29.65% | 2017 |
| MIAMI-FORT LAUDERDALE-PORT ST. LUCIE, FL | Miami, Florida | MFL | 22.13% | 2017 |
| MILWAUKEE-RACINE-WAUKESHA, WI | Milwaukee, Wisconsin | MIL | 19.61% | 2017 |
| MINNEAPOLIS-ST. PAUL, MN-WI | Minneapolis, Minnesota | MSP | 22.72% | 2017 |
| NEW YORK-NEWARK, NY-NJ-CT-PA | New York City, New York | NY | 31.22% | 2017 |
| PALM BAY-MELBOURNE-TITUSVILLE, FL | Palm Bay, Florida | PAL | 15.48% | 2017 |
| PHILADELPHIA-READING-CAMDEN, PA-NJ-DE-MD | Philadelphia, Pennsylvania | PHL | 23.87% | 2017 |
| PHOENIX-MESA-SCOTTSDALE, AZ | Phoenix, Arizona | PX | 18.57% | 2017 |
| PITTSBURGH-NEW CASTLE-WEIRTON, PA-OH-WV | Pittsburgh, Pennsylvania | PIT | 17.86% | 2017 |
| PORTLAND-VANCOUVER-SALEM, OR-WA | Portland, Oregon | POR | 21.95% | 2017 |
| RALEIGH-DURHAM-CHAPEL HILL, NC | Raleigh, North Carolina | RA | 19.02% | 2017 |
| REST OF UNITED STATES | Rest of U.S.. | RUS | 15.06% | 2017 |
| RICHMOND, VA | Richmond, Virginia | RCH | 18.19% | 2017 |
| SACRAMENTO-ROSEVILLE, CA-NV | Sacramento, California | SAC | 24.14% | 2017 |
| SAN DIEGO-CARLSBAD, CA | San Diego, California | SD | 26.98% | 2017 |

| GS Locality Name | Main Area | Code | Pay Adjustment | Year |
|---|---|---|---|---|
| SAN JOSE-SAN FRANCISCO-OAKLAND, CA | San Francisco, California | SF | 38.17% | 2017 |
| SEATTLE-TACOMA, WA | Seattle, Washington | SEA | 24.24% | 2017 |
| ST. LOUIS-ST. CHARLES-FARMINGTON, MO-IL | Saint Louis, Missouri | STL | 15.83% | 2017 |
| STATE OF ALASKA | Alaska, Alaska | AK | 27.13% | 2017 |
| STATE OF HAWAII | Hawaii, Hawaii | HI | 17.92% | 2017 |
| TUCSON-NOGALES, AZ | Tucson, Arizona | TUC | 15.66% | 2017 |
| WASHINGTON-BALTIMORE-ARLINGTON, DC-MD-VA-WV-PA | Washington DC, District Of Columbia | DCB | 27.1% | 2017 |

** This Document Provided By **www.FederalPay.org** - The Civil Employee's Resource **
*Source: www.federalpay.org/gs/locality*

# General Schedule (GS) Locality Pay Map

There are a total of 53 **General Schedule Locality Areas**, which were established by the GSA's Office of Personnel Management to allow the General Schedule Payscale (and the LEO Payscale, which also uses these localities) to be adjusted for the varying cost-of-living across different parts of the United States.

Each Locality Area has a Locality Pay Adjustment percentage, updated yearly, which specifies how much over the GS Base Pay government employees working within that locality will earn.

Therefore, localities with a higher cost of living have a higher adjustment percentage then cheaper localities. To automatically calculate location-adjusted pay, use our GS Pay Calculator.

| GS Locality Name | Main Area | Code | Pay Adjustment | Year |
|---|---|---|---|---|
| ALBANY-SCHENECTADY, NY-MA | Albany, New York | ALB | 16.5% | 2018 |
| ALBUQUERQUE-SANTA FE-LAS VEGAS, NM | Albuquerque, New Mexico | ALQ | 15.76% | 2018 |
| ATLANTA--ATHENS-CLARKE COUNTY--SANDY SPRINGS, GA-AL | Atlanta, Georgia | ATL | 21.16% | 2018 |
| AUSTIN-ROUND ROCK, TX | Austin, Texas | AUS | 16.71% | 2018 |
| BOSTON-WORCESTER-PROVIDENCE, MA-RI-NH-ME | Boston, Massachusetts | BOS | 27.48% | 2018 |
| BUFFALO-CHEEKTOWAGA, NY | Buffalo, New York | BU | 19.18% | 2018 |
| CHARLOTTE-CONCORD, NC-SC | Charlotte, North Carolina | CHA | 16.21% | 2018 |
| CHICAGO-NAPERVILLE, IL-IN-WI | Chicago, Illinois | CHI | 27.47% | 2018 |
| CINCINNATI-WILMINGTON-MAYSVILLE, OH-KY-IN | Cincinnati, Ohio | CIN | 19.87% | 2018 |
| CLEVELAND-AKRON-CANTON, OH | Cleveland, Ohio | CLE | 20.08% | 2018 |
| COLORADO SPRINGS, CO | Colorado Springs, Colorado | COS | 16.59% | 2018 |
| COLUMBUS-MARION-ZANESVILLE, OH | Columbus, Ohio | COL | 18.97% | 2018 |
| DALLAS-FORT WORTH, TX-OK | Dallas, Texas | DFW | 23.4% | 2018 |
| DAVENPORT-MOLINE, IA-IL | Davenport, Iowa | DAV | 16.08% | 2018 |
| DAYTON-SPRINGFIELD-SIDNEY, OH | Dayton, Ohio | DAY | 18.11% | 2018 |
| DENVER-AURORA, CO | Denver, Colorado | DEN | 25.47% | 2018 |
| DETROIT-WARREN-ANN ARBOR, MI | Detroit, Michigan | DET | 26.25% | 2018 |
| HARRISBURG-LEBANON, PA | Harrisburg, Pennsylvania | HAB | 16.15% | 2018 |
| HARTFORD-WEST HARTFORD, CT-MA | Hartford, Connecticut | HAR | 28.21% | 2018 |
| HOUSTON-THE WOODLANDS, TX | Houston, Texas | HOU | 31.74% | 2018 |
| HUNTSVILLE-DECATUR-ALBERTVILLE, AL | Huntsville, Alabama | HNT | 18.49% | 2018 |
| INDIANAPOLIS-CARMEL-MUNCIE, IN | Indianapolis, Indiana | IND | 16.23% | 2018 |
| KANSAS CITY-OVERLAND PARK-KANSAS CITY, MO-KS | Kansas City, Missouri | KC | 16.1% | 2018 |
| LAREDO, TX | Laredo, Texas | LAR | 17.4% | 2018 |
| LAS VEGAS-HENDERSON, NV-AZ | Las Vegas, Nevada | LAS | 16.49% | 2018 |
| LOS ANGELES-LONG BEACH, CA | Los Angeles, California | LA | 30.57% | 2018 |
| MIAMI-FORT LAUDERDALE-PORT ST. LUCIE, FL | Miami, Florida | MFL | 22.64% | 2018 |
| MILWAUKEE-RACINE-WAUKESHA, WI | Milwaukee, Wisconsin | MIL | 20.14% | 2018 |
| MINNEAPOLIS-ST. PAUL, MN-WI | Minneapolis, Minnesota | MSP | 23.37% | 2018 |
| NEW YORK-NEWARK, NY-NJ-CT-PA | New York City, New York | NY | 32.13% | 2018 |
| PALM BAY-MELBOURNE-TITUSVILLE, FL | Palm Bay, Florida | PAL | 15.93% | 2018 |
| PHILADELPHIA-READING-CAMDEN, PA-NJ-DE-MD | Philadelphia, Pennsylvania | PHL | 24.59% | 2018 |
| PHOENIX-MESA-SCOTTSDALE, AZ | Phoenix, Arizona | PX | 19.09% | 2018 |
| PITTSBURGH-NEW CASTLE-WEIRTON, PA-OH-WV | Pittsburgh, Pennsylvania | PIT | 18.35% | 2018 |
| PORTLAND-VANCOUVER-SALEM, OR-WA | Portland, Oregon | POR | 22.53% | 2018 |
| RALEIGH-DURHAM-CHAPEL HILL, NC | Raleigh, North Carolina | RA | 19.52% | 2018 |
| REST OF UNITED STATES | Rest of U.S., | RUS | 15.37% | 2018 |
| RICHMOND, VA | Richmond, Virginia | RCH | 18.79% | 2018 |
| SACRAMENTO-ROSEVILLE, CA-NV | Sacramento, California | SAC | 24.86% | 2018 |
| SAN DIEGO-CARLSBAD, CA | San Diego, California | SD | 27.88% | 2018 |

| GS Locality Name | Main Area | Code | Pay Adjustment | Year |
|---|---|---|---|---|
| SAN JOSE-SAN FRANCISCO-OAKLAND, CA | San Francisco, California | SF | 39.28% | 2018 |
| SEATTLE-TACOMA, WA | Seattle, Washington | SEA | 25.11% | 2018 |
| ST. LOUIS-ST. CHARLES-FARMINGTON, MO-IL | Saint Louis, Missouri | STL | 16.47% | 2018 |
| STATE OF ALASKA | Alaska, Alaska | AK | 28.02% | 2018 |
| STATE OF HAWAII | Hawaii, Hawaii | HI | 18.43% | 2018 |
| TUCSON-NOGALES, AZ | Tucson, Arizona | TUC | 16.17% | 2018 |
| WASHINGTON-BALTIMORE-ARLINGTON, DC-MD-VA-WV-PA | Washington DC, District Of Columbia | DCB | 28.22% | 2018 |

** This Document Provided By **www.FederalPay.org** - The Civil Employee's Resource **
*Source:* www.federalpay.org/gs/locality

# General Schedule (GS) Locality Pay Map

There are a total of 53 **General Schedule Locality Areas**, which were established by the GSA's Office of Personnel Management to allow the General Schedule Payscale (and the LEO Payscale, which also uses these localities) to be adjusted for the varying cost-of-living across different parts of the United States.

Each Locality Area has a Locality Pay Adjustment percentage, updated yearly, which specifies how much over the GS Base Pay government employees working within that locality will earn.

Therefore, localities with a higher cost of living have a higher adjustment percentage then cheaper localities. To automatically calculate location-adjusted pay, use our GS Pay Calculator.

| GS Locality Name | Main Area | Code | Pay Adjustment | Year |
|---|---|---|---|---|
| ALBANY-SCHENECTADY, NY-MA | Albany, New York | ALB | 17.19% | 2019 |
| ALBUQUERQUE-SANTA FE-LAS VEGAS, NM | Albuquerque, New Mexico | ALQ | 16.2% | 2019 |
| ATLANTA--ATHENS-CLARKE COUNTY--SANDY SPRINGS, GA-AL | Atlanta, Georgia | ATL | 21.64% | 2019 |
| AUSTIN-ROUND ROCK, TX | Austin, Texas | AUS | 17.46% | 2019 |
| BIRMINGHAM-HOOVER-TALLADEGA, AL | Birmingham, Alabama | BH | 15.77% | 2019 |
| BOSTON-WORCESTER-PROVIDENCE, MA-RI-NH-ME | Boston, Massachusetts | BOS | 28.27% | 2019 |
| BUFFALO-CHEEKTOWAGA, NY | Buffalo, New York | BU | 19.67% | 2019 |
| BURLINGTON-SOUTH BURLINGTON, VT | Burlington, Vermont | BN | 16.18% | 2019 |
| CHARLOTTE-CONCORD, NC-SC | Charlotte, North Carolina | CHA | 16.79% | 2019 |
| CHICAGO-NAPERVILLE, IL-IN-WI | Chicago, Illinois | CHI | 28.05% | 2019 |
| CINCINNATI-WILMINGTON-MAYSVILLE, OH-KY-IN | Cincinnati, Ohio | CIN | 20.21% | 2019 |
| CLEVELAND-AKRON-CANTON, OH | Cleveland, Ohio | CLE | 20.45% | 2019 |
| COLORADO SPRINGS, CO | Colorado Springs, Colorado | COS | 17.19% | 2019 |
| COLUMBUS-MARION-ZANESVILLE, OH | Columbus, Ohio | COL | 19.47% | 2019 |
| CORPUS CHRISTI-KINGSVILLE-ALICE, TX | Corpus Christi, Texas | CC | 16.01% | 2019 |
| DALLAS-FORT WORTH, TX-OK | Dallas, Texas | DFW | 24.21% | 2019 |
| DAVENPORT-MOLINE, IA-IL | Davenport, Iowa | DAV | 16.49% | 2019 |
| DAYTON-SPRINGFIELD-SIDNEY, OH | Dayton, Ohio | DAY | 18.61% | 2019 |
| DENVER-AURORA, CO | Denver, Colorado | DEN | 26.3% | 2019 |
| DETROIT-WARREN-ANN ARBOR, MI | Detroit, Michigan | DET | 26.81% | 2019 |
| HARRISBURG-LEBANON, PA | Harrisburg, Pennsylvania | HAB | 16.65% | 2019 |
| HARTFORD-WEST HARTFORD, CT-MA | Hartford, Connecticut | HAR | 28.87% | 2019 |
| HOUSTON-THE WOODLANDS, TX | Houston, Texas | HOU | 32.54% | 2019 |
| HUNTSVILLE-DECATUR-ALBERTVILLE, AL | Huntsville, Alabama | HNT | 19.18% | 2019 |
| INDIANAPOLIS-CARMEL-MUNCIE, IN | Indianapolis, Indiana | IND | 16.57% | 2019 |
| KANSAS CITY-OVERLAND PARK-KANSAS CITY, MO-KS | Kansas City, Missouri | KC | 16.6% | 2019 |
| LAREDO, TX | Laredo, Texas | LAR | 18.22% | 2019 |
| LAS VEGAS-HENDERSON, NV-AZ | Las Vegas, Nevada | LAS | 17.04% | 2019 |
| LOS ANGELES-LONG BEACH, CA | Los Angeles, California | LA | 31.47% | 2019 |
| MIAMI-FORT LAUDERDALE-PORT ST. LUCIE, FL | Miami, Florida | MFL | 23.12% | 2019 |
| MILWAUKEE-RACINE-WAUKESHA, WI | Milwaukee, Wisconsin | MIL | 20.58% | 2019 |
| MINNEAPOLIS-ST. PAUL, MN-WI | Minneapolis, Minnesota | MSP | 24% | 2019 |
| NEW YORK-NEWARK, NY-NJ-CT-PA | New York City, New York | NY | 33.06% | 2019 |
| OMAHA-COUNCIL BLUFFS-FREMONT, NE-IA | Omaha, Nebraska | OM | 15.87% | 2019 |
| PALM BAY-MELBOURNE-TITUSVILLE, FL | Palm Bay, Florida | PAL | 16.33% | 2019 |
| PHILADELPHIA-READING-CAMDEN, PA-NJ-DE-MD | Philadelphia, Pennsylvania | PHL | 25.3% | 2019 |
| PHOENIX-MESA-SCOTTSDALE, AZ | Phoenix, Arizona | PX | 19.6% | 2019 |
| PITTSBURGH-NEW CASTLE-WEIRTON, PA-OH-WV | Pittsburgh, Pennsylvania | PIT | 18.86% | 2019 |
| PORTLAND-VANCOUVER-SALEM, OR-WA | Portland, Oregon | POR | 23.13% | 2019 |
| RALEIGH-DURHAM-CHAPEL HILL, NC | Raleigh, North Carolina | RA | 19.99% | 2019 |

| GS Locality Name | Main Area | Code | Pay Adjustment | Year |
|---|---|---|---|---|
| REST OF UNITED STATES | Rest of U.S., | RUS | 15.67% | 2019 |
| RICHMOND, VA | Richmond, Virginia | RCH | 19.38% | 2019 |
| SACRAMENTO-ROSEVILLE, CA-NV | Sacramento, California | SAC | 25.59% | 2019 |
| SAN ANTONIO-NEW BRAUNFELS-PEARSALL, TX | San Antonio, Texas | SO | 16.07% | 2019 |
| SAN DIEGO-CARLSBAD, CA | San Diego, California | SD | 28.8% | 2019 |
| SAN JOSE-SAN FRANCISCO-OAKLAND, CA | San Francisco, California | SF | 40.35% | 2019 |
| SEATTLE-TACOMA, WA | Seattle, Washington | SEA | 26.04% | 2019 |
| ST. LOUIS-ST. CHARLES-FARMINGTON, MO-IL | Saint Louis, Missouri | STL | 17.05% | 2019 |
| STATE OF ALASKA | Alaska, Alaska | AK | 28.89% | 2019 |
| STATE OF HAWAII | Hawaii, Hawaii | HI | 18.98% | 2019 |
| TUCSON-NOGALES, AZ | Tucson, Arizona | TUC | 16.68% | 2019 |
| VIRGINIA BEACH-NORFOLK, VA-NC | Virginia Beach, Virginia | VB | 15.91% | 2019 |
| WASHINGTON-BALTIMORE-ARLINGTON, DC-MD-VA-WV-PA | Washington DC, District Of Columbia | DCB | 29.32% | 2019 |

** This Document Provided By www.FederalPay.org - The Civil Employee's Resource **
*Source: www.federalpay.org/gs/locality*

# EXHIBIT 7

ENGSTROM, LIPSCOMB & LACK
10100 Santa Monica Blvd. Suite 1200
Los Angeles, California 90067-4113
(310) 552-3800

Behfarin v. Pruco Life Insurance Company, et al.
38000/5702

Cost Summary

| EXPENSE CATEGORY | AMOUNT |
|---|---:|
| Court fees, filing and subpoena fees | $756.30 |
| Legal Research and Class Member outreach | $3,767.67 |
| Transcripts | $2,061.75 |
| Delivery, Mail, Messenger | $363.58 |
| Copying and document storage | $1,269.40 |
| Mileage, travel, lodging | $2,677.09 |
| Long Distance and Conference phone | $1,174.78 |
| Experts and Consultants* | $467,163.53 |
| JAMS | $20,765.90 |
| *Total:** | $500,000.00 |

*As a result of the parties' Stipulation that costs paid by Defendants be capped at $500,000, Plaintiff has capped the "Total" shown here at $500,000, and consultant Steven Roth has agreed to cap his fees to achieve that compromise. Amounts invoiced by him exceed that figure.